


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRUMP MARKS REAL ESTATE LLC,

Plaintiff,

- against -

CAP CANA, S.A., RICARDO HAZOURY, FERNANDO HAZOURY, ABRAHAM HAZOURY, CATHERINE KURY HAZOURY, GEORGE SPENCE, MICHEL RODRIQUEZ and MICHELL VARGAS,

Defendants.

12 CV 6440

Index No.


RECEIVED
U.S.D.C. S.D. N.Y.
CASHIERS

**COMPLAINT**

Trump Marks Real Estate LLC ("Trump Marks"), by and through its attorneys, Belkin Burden Wenig & Goldman, LLP, for its Complaint alleges as follows:

**NATURE OF THE CASE**

1. This action arises out of a fraudulent scheme by the developers of a luxury Dominican Republic resort known as *Trump at Cap Cana* (the "Project") to withhold more than $14 million in unpaid licensing fees from Trump Marks. Defendants have now repeatedly acknowledged they owe these fees under the terms of the license agreement they entered into with Trump Marks on or about February 16, 2007 (the "License Agreement"). Defendants' failure to remedy their repeated breaches of the License Agreement – and their express acceptance of responsibility for their misconduct – commands a swift judgment.

2. Under the terms of the License Agreement, Cap Cana was obligated to provide Trump Marks with monthly sales reports detailing, among other things, which units and lots at the Project had sold, the purchase price of the units and lots that had sold and the amount that each buyer had paid to purchase such units and lots. Trump Marks was

entitled to receive a percentage of the gross sales price of each unit or lot sold (not just at closing, but at various points in time prior to closing). Accordingly, Cap Cana's obligation to provide monthly sales reports was a critical component of the License Agreement.

3. Though Cap Cana did initially provide Trump Marks with sales reports in the months immediately following the execution of the License Agreement, in May 2008, those reports, for reasons still unknown to Trump Marks, abruptly stopped arriving.

4. When Cap Cana eventually resumed providing sales reports almost a year later, such reports revealed that not only had Cap Cana grossly underreported the payments it had received from buyers (and, consequently, the amount of license fees which had previously become due and payable to Trump Marks), but that Cap Cana claimed to no longer have the funds needed to pay Trump Marks the fees it was owed.

5. Appalled by the fact that Defendants would conspire to defraud Trump Marks out of such a substantial sum, upon receiving the latest sales report, Trump Marks immediately engaged the services of a local Dominican Republic accounting firm to perform a full scale audit of Cap Cana's books and records. To Trump Marks' dismay, the audit revealed the extent of the fraud to be far greater than had been originally thought. Cap Cana owed Trump Marks in excess of $14 million in license fees.

6. When confronted with the irrefutable results of the audit, Defendants admitted their responsibility for the outstanding fees and began to repay them. But two years have now passed and Cap Cana has still failed to completely satisfy their debts: their outstanding balance remains more than $5.8 million in fees and accrued interest.

7. As a result, Trump Marks is left with no choice but to commence this action.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a). Cap Cana has expressly consented to this Court's jurisdiction pursuant to Section 22(a) of the License Agreement

9. Venue is proper in this Southern District of New York pursuant to 28 U.S.C. § 1391(a) and pursuant to Section 22(a) of the License Agreement which provides that, in any action arising out of or in connection with the License Agreement, venue is proper in a federal court located in the County and State of New York.

## THE PARTIES

10. At all relevant times set forth herein, Trump Marks was and is a Delaware limited liability company with an address at 725 Fifth Avenue, New York, New York and subject to personal jurisdiction in the State of New York.

11. Upon information and belief, at all relevant times set forth herein, Cap Cana, S.A. ("Cap Cana") was and is a Dominican Republic company with a principal place of business located at Pedro Henriquez Urena No. 56, La Esperilla, Santo Domingo National District, Dominican Republic 10107.

12. Upon information and belief, at all relevant times set forth herein, defendant Ricardo Hazoury was and is an individual and a resident of the Dominican Republic and a principal of Cap Cana.

13. Upon information and belief, at all relevant times set forth herein, defendant Fernando Hazoury was and is an individual and a resident of the Dominican Republic and a principal of Cap Cana.

14. Upon information and belief, at all relevant times set forth herein, defendant Abraham Hazoury was and is an individual and a resident of the Dominican Republic and a principal of Cap Cana.

15. Upon information and belief, at all relevant times set forth herein, defendant George Spence was and is an individual and a resident of the Dominican Republic and the Executive Vice President and Chief Executive Officer of Cap Cana.

16. Upon information and belief, at all relevant times set forth herein, defendant Catherine Kury Hazoury was and is an individual and a resident of the Dominican Republic and a principal of Cap Cana.

17. Upon information and belief, at all relevant times set forth herein, defendant Michell Vargas was and is an individual and a resident of the Dominican Republic and the project manager of the Trump at Cap Cana.

18. Upon information and belief, at all relevant times set forth herein, defendant Michel Rodriquez was and is an individual and a resident of the Dominican Republic and the Vice President of Finance and Administration for Cap Cana.

19. Together, Cap Cana, Ricardo Hazoury, Fernando Hazoury, Abraham Hazoury, Catherine Kury Hazoury, George Spence, Michel Rodriquez and Michell Vargas are referred to as "Defendants."

**FACTS COMMON TO ALL CAUSES OF ACTION**

20. The Project, *Trump at Cap Cana*, is a luxury mixed use, multi-component resort in the process of being developed and constructed by Defendants on more than 8,000 acres of oceanfront property in and around Punta Cana, Dominican Republic.

21. On or about February 16, 2007, Trump Marks, as licensor, and Cap Cana, as licensee, entered into the License Agreement permitting Cap Cana to use the "Trump" name and mark for the purpose of identifying, promoting and marketing the Project, subject to and in accordance with the terms of the License Agreement.

22. In exchange for the license of the "Trump" name, Cap Cana agreed to pay Trump Marks certain upfront license fees together with a percentage of the gross selling price of each unit or lot sold at the Project, and certain incentive fees (collectively the "License Fees").

23. On or about February 8, 2007, Cap Cana announced, to great fanfare, that the first phase of the Project to be developed would be the *Trump Farallon Estates at Cap Cana.*

24. Consisting of 68 separate lots ranging in size from 1.6 to 12 acres, the *Trump Farallon Estates at Cap Cana* would be located within a gated community atop one of the highest bluffs in the Dominican Republic with spectacular views of the entire Project and the Caribbean Sea at prices starting at $3 million and topping off at $12 million (the "Estate Lots").

25. On May 23, 2007, Cap Cana launched the sale of the Estate Lots at a lavish sales event held in the Dominican Republic (the "Sales Event"). The Sales Event was attended by the Defendants, principals and executives of Cap Cana, and was highlighted by an appearance by Trump Marks' President, Donald J. Trump. Additionally, the Project was featured on the finale of the hit reality television show, *The Apprentice.*

26. The Sales Event was a huge success. According to a May 23, 2007 press release issued by Cap Cana, within the first four hours of the Sales Event, more than 95%

of the Estate Lots had been sold, for a combined gross sales price of over $350 million, a new record for sales in the Caribbean.

27. Pursuant to the terms of the License Agreement, as part of its License Fees, Trump Marks was entitled to receive a percentage of the gross sales price of each Estate Lot.

28. Under the License Agreement, each License Fee payment was to be made to Trump Marks on the date that the buyer either took possession of their Estate Lot or paid 90% of the purchase price of such lot, whichever came first. In the event, however, that the buyer paid more than 30% of the purchase price prior to taking possession of their Estate Lot, Trump Marks was entitled to the immediate payment of a portion of the License Fee (as more fully set forth in the License Agreement) with the remainder to be paid to Trump Marks at the time the buyer took possession.

29. Pursuant to the License Agreement, Cap Cana was also obligated to deliver to Trump Marks certain monthly sales reports for each component to be developed at the Project.

30. In or about June 2007, Cap Cana began providing Trump Marks with sales reports for the Estate Lots detailing, among other things, the name of each buyer who contracted to purchase an Estate Lot, the gross sales price to be paid for each Estate Lot and the amount of any payments made by the buyer.

31. In or about May 2008, however, at or about the time of the collapse of Wall Street giant and Cap Cana bond issuer, Bear Stearns, and the beginning of the financial meltdown, Cap Cana, for reasons which still remain unclear, abruptly stopped providing sales reports to Trump Marks.

32. Though Trump Marks did make repeated demands, both orally and in writing, that Cap Cana provide an updated sales report, such demands were repeatedly rebuffed by Defendants. In addition to simply ignoring Trump Marks' requests, Defendants manufactured a cascade of excuses to delay and obscure their failure to provide updated reports: the sales reports were soon to be forthcoming, the person in charge of preparing the sales report was out sick, on vacation, on temporary leave or had been let go, and Cap Cana was in the midst of restructuring its accounting department. But these delay tactics could not forestall the inevitable.

33. Finally, on or about May 7, 2009, Cap Cana furnished Trump Marks with an updated sales report.

34. To Trump Marks' surprise, the May 7, 2009 sales report revealed, for the very first time, that Cap Cana had grossly underreported the amount it had actually received from buyers prior to April 2008.

35. The scope of the fraud was widespread: Cap Cana had underreported the payments it had received from buyers on all but 2 of the 67 Estate Lots it had reportedly sold.

36. Equally disturbing was the depth of the fraud: Cap Cana had previously underreported the amount it had received on some of the Estate Lots by as much as 90%.

37. And, on information and belief, Cap Cana had engaged in the practice of selling lots at below market rates, further reducing the licensing fees to Trump Marks.

38. As a result, whereas Cap Cana had, in April 2008, reported to Trump Marks that it was entitled to just in excess of $500,000 in total License Fees and accrued interest as of March 31, 2008, the May 7, 2009 sales report revealed that, as of March 31, 2008,

Trump Marks was actually entitled to more than $5.5 million in License Fees and accrued interest and that, as of May 7, 2009, Trump Marks was entitled to more than $15 million in License Fees and accrued interest.

39. Even more egregiously, however, in or about May 2009, Cap Cana claimed that it had squandered the funds it had received from buyers and lacked sufficient capital to pay Trump Marks any portion of the License Fees which were admittedly owed months earlier.

40. In response, on or about July 2009, Trump Marks notified Cap Cana that it was exercising its right under the License Agreement to conduct an audit of Cap Cana's books and records (the "Audit").

41. The Audit took place in or about July 2009, covered the period commencing on the date of the License Agreement and continuing through June 30, 2009 and confirmed Trump Marks' worst fears: Cap Cana owed Trump Marks more than $15 million.

42. In the weeks and months following the Audit, Cap Cana repeatedly acknowledged to Trump Marks, in emails and other communications, that Trump Marks was owed more than $15 million in License Fees and accrued interest. In one particular email, Fernando Hazoury even promised that Trump Marks "will receive 100% of the money owed."

43. Despite making certain payments, Cap Cana has failed to pay Trump Marks the entire balance owed.

44. Accordingly, by letter dated June 17, 2010 (the "Default Notice"), Trump Marks notified Cap Cana that it was in default of its obligations under the License

Agreement in that Cap Cana had failed to timely pay to Licensor certain License Fees and accrued interest due as of the date thereof, in the sum of $9,266,647.72.

45. In the ensuing months, Defendants again acknowledged in correspondence with Trump Marks that they were obligated to pay the outstanding licensing fees. "[W]e recognize this debt," Fernando Hazoury wrote on August 11, 2010, "and have been making the corresponding payments with interest and late fees included in certain instances." Despite Mr. Hazoury's acknowledgment of the debt, however, full payment was not made.

46. One month later, on September 16, 2010, Fernando Hazoury wrote again, "I reiterate our intention of paying all the pending balance plus interest and late fees as accorded in our last conference." But again, the balance was not paid.

47. As of the filing of this Complaint, Cap Cana has still failed to fully cure its default.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
**(Breach of License Agreement)**

48. Plaintiff repeats and realleges each and every allegation as if fully set forth at length herein.

49. Pursuant to the License Agreement, in exchange for the license of the "Trump" name, Cap Cana agreed to pay Trump Marks certain License Fees as more particularly set forth in the License Agreement.

50. In breach of the License Agreement, Cap Cana has failed and refused to pay Trump Marks the License Fees which have come due as a result of Cap Cana's sale of the Estate Lots.

51. Based upon the foregoing, Cap Cana is indebted to Trump Marks in an amount to be determined at trial, but in no event less than the sum of $5,844,668, together

with interest at ten (10%) percent thereon pursuant to Section 6.1(c) of the License Agreement.

**AS AND FOR A SECOND CLAIM FOR RELIEF**
**(Piercing the Corporate Veil - Against Defendants Hazoury, Spence, Rodriquez and Vargas)**

52. Plaintiff repeats and realleges each and every allegation as if fully set forth at length herein.

53. Upon information and belief, Defendants Hazoury, Spence, Rodriquez and Vargas control all material operations and responsibilities of Cap Cana.

54. Upon information and belief, Defendants Hazoury, Spence, Rodriquez and Vargas have used both the proceeds from the sale of the Estate Lots and the License Fees due Trump Marks for their personal benefit. Cap Cana has been unable to pay Trump Marks based upon the claim that Cap Cana does not have the money.

55. Defendants Hazoury, Spence, Rodriquez and Vargas were responsible for the supervision, preparation and dissemination of the monthly sales reports for the Project. Prior to May 2009, the monthly sales reports that were provided by Cap Cana falsely reported gross sales and License Fees due Trump Marks.

56. Defendants Hazoury, Spence, Rodriquez and Vargas, for their personal benefit, directed that the preparation and dissemination of the sales reports stop.

57. The supervision, preparation and dissemination of the monthly sales reports containing false and inaccurate information was done with the knowing intent to deceive Trump Marks into believing that it was not entitled to License Fees which were unquestionably due and owing and Defendants Hazoury, Spence, Rodriquez and Vargas knew were due and owing.

58. The false submissions of Defendants Hazoury, Spence, Rodriquez and Vargas and then their failure to disseminate any sales reports was undertaken with the sole intention to deceive and defraud Trump Marks with the knowledge that Trump Marks would rely, to its detriment, upon these sales reports.

59. Upon information and belief, Cap Cana was inadequately capitalized and operated by Defendants Hazoury, Spence, Rodriquez and Vargas.

60. Defendants Hazoury, Spence, Rodriquez and Vargas exercised dominion and control over Cap Cana for their personal rather than corporate benefit.

61. By reason of the foregoing, Trump Marks is entitled to a judgment declaring that Defendants Hazoury, Spence, Rodriquez and Vargas are the alter egos of Cap Cana and therefore personally liable for the debts of Cap Cana due and owing Trump Marks.

62. By reason of the forgoing, Trump Marks is entitled to a judgment against Defendants Hazoury, Spence, Rodriquez and Vargas in an amount to be determined at trial, but in no event less than the sum of $5,844,668, together with interest at ten percent thereon pursuant to Section 6.1(c) of the License Agreement and punitive damages.

**<u>AS AND FOR A THIRD CLAIM FOR RELIEF</u>**
**(Breach of Covenant of Good Faith and Fair Dealing)**

63. Trump Marks repeats and realleges each and every allegation as if fully set forth at length herein.

64. Defendants owed a duty of good faith and fair dealing pursuant to the License Agreement as they were solely responsible for the monitoring of payments of gross sales and calculating License Fees due Trump Marks.

65. Defendants intentionally or with a reckless disregard for accuracy failed to accurately report gross sales and license fees due Trump Marks.

66. By reason of the foregoing, Defendants have breached the covenant of good faith and fair dealing and Trump Marks has suffered substantial damages in an amount to be determined at trial but in no event less than the sum of $5,844,668, together with interest at ten percent thereon pursuant to Section 6.1(c) of the License Agreement.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Accounting)**

67. Trump Marks repeats and realleges each and every allegation as if fully set forth at length herein.

68. Defendants had a fiduciary and trust relationship to accurately keep and maintain records and accurately issue reports based upon those records pursuant to the License Agreement.

69. Defendants were entrusted with money pursuant to the License Agreement.

70. Defendants have conceded they breached their fiduciary and trust relationship and that monies are owed to Trump Marks.

71. Unless and until there is a full accounting for all income and expenses of Cap Cana, Trump Marks is unable to accurately verify the full extent of its damages.

72. By reason of the foregoing, Trump Marks is entitled to a full accounting of Defendants' income, dividends, bonuses, expenses, benefits and other profits and monies Defendants took for their own benefit, to the detriment of Trump Marks and Defendants shall make available all books and records as needed by Trump Marks.

73. By reason of the forgoing, Trump Marks is entitled to a judgment in an amount to be determined at trial, but in no event less than the sum of $5,844,668, together with interest at ten percent thereon pursuant to Section 6.1(c) of the License Agreement.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Account Stated)**

74. Trump Marks repeats and realleges each and every allegation as if fully set forth at length herein.

75. Cap Cana entered into the License Agreement.

76. Trump Marks performed its obligations under the License Agreement.

77. Trump Marks subsequently presented Defendants with an invoice for their obligation to Trump Marks under the License Agreement.

78. Defendants did not object to Trump Marks' invoices within a reasonable time and expressly acknowledged in writing their obligation to remit payment to Trump Marks for those invoices.

79. Defendants have not paid Trump Mark's outstanding invoices for $5.8 million, plus accruing interest.

80. Defendants receipt and retention of the Trump Mark's invoices seeking payment under the License Agreement, without objection within a reasonable time, gave rise to an actionable account stated.

81. Judgment for account stated should, therefore, be entered against Defendants in the amount of $5,844,668, together with interest at ten percent thereon pursuant to Section 6.1(c) of the License Agreement.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Appointment of a Receiver)**

82. Trump Marks repeats and realleges each and every allegation as if fully set forth at length herein.

83. Defendants' admitted dishonesty combined with the magnitude of their admitted debt to Trump Marks presents an immediate threat to the viability of recovering assets from Cap Cana sufficient to discharge Defendants' debt to Trump Marks.

84. In the event that Defendants liquidate their real estate holdings or otherwise hide corporate assets, they will frustrate Trump Marks' ability to collect their debt and Trump Marks will suffer additional harm to Trump Marks' goodwill and corporate reputation.

85. Defendants' past corporate dishonesty would undermine the effectiveness of judicial oversight of Cap Cana.

86. There are no other less restrictive means available to adequately prevent irreparable harm to Trump Marks.

87. Accordingly, it is necessary to appoint a prejudgment receiver to control the assets of Cap Cana pending the outcome of this action.

WHEREFORE, Trump Marks respectfully requests judgment against Defendants as follows:

a. an order awarding compensatory damages against Defendants, jointly and severally, for an amount to be determined at trial, but in no event less than $5,844,668, together with interest at ten percent thereon;

b. an order appointing a receiver to control Cap Cana during the pendency of these proceedings and to liquidate such assets as are necessary to compensate Trump Marks;

c. an order awarding a full accounting of Defendants' income, dividends, bonuses, expenses, benefits and other profits and monies;

d an order awarding punitive damages in an amount to be determined at trial;

e. reasonable attorneys' fees and costs; and

f. directing such other and further relief as the Court deems just and proper.

Dated: New York, New York
August 23, 2012

BELKIN BURDEN WENIG & GOLDMAN, LLP
Attorneys for Plaintiff
Trump Marks Real Estate LLC
270 Madison Avenue
New York, New York 10016
(212) 867-4466

By:____________________
Jeffrey L. Goldman, Esq.



JGOLDMAN/2453.0846/1001675