UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

TRUMP MARKS REAL ESTATE LLC,　　　　　　:

　　　　　　　　:

　　　　　　　Plaintiff,　　　　:

　　　　　　　　:

　　　　　　　v.　　　　　　:　　Case No: 12-cv-06440-NRB

　　　　　　　　:

CAP CANA, S.A., RICARDO HAZOURY,　　:
FERNANDO HAZOURY, ABRAHAM　　　:
HAZOURY, CATHERINE KURY HAZOURY,　:
GEORGE SPENCE, MICHEL RODRIGUEZ and　:
MICHELL VARGAS,　　　　　　:

　　　　　　　　:

　　　　　　　Defendants.　　:

　　　　　　　　:

　　　　　　　　:

---------------------------------------------------------x

## DECLARATION OF JUAN A. ARTEAGA IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

STATE OF NEW YORK　　　　　)

　　　　　　　　　　ss:

COUNTY OF NEW YORK　　　　)

　　　　JUAN A. ARTEAGA, being duly sworn, declares as follows:

　　　1.　　I am associated with the law firm of Simpson Thacher & Bartlett LLP,

attorneys for Defendants Cap Cana, S.A. ("Cap Cana"), Ricardo Hazoury, Fernando

Hazoury, Abraham Hazoury, Catherine Kury Hazoury, George Spence, Michel

Rodriguez and Michell Vargas (collectively, "Defendants"). I am fully familiar with the

facts and circumstances underlying this action based on personal knowledge and a review

of the files in my possession. I submit this declaration in support of Defendants' Motion

to Dismiss the Complaint.

2.     Attached hereto as Exhibit A is a true and correct copy of the License

Agreement, dated February 16, 2007, between Trump Marks Real Estate LLC and Cap

Cana without the accompanying exhibits and schedules.


_____

JUAN A. ARTEAGA


Subscribed and sworn to before me
this 16th day of November, 2012


_____

Notary Public


STEVE M. METRO
Notary Public, State of New York
No. 01ME5029824
Qualified in Orange County
Commission Expires July 5, 2014

**Exhibit A**

CONFIDENCIAL

**LICENSE AGREEMENT**

**BETWEEN**

**TRUMP MARKS REAL ESTATE LLC**

**AND**

**CAP CANA, S.A.**

**New York – February 16th, 2007**

## TABLE OF CONTENTS

### Table of Contents

Page

| | | |
|---|---|---|
| 1. | License. | 4 |
| 2. | Exclusions to License; Use of License | 10 |
| 3. | Operating Standards and Related Matters. | 13 |
| 4. | License Fee; Reports; Audit Rights. | 25 |
| 5. | Term. | 29 |
| 6. | Events of Default; Unilateral Termination. | 29 |
| 7. | Discontinuation Use of Marks. | 36 |
| 8. | Indemnification; Insurance. | 36 |
| 9. | Assignment. | 39 |
| 10. | Infringement. | 41 |
| 11. | Representations, Warranties and Certain Covenants. | 42 |
| 12. | Licensor Office. | 46 |
| 13. | Gaming Restriction. | 46 |
| 14. | Notices. | 47 |
| 15. | Financing; Referral Fee. | 48 |
| 16. | Confidentiality. | 50 |
| 17. | Additional Representations, Warranties and Covenants. | 50 |
| 18. | Arbitration. | 51 |
| 19. | Memorandum of License. | 53 |
| 20. | Payments and Taxes. | 53 |
| 21. | Exclusivity | 54 |
| 22. | Miscellaneous. | 55 |

## Exhibits and Schedules

| | |
|---|---|
| Exhibit A | Land |
| Exhibit B | Financing Clause |
| Exhibit C | Required Inserts to the Condominium Documents |
| Exhibit D | [Intentionally Deleted] |
| Exhibit E | Development Standards |
| Exhibit F | Operating Standards |
| Exhibit G | Location Plan/Beachfront Location |
| Exhibit H | Form of Memorandum of License |
| Exhibit I | Form of Invoice for Recoverable Expenses |
| Exhibit J | Press Release |
| Exhibit K | Cap Cana Master Declarations |
| Exhibit L | Commercial Regulations of Cap Cana |
| | |
| Schedule 1 | License Fee |
| Schedule 2 | Insurance Requirements |
| Schedule 3 | Minimum Inventory Requirements |
| Schedule 3A | Minimum Requirement Deadlines |
| Schedule 4 | Licensed Marks |
| Schedule 5 | Hotel Management Agreement Term Sheet |
| Schedule 6 | Cap Cana Rights |
| Schedule 7 | Rental Program |
| Schedule 8 | Additional Services |
| Schedule 9 | Golf Course Termsheet |
| Schedule 10 | U.S. Registered Trump Marks |
| Schedule 11 | Public Relations Plan |
| Schedule 12 | Minimum Requirements Schedule |
| Schedule 13 | Fair Market Value Comparables |





## LICENSE AGREEMENT

THIS AGREEMENT ("Agreement") is made as of the 16th day of February, 2007, between **TRUMP MARKS REAL ESTATE LLC,** a Delaware limited liability company ("**Licensor**"), with a principal place of business at 725 Fifth Avenue, New York, New York 10022, and CAP CANA, S.A. a Dominican Republic company ("**Licensee**"), whose principal place of business is Alberto Larancuent No. 8, Ensanche Naco Santo Domingo, Dominican Republic. Licensor and Licensee may hereinafter be referred to as the "**Parties**" and individually as the "**Party**".

**WHEREAS,** Donald J. Trump ("**Trump**"), a world-renowned builder and developer of luxury residential real estate, among other things, who enjoys the highest reputation in these fields, is the owner of the famous name and mark "TRUMP" as used on or in connection with a variety of goods and services including but not limited to real estate services, hotel services and planning, construction, listing, leasing, and managing commercial and residential property, and further, is the sole and exclusive owner of certain United States Trademarks, including those listed on Schedule 10 hereto (the aforementioned, collectively, the "**Trump Mark**").

**WHEREAS,** Licensor is a company directly or indirectly owned and controlled by Trump which has the full right and authority, pursuant to agreements with Trump, to license and assign, for consideration, rights of use over the Trump Mark and to enter into this Agreement and perform all the obligations of Licensor hereunder.

**WHEREAS,** Licensee is in the process of developing a luxury resort on certain real property which it owns in the Dominican Republic known as Cap Cana ("**Cap Cana**").

**WHEREAS,** Licensee intends to develop and market, all under the Licensed Marks (as herein defined), a super-luxury project on a portion of Cap Cana, comprised of the following components:

(i)     a first class, luxury residential component (the "**Residential Component**") consisting of:

    a. certain residential buildings (each a "**Residential Building**") to be constructed on the land known as the "bluff" (the "**Bluff**" as shown on Exhibit G hereto) (the units located within each Residential Building, collectively referred to as the "**Residential Units**" and each a "**Residential Unit**");



    68 private luxury estate lots (each an "**Estate Lot**") to be located on the Bluff;

    c. certain private luxury golf lots (each a "**Golf Lot**") to be located or constructed (as applicable) on the Bluff and/or certain private luxury golf villas (each a "**Golf Villa**") to be located and constructed (as applicable) on the Bluff.



(ii)    a recreational component (the "**Recreational Component**") consisting of:

1



 one (1) world class, 18 hole golf course and related amenities (the "**Golf Course**") to be constructed on the Bluff;

b. one (1) first class spa/fitness center (the "**Spa**") and related amenities within the Condo Hotel (as herein defined) sufficient to accommodate (as reasonably determined by Licensor) the demands of the owners and occupants and guests of the Residential Building, the Condo Hotel and the Condominium Unit owners;

(iii) a hotel component (the "**Hotel Component**") consisting of one (1) first class, luxury condominium hotel and related amenities ("**Condo Hotel**") consisting of a minimum of 150 keys (as defined below) (the "**Condo-Hotel Units**") to be constructed at one (1) of the locations shown on Exhibit G hereto;

(iv) a first class commercial component (the "**Commercial Component**"), as designed and developed by Licensee; and

(v) such other improvements on the Property (as herein defined) as are mutually agreed upon (the "**Other Components**") by Licensor and Licensee, all on certain land ("**Land**") thereon and more particularly shown on Exhibit A annexed hereto.

The Land (including, without limitation, the Bluff), the Residential Component, the Recreational Component, the Hotel Component, the Commercial Component, a parking component and the Other Components are hereinafter collectively referred to as the "**Property**", and the foregoing development components of the Property are individually referred to as a "**Development Component**" and collectively as the "**Development Components.**" The Amenity Package (as herein defined) together with each of the Development Components shall be constructed and shall comply with each of the terms of this Agreement, including, without limitation, the provisions of these recitals and the locations and sizes set forth on Exhibit G and the requirements set forth in Schedule 12 hereto, all of which shall together be referred to as the "**Minimum Requirements.**" To the extent that Licensee elects to construct additional components (whether pursuant to the Development Update (as herein defined) or otherwise), the definitions of the foregoing Development Components shall be expanded to include such additional components. By way of example, in the event Licensee elects to build a second hotel, such second hotel shall be included in the definition of Condo Hotel and Hotel Component.

**WHEREAS**, the Condo Hotel will consist of several residential units that will be sold to third parties, which are equivalent to one or more hotel rooms that can be individually rented. The rentable rooms resulting from the lock-off of portions of the units are considered a "Key" for the purposes of this Agreement, provided, however, that each "Key" shall be subject to the Development Standards and the Operating Standards.

**WHEREAS**, the Property and some of the Development Components are to be developed in phases.

2

 

**WHEREAS,** the Property, including, without limitation, the Residential Component and the Condo Hotel Component, will each contain amenity packages (the **"Amenity Package"**), which shall be consistent with the luxury nature of the products to be developed under this Agreement and which must conform to the Development Standards and be sufficient in nature to comply with the Operating Standards (i.e. where applicable, beach access, the restaurants, catering service, room service, the Spa, and any other amenities or services that the Parties agree upon from time to time).

**WHEREAS,** Licensee intends to create one or more condominiums or similar forms of ownership of the Residential Units and the Condo Hotel Units (each a "Unit" and collectively the **"Condominium Units"**).

**WHEREAS,** Licensee intends to (i) market and sell all of the Condominium Units and the Estate Lots and Golf Lots, (ii) lease or sell all portions of the Commercial Component; and (iii) market and sell membership interests specifically created for some or all of the Development Components, such as the Golf Course, together with some of the other elements of the Recreational Component (if applicable and decided by Licensee).

**WHEREAS,** Licensee intends to design, develop, construct, operate and maintain the Property according to the Development Standards and Operating Standards (as such terms are herein defined) so as to maximize the value of the Property for the benefit of Licensor and Licensee.

**WHEREAS,** Licensee currently owns and/or has rights to certain intellectual property including, but not limited to, the name "Cap Cana," which intellectual property rights are collectively referred to as the "Cap Cana Mark." For purposes hereof, the Cap Cana Mark shall include (in addition to the name "Cap Cana"): (i) all manuals, brochures, and information prepared by Cap Cana, S.A. (and its affiliates) in connection with the Property (**"Cap Cana Materials"**); (ii) the Cap Cana Rights (as herein defined); and (iii) all trade secrets, confidential information and other information, materials, and copyrightable or patentable subject matter developed, acquired, licensed or used by Cap Cana, S.A. (and its affiliates), including, without limitation, materials relating to sales and marketing programs for the Property. The foregoing shall apply regardless of the form or medium involved (e.g., paper, electronic, tape, tangible or intangible). **"Cap Cana Rights"** shall mean those trademarks and logos attached hereto as Schedule 6.

**WHEREAS,** Licensee desires to use certain rights in a derivative of the Trump Mark (as hereinafter set forth) to identify, promote and market the Development Components and the Property, so that the Property and the Development Components will be known, subject to the provisions of this Agreement, by one of the names set forth in Schedule 4 annexed hereto and made a part hereof (the **"Licensed Marks"**).

**WHEREAS,** Licensee may also desire to develop and use a certain logo or logos in connection with its use of the Licensed Marks in accordance with the provisions of this Agreement.

**WHEREAS,** Licensor is willing to grant Licensee the right to use the Licensed Marks as



3



the name of the Property and the respective Development Components, in accordance with and subject to the terms, covenants and provisions of this Agreement.

**NOW, THEREFORE,** for One ($1.00) Dollar and other good and valuable consideration, receipt of which is hereby acknowledged, Licensor and Licensee do hereby agree as follows:

1.   **License.**

(a)   Licensor hereby grants to Licensee, during the term of this Agreement, a non-exclusive, non-assignable (except as provided in <u>Sections 9(b), 9(c) and 9(d)</u> hereof), nontransferable right, without the right to grant sublicenses, to use the Licensed Marks for the purpose of identifying, promoting and marketing the Development Components and the Property, subject to all of the terms, covenants and provisions of this Agreement. Licensee shall be required to, and hereby agrees to, use the Licensed Marks as the primary identification of the Property and the Development Components during the term of this Agreement (other than the street address of each of the Development Components). ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, ▬▬▬▬▬▬▬▬▬▬collectively, the "**Materials**"), ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ the "**Marketing Right**"), subject to all the terms, covenants and provisions of this Agreement▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. In connection with Licensee's exercise of the Marketing Right, Licensor reserves the right to prohibit the making of representations on behalf of Licensor (or Donald J. Trump), or the use of Materials which, in the reasonable judgment of Licensor, do not accurately reflect facts about Licensor or Donald J. Trump or are otherwise unacceptable to Licensor. In this regard, the Parties have reviewed and approved of the public relations plan attached as <u>Schedule 11</u> hereto (the "**Public Relations Plan**") and agree that, to the extent the Public Relations Plan conflicts with the terms of this Agreement, the terms of this Agreement shall apply. Licensor hereby approves of the press release attached hereto as Exhibit J which Licensee expects to issue contemporaneously with the Signing (as herein defined).

(b)   (i) Licensor hereby grants to Licensee, during the term of this Agreement, the right to permit each occupant of one or more portions of the Development Components to use the Licensed Marks solely for the purpose of identifying the address of such occupant's physical location at the Property. However, such right shall not permit such occupant to use the Licensed Marks as part of the name or identification of such occupant, unless Licensor permits such use, in Licensor's sole discretion, pursuant to a written agreement between such party and Licensor. For example, trade names such as "Trump at Cap Cana Restaurant" or "The Restaurant at Trump at Cap Cana" are not permitted or authorized by virtue of this Agreement. The rights and restrictions governing such occupant's use of the Licensed Marks shall be set forth in the Declaration and Condominium Documents (as such terms are hereinafter defined) and in any membership agreement and any lease of the Commercial Component or other occupancy agreement between Licensee and such occupant (each, an "**Occupancy Agreement**" and collectively the "**Occupancy Agreements**").

4





(ii) All documentation relating to the condominium(s), cooperative or other form of collective ownership established with respect to the Property or portions thereof (individually and collectively, the "**Condominium**"), including without limitation, any offering plans, prospectuses, declarations, the articles or certificates of incorporation or association, the bylaws, the rules and regulations, the covenants, conditions and restrictions and all related documentation (collectively, the "**Condominium Documents**") shall be subject to the prior review and written approval of Licensor. The Condominium Documents shall include, those clauses set forth in Exhibit C annexed hereto and made a part hereof.

(iii) Licensee will include in each purchase and sale agreement and lease agreement, as applicable, with respect to any of the Development Components or any portion thereof, a provision which expressly states and informs all buyers and lessees thereof that the use of the Licensed Marks is subject to all of the terms and conditions set forth in this Agreement and that, upon the expiration or sooner termination of this Agreement for any reason, all use of the Licensed Marks shall cease.

(iv) Each Occupancy Agreement shall be subject to the prior written approval of Licensor. Licensee agrees to cooperate fully with, and furnish assistance to Licensor in any action required, to ensure that any use of the Licensed Marks by any owner, lessee or occupant of the Property complies with the terms and conditions of this Agreement.

(v) Licensee shall reimburse Licensor for all Recoverable Expenses (as herein defined) incurred by Licensor in connection with Licensor's review of the Condominium Documents and any other agreement affecting the Property. For purposes of this Agreement, "**Recoverable Expenses**" shall mean all reasonable and documented out of pocket costs and expenses incurred by Licensor in connection with its rights and obligations under this Agreement, up to a combined total not to exceed $100,000 per calendar year (the "**Maximum Recoverable Expenses Per Year**"), including, without limitation (to the extent applicable), consultant fees, travel and lodging fees incurred by Licensor, such as in conducting bona fide site visits to the Property and attending meetings in the Dominican Republic with respect to the Property, legal fees, architectural fees, engineering fees, fees associated with obtaining trademark and/or copyright clearance assessments, trademark registration fees and domain name registration and renewal fees. Notwithstanding anything contained herein to the contrary, Licensor and Licensee hereby agree that the following costs and expenses shall not be included in calculating the Maximum Recoverable Expenses Per Year (but shall nevertheless be recoverable from Licensee to the extent permitted under the terms of this Agreement): (w) all costs and expenses incurred by Licensor or its affiliates in performing the additional services set forth in Schedule 8 (the "**Additional Services**"); (x) travel and lodging costs and expenses incurred by Licensor on any visit requested by Licensee; (y) Appearance Reimbursable Expenses (as herein defined) incurred by Licensor under Section 4(f) of this Agreement; and (z) travel and lodging costs and expenses incurred by Licensor if Licensor at any time during the term of this Agreement reasonably believes, in its sole discretion, that it is necessary for Licensor or its representatives to travel to the Property to supervise the development or construction of any Development Component or part thereof or to insure Licensee's compliance with the terms of this Agreement, including, without limitation, Licensee's compliance with the Development Standards and Operating Standards (both as herein defined), provided, with respect to this subsection (z) only, that in the event Licensee shall provide Licensor and its representatives with





reasonable accommodations during such visit, Licensor shall assume all other (i.e., non-hotel) costs and expenses incurred by Licensor and its representatives in traveling to the Property. All Recoverable Expenses shall be paid by Licensee within fifteen (15) business days (as read in this Agreement, "business days" shall mean any day other than Saturday, Sunday or holiday or any other day on which banks and financial institutions in the Dominican Republic or New York, New York are required or permitted by law to remain closed) following Licensor's submission of an invoice therefore in substantially the form attached as Exhibit I hereto, with the list of each such costs and the amount incurred therefor. All Recoverable Expenses incurred by Licensor after Licensor has incurred the Maximum Recoverable Expenses Per Year shall be subject to Licensee's prior written approval, provided, that Licensee shall not withhold its approval with respect to any costs or expenses (i) that would reasonably be incurred by a comparable high-end luxury developer such as Licensor with respect to a comparable high-end luxury development project; and (ii) incurred by Licensor in response to one or more requests by Licensee.

(c)     (i) Licensee shall have the right from time to time to supplement the Licensed Marks set forth on Schedule 4 with additional marks, each of which shall be subject to Licensor's prior written approval (each a "**Proposed Licensed Marks**"), and once Licensor shall approve same, such mark shall become Licensed Marks for all purposes under this Agreement. Licensee shall submit each Proposed Licensed Marks to Licensor in writing for Licensor's review. Following Licensee's submission of such Proposed Licensed Marks, Licensor shall review such Proposed Licensed Marks within ten (10) business days of receipt thereof, and if such Proposed Licensed Marks meet with Licensor's preliminary approval, Licensor shall obtain an assessment from counsel as to the likely registrability and/or availability of such Proposed Licensed Marks. Licensee shall bear the costs incurred in the trademark and/or copyright clearance assessment of the Proposed Licensed Marks (and Licensee shall reimburse Licensor for all expenses incurred by Licensor in connection therewith within fifteen (15) business days following Licensor's submission of an invoice therefor in substantially the form attached as Exhibit I hereto). Upon obtaining such assessment, which Licensor shall endeavor to cause counsel to provide on a reasonably timely basis, Licensor shall determine whether to finally approve such Proposed Licensed Marks and shall notify Licensee in writing whether or not Licensee is permitted to adopt and/or use any given Proposed Licensed Marks. If Licensor does not so notify Licensee within ten (10) business days of obtaining such assessment, Licensee may send a second notice to Licensor ("**Second Notice**"), which notice and the front of the envelope containing the same shall be marked "**URGENT**" and shall include the following warning thereon: "**LICENSOR'S FAILURE TO RESPOND WITHIN FIVE (5) BUSINESS DAYS OF LICENSOR'S RECEIPT OF THIS SECOND NOTICE WILL RESULT IN THE REQUESTED CONSENT OR APPROVAL BEING DEEMED TO HAVE BEEN GRANTED.**" If Licensor fails to respond to Licensee within five (5) business days of Licensor's receipt of the Second Notice (the "**Second Notice Reply Period**"), (i) Licensor shall be deemed to have approved of such Proposed Licensed Marks, (ii) the Proposed Licensed Marks shall be deemed added to the Licensed Marks set forth on Schedule 4 hereto for all purposes of this agreement and (iii) Licensee shall, within a reasonable time following the expiration of the Second Notice Reply Period, send Licensor an amended Schedule 4 clearly indicating in a cover letter that the Proposed Licensed Marks has been added to the Licensed Marks; provided that Licensor shall not be deemed to have approved such Proposed Licensed Marks unless such Second Notice has been provided by Licensee in accordance and compliance in all respects with the foregoing requirements in respect thereof.



6



Licensee may submit to Licensor multiple Proposed Licensed Marks at the same time, which shall proceed concurrently through the approval process, subject to the provisions of this Section 1(c). Licensee shall not adopt and/or use any Proposed Licensed Marks unless and until it obtains Licensor's approval in the manner set forth in this Section 1(c). In the event any of the Development Components (or elements thereof) fail to comply with the Development Standards or Operating Standards, then, in addition to all of its rights and remedies hereunder, Licensor shall have the right to restrict (in Licensor's sole discretion), in whole or in part, the use of those Licensed Marks being used with respect to such Development Component (or elements thereof). Notwithstanding the foregoing, nothing contained herein shall be deemed to in any way relieve Licensee and its affiliates of their obligation to comply with the Development Standards and the Operating Standards. Licensee shall bear the cost and expense of registering all Licensed Marks which were not registered prior to the date of this Agreement, as well as the renewal of such Licensed Marks, in each case, in the United States, the Dominican Republic and such other jurisdictions as Licensor and Licensee shall mutually agree to register (such costs and expenses to be paid by Licensee proportionately to the number of licensed users of such specific Licensed Mark in such jurisdiction pursuant to agreements with Licensor and/or any of Licensor's affiliates if there are other licensees for such Licencesed Marks. Licensee shall reimburse Licensor for all expenses incurred by Licensor in connection therewith within fifteen (15) business days following Licensor's submission of an invoice therefor in substantially the form attached as Exhibit I hereto. In addition, Licensee shall also bear the costs and expenses of such registration in those jurisdictions in which Licensee shall actively market and promote the Property (which jurisdictions Licensee shall promptly identify in writing to Licensor) if Licensor's trademark counsel reasonably believes, based upon Licensee's marketing and promotion efforts in such jurisdiction, that registration is necessary in order to protect the Trump Mark, including, without limitation, the Licensed Marks. All other registration costs and expenses which Licensor expects Licensee to reimburse Licensor for shall be subject to Licensee's prior written approval.

(d)    In connection with its identification and promotion of the Property, Licensee may propose to use a certain logo or logos incorporating the Licensed Marks, including one or more logos that substantially consist of distinctive design elements of the Property ("**Design Logo**"), in connection with the identification and promotion of the Property (collectively, the "**Proposed Logo**" or "**Proposed Logos**"). Prior to any adoption and/or use of any Proposed Logo, Licensee shall submit a graphical representation of such Proposed Logo to Licensor precisely in the manner in which Licensee intends such Proposed Logo to appear in commercial use. Following Licensee's submission of a Proposed Logo to Licensor, Licensor shall review such Proposed Logo within ten (10) business days of receipt thereof, and if Licensor approves such Proposed Logo, Licensor will promptly notify Licensee and Licensor shall obtain an assessment from counsel as to the likely registerability and/or availability of such Proposed Logo. If Licensor does not so notify Licensee within ten (10) business days of Licensor approval of such Proposed logo, Licensee may send Licensor a Second Notice. If Licensor fails to respond to Licensee within the Second Notice Reply Period, Licensor shall be deemed to have approved of such Proposed Logo and shall promptly obtain the assessment from the counsel above mentioned; provided that Licensor shall not be deemed to have approved such Proposed Logo unless such Second Notice has been provided by Licensee in accordance and compliance in all respects with the foregoing requirements in respect thereof. Licensee shall bear the costs incurred in the trademark and/or copyright clearance assessment of each Proposed

7





Logo (and Licensee shall reimburse Licensor for all expenses incurred by Licensor in connection therewith within fifteen (15) business days following Licensor's submission of an invoice therefore, itemizing the expenses incurred in substantially the form attached as Exhibit I hereto). Upon obtaining such assessment, which Licensor shall endeavor to cause counsel to provide on a reasonably timely basis, such Proposed Logo shall be adopted by Licensee and become an Approved Logo. If the outcome of the assessment is that the Proposed Logo is not available for registration, Licensee shall be entitled to submit new Proposed Logos pursuant to this clause. Licensee may submit to Licensor multiple alternative Proposed Logos at the same time, which shall proceed concurrently through the approval process, subject to the provisions of this Agreement. Licensee shall not adopt and/or use any Proposed Logo unless and until it obtains Licensor's approval in the manner set forth in this Section 1(d).

(e) If Licensor approves any Proposed Logo, such Proposed Logo shall then be referred to as an "**Approved Logo**". Upon Licensor approving any Proposed Logo, in writing, Licensee acknowledges and agrees that Licensor shall own all right, title and interest in and to any and all Approved Logos and that Licensee's sole rights with respect thereto shall be to use such Approved Logos subject to, and in accordance with, the terms, covenants and provisions of this Agreement, which use shall inure to the sole benefit of Licensor. If and when any Proposed Logo is approved in writing by Licensor in accordance with the terms of this Agreement, such Approved Logo will be considered as a Licensed Marks as of the date of such approval and its use by Licensee will be subject to the terms and conditions of this Agreement. Upon the termination of this Agreement, Licensor may, at its option, assign to Licensee (in a form reasonably acceptable to Licensor) all of Licensor's right, title and interest in and to the Approved Logos adopted and used by Licensee, if any, but only that portion of such Approved Logos that, in the sole discretion of Licensor, does not contain any element (in whole or part) of the Licensed Marks, or any elements confusingly similar to the Licensed Marks or that portion of such Design Logo(s) that can be readily separated and clearly distinguished from the Licensed Marks and/or the word "Trump" and is not, in the sole discretion of Licensor, confusingly similar to the Licensed Marks. Without limiting the foregoing, upon termination of this Agreement, Licensee shall deliver to Licensor (and assign to Licensor, if Licensor so requests) any and all documentation relating to the Approved Logos. In the event this Agreement shall terminate as a result of a breach thereof by a party to this Agreement, those costs and expenses (including reasonable attorneys' fees) arising from a party's compliance with the preceding sentence shall be borne by the breaching party.

(f) If, during the term of this Agreement, Licensee develops any Proposed Logo and Licensor approves such Proposed Logo in writing such that such Proposed Logo constitutes an Approved Logo, then both parties shall agree, from time to time, whether it is appropriate to file an application for registration of such Approved Logo at the United States Patent and Trademark Office and/or with any state or foreign jurisdictions. Should the parties at any time agree on such registration, Licensor shall promptly file an application for registration of such Approved Logo at the United States Patent and Trademark Office and/or with any state or foreign jurisdictions. All costs and expenses of such registration in the United States, the Dominican Republic and such other jurisdictions as Licensor and Licensee shall mutually agree to register shall be borne by Licensee (and Licensee shall reimburse Licensor for all expenses incurred by Licensor in connection therewith within fifteen (15) business days following Licensor's submission of an invoice therefor in substantially the form attached as Exhibit I



8



hereto). In addition, Licensee shall also bear the costs and expenses of such registration in those jurisdictions in which Licensee shall actively market and promote the Property (which jurisdictions Licensee shall promptly identify in writing to Licensor) if Licensor's trademark counsel reasonably believes, based upon Licensee's marketing and promotion efforts in such jurisdiction, that registration is necessary in order to protect the Trump Mark, including, without limitation, the Licensed Marks. All other registration costs and expenses shall be subject to Licensee's prior written approval. Such registration, if secured, will be considered a Licensed Marks.

(g) ~~Licensee shall submit to Licensor for Licensor's prior written approval (which may be withheld in Licensor's sole discretion), any domain names, which include Licensed Marks or any element thereof, which Licensee desires to use in connection with promotion of the Property.~~ If approved by Licensor, in its sole discretion, all such domain names shall be registered in the name of Trump or Licensor, as Licensor shall direct, or in the name of such other person or entity as Licensor shall identify to Licensee. Licensee shall obtain Licensor's prior written approval (in Licensor's sole discretion) of the design and content of any websites relating to the Property (as so approved, the **"Approved Websites"**), provided, however, that Licensor's approval shall not be required for non-material design or content modifications. Licensee shall be responsible for any and all costs and expenses in connection with the registration and renewal of any such approved domain names (and Licensee shall reimburse Licensor for all expenses incurred by Licensor in connection therewith within fifteen (15) business days following Licensor's submission of an invoice therefor in substantially the form attached as Exhibit I hereto). Upon termination of this Agreement, Licensee shall immediately discontinue the use of any reference on the Approved Websites to the Licensed Marks and/or Trump and undertake all actions as may be necessary to ensure that all such domain names remain the sole and exclusive property of Licensor.

(h) ~~The Licensed Marks shall at all times remain subject to Licensor's prior approval in accordance with this Agreement.~~ If Licensor reasonably determines that the use of the Licensed Marks by Licensee violates the rights of any third party or impairs Licensor's rights in the Licensed Marks, then Licensee agrees to use its best efforts to immediately terminate the offending use and/or cure such infringement (if cure is possible) in accordance with Licensor's written instructions.

(i) All rights in and arising from the Licensed Marks, other than a privilege to use the Licensed Marks as specifically granted herein, are reserved to Licensor. Licensee acknowledges the proprietary nature of Licensor's exclusive ownership of, and the validity of, the Licensed Marks and any rights that may arise from this Agreement in all countries of the world and agrees that it will not, during the term of this Agreement or thereafter, contest or question Licensor's ownership of, or the validity of, the Licensed Marks or any rights that may have arisen from this Agreement or any applications or registrations relating thereto in any country of the world. The foregoing shall not preclude Licensee from bringing an action for misrepresentation by Licensor under Section 11(a) (ii) and (iv).

(j) Notwithstanding the foregoing, in no event shall Licensee issue a press release or be interviewed by or have discussions with the media concerning the Property, the Trump Mark, including, without limitation, the Licensed Marks, and/or any of the following persons and/or entities: Licensor, Trump and/or any member of Trump's family (all of the

9




foregoing persons and/or entities collectively, the **"Press Protected Parties"**) without Licensor's prior written approval, in each instance, which may be withheld by Licensor in Licensor's sole discretion. The parties will cooperate with each other in order to have a collection of pre approved press releases for daily use.

2. **Exclusions to License; Use of License**

(a) Licensee recognizes and agrees that other than as expressly provided hereunder, no other rights to use or to register the Licensed Marks, are granted hereunder. Accordingly, inter alia, Licensee has no right to use the Licensed Marks in connection with individual facilities within the Property other than the Development Components to which specific Licensed Marks are assigned pursuant to this Agreement, or with any products or services sold or offered for sale at the Property or elsewhere, except as expressly provided herein or if and as may subsequently be agreed to in writing by Licensor, in Licensor's sole discretion.

(b) (i) Licensee also recognizes and agrees that it has no rights to the use of the Trump Mark other than in respect to the Licensed Marks in accordance with the terms, covenants and provisions of this Agreement, and recognizes Licensor's sole and exclusive ownership of all rights in the Trump Mark, including, without limitation, the Licensed Marks. Licensee further recognizes the great value of the goodwill associated with the Trump Mark, including, without limitation, the Licensed Marks, and acknowledges that the foregoing and all rights therein and goodwill pertaining thereto belong exclusively to Licensor, and that each has a secondary meaning in the mind of the public. Any and all use by Licensee of the Licensed Marks or any part thereof, and the goodwill arising therefrom, shall inure to the benefit of Licensor. Licensee will not register nor attempt to register the Trump Mark, including, without limitation, the Licensed Marks, or any mark confusingly similar thereto, alone, or with any other word, or in any derivations or phonetic equivalents thereof, as a name, trademark, service mark, domain name or otherwise. Licensee agrees not to assert any claim to any goodwill, reputation, or ownership in any country or territory around the world of the Trump Mark, including, without limitation, the Licensed Marks and agrees not to contest the validity or ownership by Licensor of the Trump Mark and/or the Licensed Marks or any mark confusingly similar thereto, alone, or with any other word, or in any derivation or phonetic equivalent thereof. Licensee agrees that it will not do any act or thing, or permit any act or thing to be done, in derogation of any of the rights of Licensor in connection with Licensee's use of the Licensed Marks either during the term of this Agreement or thereafter and that Licensee will not use the Trump Mark and/or Licensed Marks except as licensed hereunder and as expressly provided in this Agreement. The foregoing shall not preclude Licensee from bringing an action for misrepresentation by Licensor under Section 11(a) (ii) and (iv).

(ii) Licensor also recognizes Licensee's sole and exclusive ownership of all rights in the Cap Cana Mark. Licensor further recognizes the great value of the goodwill associated with the Cap Cana Mark, and acknowledges that the foregoing and all rights therein and goodwill pertaining thereto belong exclusively to Licensee, and that each has a secondary meaning in the mind of the public. Licensor will not register nor attempt to register the Cap Cana Mark, or any mark confusingly similar thereto, alone, or with any other word, or in any derivations or phonetic equivalents thereof, as a name, trademark, service mark, domain name or

10





otherwise. Licensor agrees not to assert any claim to any goodwill, reputation, or ownership in any country or territory around the world of the Cap Cana Mark and agrees not to contest the validity or ownership by Licensee of the Cap Cana Mark or any mark confusingly similar thereto, alone, or with any other word, or in any derivation or phonetic equivalent thereof. Notwithstanding anything contained herein to the contrary, Licensee hereby grants to Licensor, its affiliates (including, without limitation, any Condo Hotel operator affiliated with Licensor) and any of Licensor's Permitted Transferees, during the term of this Agreement, a non-exclusive, non-assignable (except as permitted under Section 9 hereof), nontransferable right, without the right to grant sublicenses, to use (i) the name "Cap Cana", (ii) the Cap Cana Rights and (iii) the Cap Cana Materials, for the sole purpose of promoting and marketing the Development Components and the Property, but solely to identify the location of the Development Component (and not as a separate mark with independent rights of intellectual property) whether alone or in conjunction with any other properties being developed, marketed or promoted by Trump, Licensor or their respective affiliates, provided, that nothing contained in this Agreement shall be deemed to restrict Licensor from using the Cap Cana Mark, including, without limitation, the Cap Cana Materials and the Cap Cana Rights, to the extent that same contain or include the Trump Mark, including, without limitation, the Licensed Marks. Licensor hereby agrees that the Cap Cana Mark shall be used by Licensor only in the form approved by Licensee. The foregoing shall not preclude Licensor from bringing an action for misrepresentation by Licensee under Section 11(c)(ix).

(c)     All uses of the Licensed Marks by Licensee shall accurately reproduce the design and appearance of the Licensed Marks approved by Licensor.

(d)     At the request of Licensor, Licensee shall include the trademark designation legally required or useful for enforcement (e.g. "TM", "SM" or ®, as applicable) in connection with Licensee's use of the Licensed Marks. Licensee shall, at Licensor's request, include a reasonably prominent statement on all Materials bearing the Licensed Marks providing that such mark is being licensed to Licensee by Licensor and such license may be revoked or terminated pursuant to a license agreement between Licensor and Licensee.

(e)     Except as specifically authorized under this Agreement, Licensee shall not use the Licensed Marks, either alone or with any other word, or any other trademark or service mark confusingly similar thereto on or in connection with any other business and shall not permit or authorize any other person or entity to use the Licensed Marks or any other trademark or service mark confusingly similar thereto in any manner.

(f)     Licensee agrees to submit to Licensor from time to time and in any event within thirty (30) days after receipt of written notice from Licensor, detailed photographs and/or specimens of any use of the Licensed Marks by Licensee.

11





dis~~~~~~~~~~~~~~~~~~~~~~~~ If Licensor does not so notify Licensee within such ten (10) business day period, Licensee may send Licensor a Second Notice. If Licensor fails to respond to Licensee within the Second Notice Reply Period, Licensor shall be deemed to have approved of such Materials; provided that Licensor shall not be deemed to have approved such Materials unless such Second Notice has been provided by Licensee in accordance and compliance in all respects with the foregoing requirements in respect thereof.

(g) Licensee agrees to take all steps necessary to ensure that, in such cases as Licensor may require use or display of the Licensed Marks is in a manner sufficient to indicate that the Licensed Marks are owned by and/or licensed from Licensor and are being used under license.

(h) The Parties shall conduct their business and operations in which the Licensed Marks and the Cap Cana Mark (as the case may be) are used in a lawful manner and shall do nothing to bring disrepute to or in any manner impair or damage the Trump Mark, including, without limitation, the Licensed Marks, or the Cap Cana Mark (as the case may be), or the goodwill associated therewith. In the event Licensee at any time during the term of this Agreement reasonably believes that Licensor is causing damage to the Cap Cana Mark, Licensee shall have the right to request, within a reasonable amount of time following Licensor's receipt of written notice from Licensee, that Licensor cease using the Cap Cana Mark, provided, that Licensor shall be responsible for all costs and expenses incurred by Licensor in removing the Cap Cana Mark from all of Licensor's signs, advertisements, promotional, marketing and publicity materials of any form or content.

(i) Except as specifically authorized in writing by Licensor, Licensee shall not use a photograph, image or likeness of Trump, or his recorded voice, or any facsimile of any of the foregoing, or any member of his family, or anyone associated with or employed by Licensor or Trump. In addition, except as specifically permitted under this Agreement or otherwise authorized in writing by Licensee, Licensor shall not use the Cap Cana Mark, any communication with Licensee or anyone associated with or employed by Licensee.

(j) Licensee shall install prominent signage using the Licensed Marks in or about the Development Components and the Property, the designs, positions and locations of which shall be mutually agreed upon by Licensor and Licensee. Such prominent signage shall (x) be in accordance with Licensee's reasonable development, marketing and promotion standards; (y) be consistent with the overall character of Cap Cana; and (z) not negatively affect, in a material way, the views of the ocean from Cap Cana, or from any Development Component.

(k) Upon termination or expiration of this Agreement, Licensee shall (at the request of Licensor) deliver or cause to be delivered to all Users a written notice, in form and substance acceptable to Licensor, advising: (i) the termination of this Agreement (or, as applicable, the Subsequent Board Agreements) and the use of the Licensed Marks in connection with the Property, and (ii) such other matters as are appropriate to disassociate the Property from Licensor and the Licensed Marks.





12

3. **Operating Standards and Related Matters.**

As a material inducement for Licensor's execution of this Agreement, Licensee covenants and agrees:

(a) To design, develop, construct, equip and furnish the Property, including without limitation, each Development Component, including the Amenity Package and any other amenities at the Property, in accordance with the standards (the **"Development Standards"**) annexed hereto and made a part hereof as Exhibit E and the Master Declarations of Cap Cana annexed hereto and made a part hereof as Exhibit K (the **"Master Declarations"**), which Master Declarations Licensee represents in no way conflict with the Development Standards anexed hereto. Licensor and Licensee acknowledge and agree that, as of the date hereof, the Signature Properties (as herein defined) are examples of properties (or components thereof, if indicated below) which have been developed with the level of quality and luxury required by the Development Standards. In the event Licensor shall hereafter amend or update the Development Standards and/or the Operating Standards (as herein defined), then Licensor shall have the right to direct Licensee to perform comparable upgrades to the Development Components and the Property and Licensee shall thereupon apply reasonable commercial efforts to timely comply with Licensor's direction provided that such amendments and updates are consistent with applicable law, the Master Declarations and any covenants, conditions and restrictions affecting the Property. For purposes of this Agreement, the term **"Signature Properties"** shall mean (i) with respect to the Residential Units, the residential portion of Trump International Hotel & Tower, One Central Park West, New York, New York; (ii) with respect to the Estate Lots, the Estates at Trump National Golf Club, One Ocean Trails Drive, Rancho Palos Verdes, California; (iii) with respect to the Golf Courses, the golf course at Trump National Golf Club, One Ocean Trails Drive, Rancho Palos Verdes, California, (iv) with respect to the Spas, the spa at Mar-a-Lago, 1100 South Ocean Boulevard, Palm Beach, Florida; (v) with respect to the Hotel Component, Trump International Hotel & Tower, One Central Park West, New York, New York; (vi) with respect to the Commercial Component, the commercial component of Trump Tower, 721-725 Fifth Avenue, New York, New York; (vii) with respect to the Parking Component, consistent with the overall luxury level of the Property; and (viii) with respect to the Additional Recreation Amenities and the Other Components, such reference properties as shall be agreed upon by Licensor and Licensee from time to time, provided the same shall be of a quality and standard consistent with what would be offered at the Signature Properties if the Signature Properties included such Other Improvements. With respect to the Estate Lots only, the Development Standards shall be reasonably modified to accommodate the market in the Dominican Republic, but nevertheless exceeding the highest level of quality and luxury in the Dominican Republic as reasonably determined by Licensor at the time Licensee completes the Final Plans and Specifications (as herein defined). Further, with respect to the Golf Course, Licensor shall have the right to approve all architects/designers of the Golf Course selected by Licensee.

(b) At all times, to operate and maintain, and ensure by the provisions of the Condominium Documents, the Declaration and any Occupancy Agreement (in each case as expressly permitted herein and as approved by Licensor in writing as to each such document's compliance with the provisions of this Agreement) that all Users maintain standards in connection with the ownership, operation, maintenance and use of each such Development



13



Component, that are at least equal to those standards of ownership, operation and maintenance set forth on Exhibit F annexed hereto and made a part hereof (the **"Operating Standards"**). Licensor and Licensee acknowledge and agree that, as of the date hereof, the Signature Properties (as herein defined) are examples of properties (or components thereof, if indicated above) which are operated and maintained with the level of quality and luxury required by the Operating Standards. Without limiting the foregoing, in furtherance of the Operating Standards, the staffing of the Development Components, including, without limitation, the persons and number of persons serving or functioning as the resident managers of the buildings in which the Residential Units are located, the property managers of the Commercial Component and the general managers of the Condo Hotel, each element of the Recreational Component and the Parking Component, and the number and type of other employees servicing each of the Condominiums, the Condo Hotel and each element of the Recreational Component shall be subject to Licensor's prior written consent. Further, Licensee covenants and agrees that with respect to all of the Commercial Space, prospective Users shall be identified to Licensor, and shall be subject to Licensor's prior written approval, to assure Licensor that such prospective Users are generally comparable in composition to the general caliber of tenants located at the Signature Properties for such Development Components; provided, however, the resort nature of the Property shall be taken into account in connection therewith. Further, Licensee shall reasonably cooperate with Licensor to develop and implement appropriate security measures in connection with the safety and security of the Property.

(c)     To include in the Master Declaration provisions for the integrated development and operation of the Property in accordance with the Development Standards and the Operating Standards (as hereinafter defined) and establishment of design and architectural standards for the Property as well as the Development Components insofar as such inclusion is legal and enforceable under applicable Dominican Republic law, provided, that in the event any such provision is or becomes illegal or unenforceable, Licensor shall have the right to replace said provision with a substitute provision, the language of which shall be consistent with the terms of this Agreement and mutually agreed to by the Parties. In the event the Parties are unable to agree on a substitute provision, either Party shall be permitted to submit such dispute to arbitration pursuant to the Arbitration Procedures (as herein defined), except that (i) the arbitrators shall be attorneys admitted to practice with at least ten (10) years full-time condominium hotel legal experience for properties comparable to the Development Components being developed pursuant to this Agreement; and (ii) the third arbitrator, if any, shall not be required to select one of the two proposed determinations issued by the arbitrators appointed by the Parties, and such third arbitrator shall have the authority to propose an alternative or any modification of either of the determinations proposed by the arbitrators selected by the Parties.

(d)     Licensor or its representatives shall at all times have access to, and the right to inspect, the Property, the interior and exterior of all Development Components (but excluding the interior of privately owned units, unless authorized by such owners), and to discuss the operation of the Property with members of its staff, during normal business hours, upon seventy-two (72) hours' notice, but without unreasonably interfering with the operation of the Property, to confirm Licensee's compliance with the provisions of this Agreement.

(e)     (i)     Concurrently with achieving the percentage completion of the "Plans" (as herein defined) for each "Phase" (as herein defined) of the development of the

14



Property, as provided below, Licensee shall deliver to Licensor plans and specifications and a written narrative, renderings and other explanatory materials as Licensor shall reasonably require, to convey the design and operating parameters for the Property applicable to each such Phase (collectively, with any revised Plans, as provided in Section (e)(iii) below, the "**Plans**") for Licensor's review and written confirmation that the Plans comply with the Development Standards and where applicable, the Operating Standards. Concurrently with each submission of Plans to Licensor, Licensee shall have the right to submit a list of any proposed "Standards Exceptions" (as herein defined) for Licensor's consideration. Licensor's approval of any such Plans shall include written approval of such Standards Exceptions, if any, as Licensor shall approve. The Plans shall separately cover the following Phases (individually, a "**Phase**" or collectively, the "**Phases**", and for the purposes of this Agreement, the terms "Phase" or "Phases" shall have the meanings ascribed to them in American Institute of Architects standard contract documents) of the design and development of the Property:

> (w)     conceptual design Phase (at ninety (90%) percent of completion);
>
> (x)     schematic design Phase (at ninety (90%) percent of completion);
>
> (y)     design and development Phase (at sixty (60%) percent of completion); and
>
> (z)     construction documents Phase (at ninety (90%) percent of completion, subject to the provisions of Section 3(f) hereof).

      (ii)     Each submission of Plans by Licensee (with the level of detail to vary consistent with the applicable Phase), shall include but not be limited to:

> 1.     Plans of each Development Component, including architectural and mechanical and structural systems of such Development Component;
>
> 2.     Plans showing the exterior design of each Development Component, including, but not limited to materials, colors, textures, façade details, signage, site circulation and landscaping;
>
> 3.     Plans, depicting the layouts and finishes and interior design features (including, without limitation, lobbies, hallways and other common areas), unit layouts and room counts;
>
> 4.     Renderings and sample boards and representative photographs of all furniture, fixtures, equipment and appliances for the lobby, halls, each component of the Amenity Package, Condominium Units and other areas of each building and the Property;

15





5. all signage, including without limit, interior and exterior signage;

6. A narrative explaining the scope of the project contemplated by the Plans, including identifying proposed interior and exterior space usage, look and feel of interior and exterior spaces, and services and staffing anticipated for each Development Component and the overall Property;

7. In addition, Licensee shall deliver to Licensor during the design and development phase a sales leasing (to the extent leasing will occur as permitted by this Agreement) and marketing plan for the Property, including prices, rents and other fees, sales and leasing office location and layout, proposals for advertising and promotion of the Building, a sales and leasing staff training program and details regarding amenities to be provided by or at each Development Component; and

8. The allocation of costs, availability and benefits of each element of the Amenity Package to each element of the Development Components.

(iii) Within fifteen (15) business days of receipt by Licensor of the Plans for each Phase, Licensor will either approve the same or send a Deficiency Notice (as herein defined) to Licensee, specifying the manner in which the Plans fail to comply with the applicable Development Standards and/or Operating Standards. Licensee shall promptly prepare and deliver to Licensor revised Plans applicable to such Phase which satisfy such Deficiency Notice. In the event that Licensor does not deliver to Licensee an approval or issue a Deficiency Notice with respect to any Plans within such fifteen (15) business day period, Licensee may send Licensor a Second Notice. If Licensor fails to respond to Licensee within the Second Notice Reply Period, Licensor shall be deemed to have approved the Plans for such Phase; provided that Licensor shall not be deemed to have approved the Plans for such Phase unless such Second Notice has been provided by Licensee in accordance and compliance in all respects with the foregoing requirements in respect thereof. Within ten (10) days following receipt of Licensor's approval of each of the Plans, but before Licensee shall commence any construction or other work as provided on such approved Plans, Licensee shall deliver to Licensor a written certification by Licensee's Vice President for Architecture and Development and Licensee's architect, in a form approved by Licensor (the "Certification"), that the subject Plans are in compliance with the Development Standards and applicable Operating Standards with only such exceptions as Licensor shall, in its sole discretion, have agreed to in writing pursuant to the approval process above (the "Standards Exceptions"). No deviation from any Development Standards or Operating Standards shall be acceptable to Licensor with respect to any Plans, unless a Standards Exception shall have been approved by Licensor in writing with respect thereto.

(f) (i) On the date that is the first to occur of (x) the date that Licensee's construction Plans are approximately ninety (90%) percent complete and (y) the date that is ninety (90) days prior to Commencing Construction (as hereinafter defined) of any Development

16





Component or portion thereof, Licensee shall submit to Licensor its construction Plans, including each of the items delineated in Subsections (e) (ii) (1)-(8) hereof. Within fifteen (15) business days after review of the final construction Plans, Licensor shall deliver a report to Licensee, which either approves, in writing, the final construction Plans or identifies in detail each portion of the final construction Plans that does not comply with the Development Standards or the Operating Standards, if applicable (the "**Deficiency Notice**") and specifies what changes need to be made to the final construction Plans. Licensee shall thereafter diligently attempt to cure such deficiencies, and upon completion, shall submit revised final construction Plans to Licensor to the extent such Plans have been revised. Upon obtaining such revised final construction Plans, Licensor shall review the same, and within ten (10) business days after receipt thereof, shall either approve of such revised final construction Plans or issue another Deficiency Notice with regard to such disputed parts of the construction Plans. In the event that Licensor does not either approve of such revised final construction Plans or issue another Deficiency Notice within such ten (10) business day period, Licensee may send Licensor a Second Notice. If Licensor fails to respond to Licensee within the Second Notice Reply Period, Licensor shall be deemed to have approved of the revised final construction Plans; provided that Licensor shall not be deemed to have approved of such Plans unless such Second Notice has been provided by Licensee in accordance and compliance in all respects with the foregoing requirements in respect thereof.

(g)     (i) Once approved, Licensee shall construct or cause construction of the applicable approved Development Component substantially in accordance with the final construction Plans, as approved by Licensor, which shall adhere to and comply with the Development Standards. For purposes of this Agreement, the term "**Commencing Construction**" with respect to any Development Component shall mean the date of Licensee's initiation of construction of such Development Component, which shall include, without limitation, the earliest to occur of any of the following: excavation, driving of piles or drilling of caissons, pouring of foundations and/or footings.

(ii)     On the date on which a temporary or final certificate of occupancy (or local equivalent) for any structure is issued, Licensee shall deliver to Licensor a Certification that such structure, including issuance by an independent engineer of a certificate of substantial completion, as completed, is in conformity with the Development Standards and the Operating Standards, subject only to any Standards Exceptions.

(iii)     Licensor shall have the right to cause each of the Plans and all revisions thereto to be reviewed, on Licensor's behalf, by a licensed architect and/or engineer of Licensor's selection (the "**Review Professional**") and Licensee shall reimburse Licensor for all Recoverable Expenses incurred in connection therewith. Licensor, its representatives and/or the Review Professional shall have the right, from time to time, to communicate directly with Licensee's architect, engineer, design team, contractors, consultants and other professionals involved in the design and construction of the Building to ascertain whether each or any Phase and the Plans applicable thereto are in compliance with the Development Standards and to endeavor to resolve any issues related thereto. Subject to Licensor's right to approve the Materials for the Property, Licensee will be entitled to initiate any activities permitted under this Agreement related to the marketing, promotion and sales of each Development Component immediately upon approval by Licensor (as provided in Section 3(e)) of the design development plans for such Development Component.



17



(h)     Without limiting any of the provisions in this Section 3, (i) the Amenity Package shall be subject to Licensor's prior written approval, and the approval process set forth in Section 3 hereof shall govern with respect thereto, and (ii) prior to the occupancy of any Residential Unit, Estate Lot or Condo-Hotel Unit, the Amenity Package for such Residential Unit, Estate Lot or Condo-Hotel Unit must be developed and fully operating.

(i)     To the extent permitted by law and so long as the rates available, through any mortgage company affiliated with Licensor, are reasonably competitive with those generally being offered at the time in the relevant marketplace, the Condominium Documents and the sales and marketing staff engaged or employed by Licensee shall encourage purchasers to utilize the services of any mortgage company affiliated with Licensor to obtain financing in connection with the purchase of any of the Development Components.

(j)     Both parties will agree on the contents of the informational, promotional and welcome package to be delivered to each Condominium Unit owner, each Estate Lot owner and each tenant, member or occupant of the other Development Components (the "**Welcome Package**"). Licensee shall bear the cost of production and delivery of such Welcome Packages, and will be responsible to deliver or cause the Welcome Packages to be delivered to each of the aforementioned addressees. Additionally to the agreed contents Licensor shall, at its own discretion and cost, be entitled to produce, compile, and include as part of the Welcome Package such information and other materials about Licensor and its affiliates (including Trump) as Licensor in its discretion determines to include in such package.

(i) At the time of this Agreement, Licensor and Licensee are also negotiating one or more management agreements (individually a "**Management Agreement**" and collectively, the "**Management Agreements**") for the management of the Hotel Component and the Golf Course Component, as well as any other Development Component subject to an organized rental program by an affiliate or affiliates of Licensor Consistent with and without limiting the foregoing, the Parties have agreed on the principal terms that will govern a management agreement for the operation of the Condo Hotel (the "**Condo-Hotel Management Agreement**") to be developed on the Property, which terms are set forth in Schedule 5 hereto. In addition, the parties have agreed that the final agreement will be compatible with Licensor's (or Licensor's affiliate's) customary form of condominium hotel management agreement, to the extent that such form is consistent with the industry standards for this type of agreement (*i.e.*, the operation of a luxury condominium hotel to be operated in a manner consistent with the Operating Standards) Notwithstanding the foregoing, the Parties acknowledge that at the time of this Agreement, and as a result of time constrains, Licensee has not had access to Licensor's form of condominium hotel management agreement, and therefore, in the event that there is any discrepancy between Licensor and Licensee with respect to the provisions to be included in the final Condo-Hotel Management Agreement (other than the terms set forth in Schedule 5 which the Parties may not dispute), Licensee shall have the right to present Licensor with credible written evidence that the terms of such provisions are materially different from the terms included in the form of condominium hotel management agreement typically entered into by other luxury, first class hotel management companies similar in reputation, operation, quality and amenities to, for example, Ritz Carlton, Four Seasons, St. Regis or Mandarin Oriental in connection with condominium hotels comparable to the Condo Hotel Should the parties disagree about the applicable industry standard for such Condo-Hotel



18



Management Agreement, either party shall have the right to initiate an arbitration procedure pursuant to Section 18 hereof, except that the arbitrators shall be individuals with at least ten (10) years full-time experience with the management, operation and development of luxury properties and, more specifically, the components at issue (comparable to the components contemplated to be developed pursuant to this Agreement) in the Dominican Republic or another comparable area of the Caribbean. If the parties are not able (after good-faith efforts to do so) to reach a final agreement with regard to the Condo-Hotel Management Agreement no later than eighteen (18) months prior to the date scheduled for the opening of the Condo Hotel to the public, then Licensee shall be permitted to negotiate a management agreement for the Condo Hotel with a third party manager capable of operating such luxury Development Component in compliance with the Operating Standards and with prior experience operating and managing hotels comparable to the Condo-Hotel (the "**Competitor Manager**"), provided, that the hotel management agreement with such Competitor Manager shall be on terms and subject to conditions that are not more favorable to the Competitor Manager than those offered to Licensor (or its affiliates) based on the terms and conditions as specified in the hotel management agreement term sheet attached as Schedule 5 hereto (the "**Hotel Management Agreement Term Sheet**") as modified, amended, updated and/or supplemented (in writing, by e-mail, correspondence or any other form of writing) by such material terms subsequently agreed to by the Parties during such negotiations. The Competitor Manager shall be required to utilize Licensor's (or Licensor's affiliates) applicable centralized services (*i.e.*, central reservation center ("CRC"), Trump brand advertising campaigns that are common and required to be adopted at all hotels under the Trump brand, compulsory training programs for all employees of Trump branded hotels and development and information technology required for the connectivity with the CRC) and such Competitor Manager shall pay the designated fees associated therewith. The substance of the preceding portion of this subsection (k) shall also apply to the management of the Golf Course in accordance with the term sheet attached hereto as Schedule 9 (the "**Golf Term Sheet**") In addition, with respect to the other (i.e., non Condo-Hotel) Development Components, provided Licensor's fees (or those of its affiliates) are competitive with the fees charged and conditions offered for the management of comparable properties in the market, the Parties shall negotiate in good-faith the terms of one or more management agreements for the other components of the Property.

(ii)    In the event Licensor and Licensee are not able to agree upon the terms of the Hotel Management Agreement as provided herein, Licensee may thereupon proceed to engage third party hotel manager to manage the Condo Hotel, subject to Section 3(k)(i) above and Licensor's prior written approval as to such third party manager and the terms of the agreement, which will not be unreasonably withheld or denied. Notwithstanding the provisions of the foregoing sentence and Section 3(k)(i), for the selection and approval of the Competitor Manager, as soon as reasonably possible following a determination by the Parties that Licensor will not manage the Condo Hotel, Licensee shall present from time to time, for Licensor's approval, up to three (3) suitable substitute candidates (*i.e.,* those which comply with the definition of Competitor Manager) to serve as Competitor Manager with respect to the Condo Hotel. If Licensor approves any of such proposed substitute candidates, such candidate shall become the Competitor Manager of the Condo-Hotel for all purposes under this Agreement. In the event Licensor rejects all three (3) proposed substitute candidates, Licensee shall be entitled to submit the question of whether any of such three (3) candidates qualifies as a Competitive Manager to arbitration pursuant to the Arbitration Procedures set forth in Section 18 of this



19



Agreement, except that the arbitrators shall be individuals with at least ten (10) years full-time experience with the management, operation and development of luxury properties comparable to the components contemplated to be developed pursuant to this Agreement in the Dominican Republic or another comparable area of the Caribbean and, if such arbitrator (or arbitrators) shall determine that any one of the three (3) proposed candidates qualifies as a Competitor Manager, such candidate shall become the Competitor Manager for all purposes under this Agreement in compliance with Section 3(k)(i). In no event shall the Competitor Manager be permitted to advertise or disclose, except to the extent required by law, that it is the manager of a hotel bearing the "Trump" name (such non-disclosure hereinafter referred to as the "**Management Confidentiality Requirement**"). In this case, Licensor shall have the right to supervise the operations and management of the Condo Hotel by the selected manager to ensure compliance with the Operating Standards, and shall be entitled to receive, on a quarterly basis, in lieu of receiving a management fee with respect to such Condo Hotel, (x) a supervisory fee of 1% of the Gross Revenues (as herein defined) from the Condo Hotel not managed by Licensor (or its affiliate) (the "**Supervisory Fee**") and (y) a concession fee of 2% of the Gross Revenues (as herein defined) from the Condo Hotel not managed by Licensor (or its affiliate) (the "**Concession Fee**"). Licensor's rights to collect both the Supervisory Fee and the Concession Fee shall be covenants included in the Condominium Documents and shall be binding on all of Licensee's successors and assigns. Both the Supervisory Fee and the Concession Fee shall be payable to Licensor, on behalf of the owner(s) of the Condo Hotel, by the agreed-upon substitute manager of the Condo Hotel. If the third party manager fails to pay when due the Supervisory Fee and/or the Concession Fee to Licensor, Licensor shall be entitled to collect such fees directly from the unit owners, provided that Licensor shall have served notice to the manager of the default on payment and the manager shall have not paid to Licensor such amounts within the three (3) business days following the notice from Licensor. Licensee shall ensure that this provision is properly included in each management agreement entered into with any third party other than Licensor or Licensor's affiliates in connection with any hotel developed by Licensee and operated on the Property. Licensee will include, or cause to be included, these provisions in the respective Condominium Documents. To the extent Licensee is unable to find an appropriate Competitor Manager to manage the hotel for which no agreement has been reached with Licensor or its affiliates, Licensee shall be permitted to manage the Condo Hotel on its own (subject to Licensee's compliance with all of the terms and conditions of this Agreement, including, without limitation, the Operating Standards) until such time as Licensee is able to find an appropriate substitute manager for the Condo Hotel, provided, that Licensee (a) shall commit reasonable commercial efforts not to manage the Condo Hotel; and (b) shall not manage any Condo Hotel for more than six (6) consecutive months, provided, that in case an arbitration proceeding is initiated as set forth in this subsection, such six (6) month period shall be automatically extended until the last day of the third (3rd) complete month following the date of the arbitration determination.

(iii) Similarly, in the event Licensor (or any of its affiliates) does not enter into a Management Agreement for any other Development Component (i.e. non Hotel Component and non Golf Course Component), Licensee will be able to manage such Development Component or be able to appoint a Competitor Manager, but there will be no Concession Fee and Licensor (or its affiliate) will be entitled only to payment of a one per cent (1%) Supervisory Fee of Gross Revenues with respect to that Development Component, provided, that under no circumstances shall Licensor be entitled to a Supervisory Fee with

20





respect to the Golf Lots or Estate Lots unless there shall at any time be an organized rental type program with respect to such components. In connection with any Development Component which is not the Condo Hotel or the Golf Course, for purposes of this Section 3(k)(iii), the Parties shall negotiate in good faith an appropriate definition of "Gross Revenues" which shall in any event include all common charges payable in connection with such Development Component. 

(iv) For purposes of Section 3(k)(ii), "**Gross Revenues**" shall mean: all revenue and income of any kind derived directly or indirectly from operations at the Condo Hotel (as defined in the License Agreement) and from the rental of Keys belonging to units participating in the rental program (it being understood that all units being rented shall participate in the official rental program managed by the manager of the hotel), the spa (revenue of the spa), food and beverage revenue, parking areas and other commercial areas related to parking fees and leases of the commercial areas of the Condo Hotel including (w) rents (including percentage rents from leases but excluding, for the sake of clarity, the commissions due to Cap Cana, S.A. pursuant to Title III Article 1 of the Commercial Regulations of Cap Cana) or lessees, operators or concessionaires of space at the Property, but not gross receipts of such lessees, operators or concessionaires; (x) consideration for the provision of services or facilities and services provided by third parties (such as outside cleaners and florists) to unit owners and other occupants, whether paid by the unit owners or by the condominium association, including any so-called "access" or similar fees as long as such fees are collected by the Condo Hotel and (y) the rental of all units in the official rental program (prior to distribution of any amounts to unit owner); but excluding applicable excise, sales, occupancy and use taxes, or similar government taxes, duties, levies, service charges or tips collected directly from patrons or guests, or as a part of the sales price of any goods, services, or displays.

(v) Licensor and its designated representatives shall have the right, not to be exercised more than once per calendar year, on not less than five (5) days notice to Licensee, to audit, at its own cost and expense, Licensee's books and records in the Dominican Republic with respect to the determination of the Supervisory Fee and Concession Fee pursuant to the same procedures set forth in Section 4(c) for determining the License Fee (including, without limitation, Licensee's liability for Licensor's reasonable out-of-pocket costs of such audit if such audit reveals that the Supervisory Fees or Concession Fees actually due to Licensor exceeds by more than 4% the Supervisory Fees or Concession Fees actually paid to Licensor). The Management Agreements (and the terms thereof) entered into by Licensee with third party operators may, with respect to the Management Agreement for each Development Component that is subject to a Condominium ownership, subject to the terms of such Management Agreement, be assigned by Licensee to the board of managers, board of directors, or other governing body of the applicable Condominium, however designated.

(vi) In the event Licensor or any of Licensor's affiliates shall not manage all or any portion of the Property, after giving effect to the provisions of this Section 3 (k), the management companies selected by Licensee (other than Licensee or any affiliate thereof), and any management agreements relating thereto, and the terms thereof, shall be subject to Licensor's prior written approval, which will not be unreasonably withheld or denied. For the sake of clarity, the restriction on the direct management of the Condo Hotel by Licensee shall not be applicable for any of the other Development Components, nor to any hotel in

21





respect to which a Hotel Management Agreement with Licensor or its affiliates is terminated pursuant to a default attributable to Licensor or any of its affiliates hereunder or to Licensor or any of its affiliates under the Hotel Management Agreement.

(l) At all times during the term of this Agreement, Licensor shall, to the extent permitted by applicable law, be entitled to appoint one (1) member (which member may be the same or different individuals for any particular board) to each board of managers, board of directors, or other governing body of each association or other entity created pursuant to the Declaration and of each Condominium (each, a **"Board"** collectively, the **"Boards"**), which board member shall also be appointed to and serve on each committee, if any, of each Board, and the Declaration and Condominium Documents shall at all times during the term provide for the same. The Declaration and Condominium Documents shall include a provision such that Licensor's board member shall have all of the voting rights and all of the other rights afforded to all of the members of the Board. The Declaration and Condominium Documents shall further provide that such requirement may not be removed or amended in any way without Licensor's prior written consent. In the event that applicable law now or hereafter prohibits the foregoing, then, at all times during the term of this Agreement (or, if applicable, at all times from and after such prohibition becomes effective), in lieu of providing Licensor with the right to appoint an on-site Trump representative as a member to the respective Board, Licensor shall be entitled to appoint one (1) representative to such the Board (the **"Observer"**). The Observer shall be entitled to attend all executive and other committee meetings of such Board and to receive the same information concerning the Condominium and/or the Property at the same time and in the same manner as provided to members of such Board and such committees. The Observer shall receive no compensation from the Condominium or the other owners for service as an Observer; provided, that the Observer shall be reimbursed for Recoverable Expenses incurred by the Observer in connection with attendance at any meeting of such Board. The Observer shall be one of the on-site personnel of Licensor or its Affiliates. The Observer shall be allowed to participate in discussions of matters brought to such Board or any committee thereof; provided that the Observer shall not be entitled to vote on any matter brought before such Board. The Observer shall further be entitled to receive copies of all notices, minutes, consents and other materials that are provided to members of such Board and, if applicable, each committee thereof, at the same time and in the same manner as provided to such members of such Board and such committees. Licensor may remove and replace, as applicable, the member of each Board or Observer appointed by Licensor at any time and from time to time in Licensor's sole discretion by notice to the applicable Board. Observer, Trump, Licensor (and its affiliates) which eventually become recipient of the information/documentation shall be subject to any confidentiality obligations under law, constituent document and regulations applicable to ordinary members of the Board.

(m) Licensee agrees that the Property shall, after completion of the corresponding Development Component (other than the Estate Lots and Golf Lots), include (i) at least one (1) Signature Restaurant (as herein defined) and one (1) Bistro Type (as herein defined) restaurant in the Condo Hotel; (ii) at least one (1) Signature Restaurant servicing the Residential Buildings which Signature Restaurant shall be located on the Bluff within close proximity to the Residential Buildings and the Estate Lots; and (iii) at least one (1) restaurant at the Golf Course comparable to the restaurant located at Trump National Golf Club, Los Angeles, California, all of which shall comply with the Restaurant Standards, but may be varied



22



according to type. For purposes of this Agreement, the term "**Restaurant Standards**" shall mean that the kind and quality of food and liquors offered, the decor of the restaurant, the services provided by and the appearance of the restaurant staff, the level of staffing maintained by the restaurant and the public image and reputation of the restaurant will be of the highest quality, comparable to the standards of quality and prestige to the Signature Restaurants and the Bistro Type restaurant, as applicable. For purposes of this Agreement, the term "**Signature Restaurants**" shall mean restaurants comparable to: (i) Spago, 176 North Cañon Drive, Beverly Hills, CA; (ii) Babbo, 110 Waverly Place, New York, New York; (iii) Del Posto, 85 10th Avenue, New York, New York; and (iv) David Burke & Donatella, 133 East 61st Street, New York, New York; as such restaurants exist on the date hereof. For purposes of this Agreement, the term "**Bistro Type**" shall mean a restaurant comparable to: (i) Rainwater's on Kettner located at 1202 Kettner Blvd. (W. B St.) San Diego, CA; (ii) Roy's located at 8670 Genesee Ave. (bet. La Jolla Village & Nobel Drs.) San Diego, CA; (iii) Il Fornaio located at 18051 Von Karman Ave. (bet. Main St. & Michelson Dr.) Irvine, CA. The Condo Hotel shall also, promptly following Substantial Completion of Construction (as defined in Schedule 3A hereto) (and in no event later than the date when the Condo Hotel shall be occupied by owners, residents or guests), include a room-service function similar in nature to that provided at Jean Georges at Trump International Hotel & Tower, One Central Park West, New York, New York. In addition, the Parties anticipate that the Residential Building, the Estate Lots and the Golf Lots shall receive catering services consistent with the quality of such Components. Subject to the satisfaction all of the preceding restaurant requirements, the Property may also include casual or other informal dining venues, provided that each of the foregoing shall be operated and maintained in compliance with and according to the standards applicable to the Restaurant Standards.

(n)     Any agreements (including without limitation, all amendments and modifications thereto) related to or concerning the ownership, operation, rental, maintenance or marketing of the Condo Hotel comprising the Hotel Condominium and/or the Condo Hotel Units, or any other matter related to the Condo Hotel, including, without limitation, any unit maintenance agreement and any agreement or agreements relating to, in whole or in part, the rental program whereby Condominium Unit owners make available Condo Hotel Units to guests on a transient basis (collectively, the "**Collateral Agreements**"), shall be subject to the prior written review and reasonable approval of Licensor. Licensee shall reimburse Licensor, within fifteen (15) business days following Licensor's request therefor, for all out-of-pocket fees and expenses, incurred by Licensor (including, without limitation, reasonable attorneys' fees and expenses) in connection with reviewing the Collateral Agreements. Licensor has received from Licensee the current standard form of the rental programs as prepared by Licensee (the "**Rental Programs**"). As part of the negotiations for the respective management agreement, the parties agree hereby to work in any amendments on the Rental Programs in order to make it compatible with the final terms of such management agreements if entered with Licensor or any affiliates thereof, provided, that such amendments shall include the items set forth on the Hotel Management Agreement Term Sheet with respect to the Rental Programs.

(o)     Licensee covenants, represents and warrants to Licensor and its affiliates that during the term of this Agreement all Materials, through any medium of communication, shall at all times be in compliance with all applicable laws, rules and regulations (including, without limitation, federal, state and local securities, brokerage, condominium and land sales



23



laws, rules and regulations of the Dominican Republic and, if applicable in any specific matter, the United States of America) governing the offering, sale, leasing, licensing, marketing, advertising, registration, creation or promotion of the Property, including without limitation, the Estate Lots, the Condominium Units, the Recreational Components and the rental program, and all persons or entities engaged in such activities shall at all times have all required licenses. Licensor and Licensee agree that neither any provision of this Agreement nor Licensor's review or approval of any Collateral Agreements or Materials pursuant to this Agreement shall be deemed to constitute a representation, warranty or opinion by Licensor as to the legality of any such Collateral Agreements or Materials, Licensee hereby acknowledging and agreeing that compliance with all applicable legal requirements is and shall remain the sole responsibility of Licensee.

(p)     Notwithstanding anything to the contrary contained in this Agreement, none of the Trump Indemnified Parties (as defined below) shall be responsible for or shall have liability to Licensee or any other person or entity, including, without limitation, the Users and/or Licensee's lenders, for any design, construction, repair, operation means, methods, techniques, sequences and procedures, or for security or safety precautions and programs, with respect to the design, construction, repair, or operation of the Development Components, whether employed by or on behalf of Licensee, its affiliates, agents, servants, employees, contractors or otherwise. It is further understood and agreed by Licensee that none of the Trump Indemnified Parties is an architect, engineer, contractor, or other professional licensed by any state, city or municipal authority or any department or agency of any of the foregoing, and none of the Trump Indemnified Parties shall provide services to Licensee in such capacity or have any liability to Licensee or any other person or entity, including, without limitation, the Users and/or Licensee's lenders. No reviews, recommendations, approvals, or advice to be furnished by any of the Trump Indemnified Parties under this Agreement shall be deemed to be warranties or guarantees or constitute the performance of professional services as aforesaid, but instead, are intended solely for the benefit of Licensor in order that it may protect the goodwill associated with the Licensed Marks.

(q)     Licensee shall take such action or exercise such rights under the Declaration and the Condominium Documents (through exercise of voting rights, enforcement of remedies or otherwise, subject to any constraints imposed by applicable law) as may be necessary or desirable in order (i) to ensure that the Development Components are constructed, maintained and operated in accordance with the Development Standards and the Operating Standards, and (ii) otherwise to effectuate the terms of this Agreement. In the event of any default by Licensee under this Agreement after the lapse of any applicable cure period, Licensee shall be deemed to have automatically appointed Licensor as its attorney in fact, coupled with an interest, under the Declaration and Condominium Documents for the foregoing purposes.

(r)     Licensor hereby agrees to provide Licensee with the additional services set forth in Schedule 8 (the "**Additional Services**").

De 2007
Notwithstanding anything contained herein to the contrary, not later than one hundred eighty (180) days from the Commencement Date, Licensee shall provide Licensor with a written update detailing the Development Components which Licensee intends and is permitted by applicable law to develop and construct on the Property as of the date thereof (the



24



"**Development Update**"). The Development Update shall set forth the specific details relating to each Development Component (including, for example, size and number of rooms, locations, product mix, roll-out schedule, the size and number of lots, etc) and shall fully comply in all respects with and shall be equal to or in excess of the Minimum Requirements. Notwithstanding the foregoing provisions of this paragraph, Licensee shall be entitled from time to time, and based upon market conditions prevailing at that time, and market demand for CapCana real estate products, to amend or supplement the Development Update as existing at that time, to give effect to such changing market conditions. In every such case, Licensee shall promptly inform Licensor about any changes in the mix of products to be developed in each Development Component and the rationale for such modification, provided however that any such amendment shall always be consistent with: (i) the Minimum Requirements; and (ii) the Minimum Inventory as set out in this Agreement. Subject to the Minimum Requirements and the Minimum Inventory, the Parties agree and acknowledge that construction of each Development Component will be developed in phases and that the roll-out of each product will be agreed upon based on future evolution of the overall Cap Cana project and evolving market and requirements of the market. In the event that the Development Update fails to comply in all respects with the Minimum Requirements and/or the Minimum Inventory, Licensor will deliver a notice to Licensee stating that the Development Update does not comply with the Minimum Requirements and/or the Minimum Inventory, and indicating the grounds for such non-compliance, which notice and the front of the envelope containing the same shall be marked "URGENT" and shall include the following warning thereon: **FAILURE TO RESPOND WITHIN FORTY-FIVE (45) DAYS OF RECEIPT OF THIS SECOND NOTICE WILL RESULT IN LICENSOR'S RIGHT TO TERMINATE THE LICENSE AGREEMENT.** If, within such forty five (45) days following the delivery of such notice, Licensee fails to deliver to Licensor an amended version of the Development Update in a way which, in Licensor's sole discretion, complies with the Minimum Requirements and the Minimum Inventory, Licensor shall have the right to terminate this Agreement and retain any and all fees previously paid to Licensor.

(t)     In order to ensure the proper supervision and follow-up of the development of the Property by Licensee, and to expeditiously cooperate in good faith with the development throughout the diligent exercise of Licensor's controlling and approval rights under this Agreement, Licensor shall be entitled, without any fee or expense to Licensee, to appoint one member to each and every architectural and technical board or committee in charge of supervising the development of the Property ("**Licensor's Representative**"). To the extent Licensor's Representative approves any architectural or technical construction drawings or plans, Licensor's approval, as required in this Agreement, shall be deemed granted and Licensor shall have no further rights to object or request any change orders over such drawings/plans.

4.     **License Fee; Reports; Audit Rights.**

(a)     In return for the license rights granted in Section 1 hereof, Licensee shall pay to Licensor, non-refundable license fees (collectively the "**License Fee**") as set forth on Schedule 1 annexed hereto and made a part hereof, which License Fee shall be payable at the time(s) set forth on Schedule 1, subject to the provisions of Section 20 hereof. For purposes of this Agreement, the term "Licensee Fee" shall also be deemed to include the Supervisory Fee, the Concession Fee and any other fees due to Licensor hereunder.



25



(b)        Licensee shall deliver to Licensor throughout the design, development, construction, marketing leasing (as applicable) and sales phase of each Development Component or portion thereof, progress reports with respect to each such phase, on such forms, and containing such information, as licensor shall require (collectively, the "**Reports**"): The Reports shall be delivered to Licensor with the following frequency: (x) quarter-annual Reports covering the design, development and construction phases, commencing on the date of execution of this Agreement; and (y) monthly Reports covering the marketing and sales phases, commencing upon the date that Licensee shall commence the preparation of a sales campaign for the Property and each of the Development Components.

(c)        Licensor or its designated representatives shall have the rights not to be exercised more than once (1) per calendar year, on not less than five (5) days notice to Licensee, to audit Licensee's books and records in the Dominican Republic with respect to the determination of the License Fees and any and all other fees payable to Licensor hereunder, including, without limitation, all Supervisory Fees, Concession Fees, Referral Fees, deposits made to Licensee by purchasers of any units at the Property, and, subject to Section 16 of this Agreement, Licensor shall have the right to copy and duplicate from Licensee such information and documentation as Licensor shall reasonably require for such audit. Upon Licensor's request, at Licensee's reasonable expense, Licensee shall deliver to Licensor, within ten (10) business days following Licensor's request therefor, a certificate from Licensee's Chief Financial Officer or a substitute senior officer, with direct knowledge of the information being certified, certifying the accuracy of the information delivered by Licensee to Licensor. If any such audit discloses that the actual amount due to Licensor hereunder exceeds the amount paid, then Licensee shall immediately pay to Licensor all License Fees due to Licensor, and if the excess of such License Fees represents more than 4% over the actual amount of License Fees accrued to Licensor, Licensee shall also then pay Licensor's reasonable out-of-pocket costs of such audit within fifteen (15) business days following Licensor's submission to Licensee of an invoice therefor together with reasonable accompanying back-up documents therefor and Licensee hereby agrees that such costs shall not be included in calculating the amount of Recoverable Expenses incurred by Licensor. In the event there shall arise a difference or dispute between Licensor and Licensee concerning any audit conducted by Licensor under this Agreement or the amount due to Licensor hereunder (each an "**Audit Dispute**"), either Licensor or Licensee may submit the Audit Dispute to arbitration in accordance with the Arbitration Procedures set forth in Section 18 hereof, except that the arbitrators shall all be licensed real estate brokers, proficient in Spanish, with at least ten (10) years full-time commercial brokerage experience with the selling and development of luxury properties (comparable to the Development Components contemplated to be developed pursuant to this Agreement) in the Dominican Republic or another comparable area of the Caribbean, whichever is most relevant in such arbitrator's experience given the nature of the Audit Dispute. If any audit shall be commenced by Licensor or if there shall arise an Audit Dispute, then and in any such event Licensee's books and records (including any supporting data) shall be preserved and retained by Licensee until the later to occur of sixty (60) days following: (i) the completion of such audit; (ii) a final written settlement of the Audit Dispute; or (iii) the Audit Dispute has been finally decided pursuant to the Arbitration Procedures and is not subject to appeal. In any event, Licensee's books and records shall be retained by Licensee for not less than six (6) years from



26



the later to occur of the closing of sale of the last Residential Unit or the last Estate Lot, as applicable.

(d)    Licensee shall at all times use its good faith efforts to market and sell, as applicable, all elements of the Development Components, and lease all elements of the Commercial Component, and do so at the highest prices then obtainable in an arms-length transaction and, in accordance with any applicable Condominium Documents.

(e)    Licensee shall reimburse Licensor for those Recoverable Expenses associated with Licensor's customary travel and miscellaneous expenses incurred by Licensor in connection with this Agreement. By way of example only, Licensor shall be entitled to those Recoverable Expenses incurred by Licensor hereunder for travel, lodging and miscellaneous expenses incurred by Licensor in conducting bona fide site visits to the Property and attending meetings in the Dominican Republic with respect to the Property.

(f)    (i) Licensor shall cause Trump to attend, within six (6) years of the date of this Agreement, the following events, all on dates to be mutually agreed to by Licensor and Licensee (together, the **"Donald Trump Events"**):

(x) two (2) "Kick-Off" or "Sales Launch" events in the Dominican Republic relating to the marketing and promotion of the Property, it being understood that Trump shall only be required to stay in the Dominican Republic overnight on the first of his two such visits and will make all reasonable efforts to be available and to attend the program and events scheduled for such second visit (in the understanding that, if required, Trump will make himself available to spend a complete day on such activities, but he will not be required to stay overnight);

(y) a combined total of four (4) other events related to the Property in the City of New York and/or in the State of Florida, County of Palm Beach; and

(z) one (1) other event which shall be satisfied by Trump attending a ceremony in connection with the signing of this Agreement (the **"Signing"**) at Licensor's offices in New York, New York (to be videotaped and photographed at Licensee's sole cost and expense, provided, that Licensor shall have approval rights with respect to all photographs and video footage taken);

it being understood that if any Trump Family Member (as defined below) appears at any of the Donald Trump Events, unless such appearance is expressly requested by Licensee, such appearance will not be counted toward the appearances required of the Trump Family Members as set forth in the following subsection (ii).

(ii)    In addition, during the Term of this Agreement, one of Ms. Ivanka Trump or Mr. Donald Trump, Jr. or Mr. Eric Trump (the **"Trump Family Members"**), or any combination of the Trump Family Members (it being understood that any appearance where more that one Trump Family Member is

27





present, shall be treated as one appearance unless such joint appearance has been expressly requested by Licensee), shall be available and shall, at the request of Licensee, appear to the following events (all the events referred to in this subsection (ii) shall be collectively referred to as the **"Public Events"**):

(y) at the Property at a combined total of five (5) events (two (2) of which events Licensee may move, at its sole discretion, to San Juan, Puerto Rico and/or to any one (1) of the following U.S. locations (the **"U.S. Locations"**) per event): Boston, Dallas, New York, Philadelphia, Chicago, Atlanta, New Jersey, Miami, Fort Lauderdale, Mar-a-Lago, Palm Beach County (in Florida). Such events shall be arranged by Licensee as follows: a combined total of two (2) events to market and promote the Golf Lots/ Golf Villas (as applicable); a combined total of two (2) events to market and promote either the Residential Buildings or the Golf Course (at Licensee's request); and one (1) event to market and promote the Condo Hotel (it being understood that the foregoing Development Components to be marketed and promoted at such events, as described in this subsection (ii), are subject to change at Licensee's request); and

(z) at a combined total of five (5) events related to the promotion of the Development Components and/or the Property, in Licensee's sole discretion, in any one of the U.S. Locations per event, all on dates to be mutually agreed upon by Licensor and Licensee. The Trump Family Members agree that a combination of any two of them will attend four (4) of the Public Events upon Licensee's request, but that Licensor shall, at any time, have the option, but not the obligation, to substitute Trump for any of the Trump Family Members at any of the Public Events. Licensee intends to film and produce marketing materials resulting from the Trump Events and the Public Events, which, subject to Licensor's prior approval, will be available for use by Licensee in the promotion and marketing of the Property and the Development Components.

(iii)    All of the Donald Trump Events and the Public Events referred to in this subsection (f) are subject to coordination with the schedules of Trump and the Trump Family Members. Although there shall be no fees or charges incurred by Licensee for the appearances of Trump and the Trump Family Members, Licensee shall reimburse Licensor for the cost of their first class travel for commercial airline flights and accommodations and miscellaneous expenses incurred in connection with the appearances under this section (the **"Appearance Reimbursable Expenses"**).    Licensee shall reimburse such Appearance Reimbursable Expenses to Licensor within fifteen (15) days following Licensor's submission of a statement therefor, accompanied by invoices or other reasonably satisfactory evidence of the costs for which reimbursement is sought. Licensee acknowledges that (i) Mr. Donald Trump's travel may include, in Mr. Trump sole discretion, at Licensee's expense, travel for his wife and one child, (ii) Mr. Donald Trump Jr.'s travel may include, in Mr. Trump's sole discretion, at Licensee's expense, travel for his wife and child, (iii) Ms. Ivanka Trump's travel may include, in Ms. Ivanka Trump's sole discretion, at Licensee's expense, travel for one guest, and (iv) Mr. Eric Trump's travel may include, in Mr. Eric Trump's



28



sole discretion, at Licensee's expense, travel for one guest, and the Appearance Reimbursable Expenses may include amounts incurred in connection therewith, which will similarly be subject to provision to Licensee of satisfactory documentation of such costs. If Licensee requests, Licensor shall engage in reasonable commercial efforts to make Mar-a-Lago and the Trump International Golf Course at Palm Beach available to Licensee as a venue (subject to availability) for one or more of the Donald Trump Events and/or the Public Events at Licensee's sole cost and expense.

(g) If, at Licensee's request, Licensor shall elect to negotiate, on Licensee's behalf, any fees and charges payable by Licensee in connection with any construction or other contracts relating to the Property (each, a "**Contract**"), Licensee shall pay Licensor, simultaneously with the execution by Licensee of the applicable Contract, a sum equal to thirty (30%) percent of the savings achieved as a result of such negotiation by Licensor.

(h) All rights and remedies of Licensor under this Agreement accruing on or before the effective date of any termination of this Agreement shall survive such termination. In this regard, by way of illustration but not limitation, in the event a contract for the sale or lease of any Development Component or portion thereof has been executed by Licensee and a buyer on or prior to the termination of this Agreement, the applicable License Fee shall remain due and payable to Licensor as provided in Schedule 1 even though the closing of sale or lease for such Development Component or portion thereof shall occur subsequent to the termination of this Agreement.

5. **Term.**

The term of this Agreement shall commence on the date hereof (the "**Commencement Date**") and shall end on the date this Agreement shall terminate pursuant to any of its terms or provisions or as a consequence of the operation of law. The expiration or earlier termination of the term of this Agreement shall not affect Licensor's or Licensee's obligations that accrued at the time of or prior to such expiration or termination (including, without limitation, any obligation to pay all sums payable to Licensor by Licensee pursuant to Section 4 hereof or that accrue pursuant to Section 4 hereof after such expiration or termination).

6. **Events of Default: Unilateral Termination.**

6.1 **By Licensor**

(a) Notwithstanding anything to the contrary contained herein, in addition to any other right or remedy of Licensor hereunder, Licensor shall have the absolute right, but not the obligation, to terminate this Agreement and the rights licensed hereunder and any other agreement ("**Related Agreements**") between Licensor or any affiliate of Licensor and Licensee or any affiliate of Licensee, including, without limitation, the Management Agreement and the Condo-Hotel Management Agreement, upon thirty (30) days' prior written notice of such termination to Licensee, if or upon:

(i) Licensee (A) commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief



29



of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction; (B) has commenced against it any such case or proceeding described in the preceding clause (A) that is not dismissed within ninety (90) days after commencement; (C) is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered; (D) suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within ninety (90) days; (E) makes a general assignment for the benefit of creditors; (F) fails to pay, or states that it is unable to pay or is unable to pay, its debts generally as they become due; (G) calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts; or (H) by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing; or

(ii)     a substantial portion of the Property (other than the Estate Lots and the Golf Lots once they have been sold to third parties) is damaged or destroyed by fire, act of terrorism or other casualty and Licensee fails to apply commercially reasonable efforts to cause it to be rebuilt in a diligent and expeditious manner and in compliance with the Development Standards and/or the Operating Standards (as applicable), it being understood that Licensor's right of termination hereunder shall only extend to that portion of the Property so affected, provided, that (x) Licensee shall use its best efforts to ensure that the remaining portion of the Property is operated and developed as provided for herein; and (y) to the extent that Licensor or an affiliate is a party to a management agreement with respect to a Development Component (or portion thereof) and such management agreement is terminated, Licensee shall not be liable for the payment of any future management fees contemplated in this Agreement with respect to such Development Component (or portion thereof) for which this Agreement is so terminated; or

(iii)    a substantial portion of the Property (other than the Estate Lots and the Golf Lots once they have been sold to third parties) is taken in condemnation or eminent domain proceedings and the remaining portion of the Property cannot be operated in a manner consistent with the Development Standards and/or the Operating Standards (as applicable), it being understood that Licensor's right of termination hereunder shall only extend to that portion of the Property so affected, provided, that (x) Licensee shall use its best efforts to ensure that the remaining portion of the Property is operated and developed as provided for herein; and (y) to the extent that Licensor or an affiliate is a party to a management

30



agreement with respect to a Development Component (or portion thereof) and such management agreement is terminated, Licensee shall not be liable for the payment of any future management fees contemplated in this Agreement with respect to such Development Component (or portion thereof) for which this Agreement is so terminated; or

(iv)  the termination (pursuant to a default by any party other than Licensor or pursuant to a termination right of Licensor (or an affiliate of Licensor) in the event there are an insufficient number of units in the rental program applicable to the Property) of any of the Management Agreement or Condo-Hotel Management Agreement or any other agreement with Licensor or any affiliate thereof; in which case, Licensor shall have the option to terminate this Agreement with respect to that portion of the Property so affected in all aspects related to Licensee's use of the Licensed Marks but only in connection with the Licensed Marks assigned to such portion of the Property for which such management agreement has been terminated; or

(v)  Fernando Hazoury, Ricardo Hazoury, Abraham Hazoury and Catherine Kury Hazoury (the **"Principals"**) cease to collectively own a direct or indirect control stake interest in Licensee; or

(vi)  The Development Components, as constructed, fail to comply in all material respects with the Minimum Requirements or, if during the course of construction, the independent engineer in charge of supervising the corresponding Development Component (the **"Independent Engineer"**) reasonably determines from time to time that, in connection with any Development Component, Licensee will not be able to comply (or promptly remediate) with the Minimum Requirements once fully constructed; or

(vii)  If the buyer of a particular unit, lot or other Development Component or portion thereof obtains a final judicial decision from a court of competent jurisdiction stating Licensee's liability for a significant delay in the completion of construction and delivery of such unit, lot or other Development Component by Licensee or the Independent Engineer determines that a unit, lot or other Development Component will not be delivered to the buyer in compliance with any of the following;

(A) with respect to the Condo Hotel, within thirty (30) months from the date when Ten Executed Contracts have been signed. For purposes of this Agreement, **"Ten Executed Contracts"** shall mean the date when ten (10) contracts have been signed and are in full force and effect for the applicable phase or



31



building of Development Component and deposits for such ten (10) contracts of at least ten percent (10%) of the sale price have been received;

(B) with respect to the Golf Lots and Golf Villas, as applicable, within thirty-six (36) months from the date of Ten Executed Contracts for Golf Lots and Ten Executed Contracts for each specific phase of the Golf Villas;

(C) with respect to the Residential Building, (i) within thirty-six (36) months from the date of Ten Executed Contracts of each specific building for buildings of seven or less floors; or (ii) in a reasonable period (based on considerations including engineering, design and environmental requirements) from the date of Ten Executed Contracts of each corresponding building if the Residential Building is a high-rise of eight or more floors. Such reasonable period shall be proposed by Licensee in the Development Update; and

(D) with respect to the Golf Course, within thirty-six (36) months from the date of Ten Executed Contracts of the Golf Lots and/or Golf Villas, whichever comes first;




unless, in each case, such delay shall result from any strikes, lockouts or labor disputes, inability to obtain labor or materials or reasonable substitutes thereof, acts of God, governmental restrictions, regulations or controls, enemy or hostile government action, civil commotion, riot or insurrection, fire or other casualty or other events similar to the foregoing beyond the reasonable control of Licensee, which in no event shall be more than one hundred twenty (120) days per event (collectively, "**Unavoidable Delays**"), in which event the applicable period shall be deemed extended for a period equal to the duration of the Unavoidable Delays which is contemporaneously documented by Licensee in writing to Licensor; or

(viii) Closings for at least fifty (50%) percent of the Minimum Inventory shall have not occurred or such Minimum Inventory shall not be under bona fide binding purchase contracts with deposits of at least ten (10%) percent by December 31, 2011; or

(ix) Licensee shall be unable to provide evidence satisfactory to Licensor that it has available funds sufficient to finance construction of each Development Component by any combination of financing, equity, committed capital or deposits from sales or pre-sales of Units that form a part of such Development Component (which deposits Licensee shall be permitted to use for the construction of such component and any other direct or indirect

32

cost related to the branding campaign of the Cap Cana Project, marketing, promotion and sale of the Development Components (subject to Licensor's right to receive its proportional share of fees upon deposits greater than 30% in accordance with <u>Schedule 1</u> hereof), within the respective applicable periods set forth in subsections A to D of section (vii) above), in which case, Licensor shall have the right to terminate this Agreement, but only with respect to such Development Component, unless any such failure to provide evidence of financing shall result from Unavoidable Delays that are contemporaneously documented by Licensee in writing to Licensor; or

(x)     Licensee fails to apply for any required construction or demolition permits for any Development Component within ninety (90) days from the date Licensor approves of the final construction Plans for such Development Component; or

(xi)    the Licensed Marks or any mark confusingly similar thereto is used by Licensee either alone or with any other word, or in any derivation or phonetic equivalent thereof, in a manner which is not expressly permitted by the terms of this Agreement; or

(xii)   the Trump Mark or any mark confusingly similar thereto (other than the Licensed Marks as and to the extent the Licensed Marks are expressly permitted to be used pursuant to the terms of this Agreement) is used by Licensee either alone or with any other word, or in any derivation or phonetic equivalent thereof; or

(xiii)  Licensee or any of the Principals (employed at the time by Licensee or an entity owned or controlled by the Principals) shall be convicted of a felony in a non-appealable decision of a state or federal court in the United States or the Dominican Republic, or plead *nolo contendere*; or

(xiv)   if the Condo Hotel manager is other than Licensor or an affiliate thereof and such manager violates the confidentiality provisions of <u>Section 16</u> of this Agreement or violates the Management Confidentiality Requirement; or

(xv)    Licensee fails to comply with the obligations attributable to Licensee set forth in <u>Section 3(k)</u> hereof, unless such failure shall be the direct result of Licensor's breach of its obligations under Section 3(k); or

(xvi)   Licensee fails to "actively market, promote and offer for sale" (as herein defined) the Minimum Inventory set forth on <u>Schedule 3</u> hereto within the corresponding year set forth on <u>Schedule 3</u>. For



33



purposes of this Agreement, **"actively market, promote and offer for sale"** shall mean Licensee's good faith efforts to diligently market, promote and offer for sale, as applicable, all elements of the Development Components and lease all elements of the Commercial Component, at the highest prices then obtainable.

(b) If (i) Licensor determines that the Development Standards or the Operating Standards are not being maintained; (ii) Licensee has breached any other provision of this Agreement, including, without limitation, <u>Section 3(a)</u> or <u>3(b)</u> hereof, (iii) Licensee or a third party responsible therefore on Licensee's behalf fails to pay when due to Licensor any portion of the License Fee or any other fee payable to Licensor hereunder, (iv) Licensee transfers or assigns this Agreement in any manner except as expressly permitted pursuant to this Agreement, or (v) any representation made by Licensee is false or misleading in any respect (collectively, a **"Breach"**), then Licensor may notify Licensee thereof in writing (the **"Default Notice"**) and if Licensee shall fail to fully correct, to Licensor's satisfaction, any condition or cure any other Breach identified in the Default Notice, within fifteen (15) business days of the date of such Default Notice, Licensor may immediately terminate this Agreement and all rights licensed hereunder and the Related Agreements by notifying Licensee in writing of such termination; provided however, that so long as the Breach cannot be cured solely by the payment of money and Licensee shall have commenced the curing of such Breach within such fifteen (15) business day period and shall diligently prosecute the curing thereof to completion, then Licensee shall have such reasonable additional period of time as shall be reasonably necessary to cure such Breach, but in no event more than sixty (60) days. Licensor shall not be required to send a Default Notice on more than two (2) occasions in any twenty-four (24) consecutive month period during the term hereof and in the event of a third (3rd) Breach within such twenty-four (24) consecutive month period, Licensor may immediately terminate this Agreement and all rights licensed hereunder and the Related Agreements by notifying Licensee in writing of such termination.

(c) Interest shall accrue and be payable to Licensor on all License Fees and other amounts not paid to Licensor when due hereunder at the rate of the greater of (i) 3% above the then published prime rate of Citibank, N.A. in New York City (or if Citibank, N.A. shall no longer publish a "prime rate" then the prime rate of a comparable bank in New York City), or (ii) 10% per annum, in any event calculated on the basis of actual days elapsed, based on a 365-day year, from the due date of such payments to (but not including) the date of payment.

### 6.2 **By Licensee**

(a) Notwithstanding anything to the contrary contained herein, in addition to any other right or remedy of Licensee hereunder, Licensee shall have the absolute right, but not the obligation, to terminate this Agreement and the services hired hereunder and the Related Agreements including, without limitation, the Management Agreement and the Hotel Management Agreement, upon ten (10) days' prior written notice of such termination to Licensor, if or upon:

(i) Either Trump or Licensor (A) commences a case or other proceeding under any bankruptcy, reorganization, arrangement,



34



adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction; (B) has commenced against it any such case or proceeding described in the preceding clause (A) that is not dismissed within ninety (90) days after commencement; (C) is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered; (D) suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within ninety (90) days; (E) makes a general assignment for the benefit of creditors; (F) fails to pay, or states that it is unable to pay or is unable to pay, its debts generally as they become due; (G) calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts; or (H) by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing; or

(ii) Trump shall fail to attend the Donald Trump Events or one or two, as applicable, of the Trump Family Members shall fail to attend the Public Events as set forth in Section 4(f) hereof, unless such failure shall be due to the death or illness of Trump, the Trump Family Members or any of their immediate family members, close friends or relatives (in which event, the Parties shall use reasonable commercial efforts to reschedule such event), subject to Trump's and/or the Trump Family Member's right to cure by attending a substitute event reasonably promptly after the Parties have agreed on a new date for such event. To the extent any such rescheduling in required or contemplated in the preceding sentence, the Parties agree to treat the resulting delay as a Unavoidable Delay for all purposes of this Agreement so long as the Parties are working to reasonably promptly schedule such event; or

(iii) Trump or any Trump Family Member (employed at the time by Licensor or an entity owned or controlled by Trump) shall be convicted of a felony in a non-appealable decision of a state or federal court in the United States, plead *nolo contendere*.

In the case of the death or legal incapacity of Trump, Licensee, upon ten (10) days prior written notice of termination to Licensor, shall have the right, but not the obligation, to partially terminate this Agreement, but solely with respect to those portions of the Development Components for which a Marketing Event (as herein defined) shall not have occurred as of the date of such death or declaration of legal incapacity of Trump. For purposes of this Section 6.2(b), a "**Marketing Event**" shall mean Licensor and/or Licensee or any affiliate thereof marketing such Development Component as a "Trump" project, including, without limitation, whether pursuant to making a public announcement of the "Trump" affiliation with such Development Component or by distribution of sales and marketing



35



literature or a condominium offering plan utilizing the "Trump" name, it being agreed that the Signing shall not constitute a Marketing Event. Thus, by way of example only, in the event Trump's death shall occur subsequent to Licensor and Licensee or any affiliate thereof engaging in a Marketing Event for a Condo Hotel but prior to Licensor and Licensee or any affiliate thereof engaging in a Marketing Event for the Golf Course, Licensee shall have the right to partially cancel this Agreement solely to the extent that it relates to the Golf Course, but not to the extent that it relates to the Condo Hotel or any other Development Component for which a Marketing Event shall have occurred.

### 7.    **Discontinuation Use of Marks.**

Upon expiration or termination of this Agreement for any reason, Licensee will immediately undertake its best efforts to discontinue any and all uses of the Licensed Marks, and make no further use of the same whatsoever. Within thirty (30) days after expiration or termination of this Agreement, Licensee shall remove the Licensed Marks from the Property and cease using the Licensed Marks as the Property's and the Development Components' name and in connection with any marketing and sales relating to the Property, and neither Licensee nor any person acting for or on behalf of Licensee shall identify the Property in any manner as a "Trump" property or as a complex or development operated by Trump, Licensor or its affiliates, or otherwise associate itself or the Property with any Licensed Marks in any manner to the public. If Licensee fails to remove any exterior or interior signage at the Property bearing the Licensed Marks within thirty (30) days after the effective date of termination, Licensor shall have the right, at Licensee's expense, to enter the Property and remove and retain all such exterior and interior signage, without any liability for the cost to repair or restore the Property or damage to any furniture, fixtures, or equipment resulting from such removal. In the event of a breach of this Section 7 by Licensee, then in addition to all of the other remedies available to Licensor hereunder for a breach of this Agreement, Licensor shall be entitled to immediate injunctive relief and all other applicable remedies, including, without limitation, damages in connection therewith, against Licensee and any other party claiming the right to use of the Licensed Marks by, through, or under Licensee. Notwithstanding the foregoing, to the extent Licensor partially terminates this Agreement only with respect to a specific Development Component, the provisions of this Agreement shall remain in effect with respect to all other Development Components and Licensee shall be entitled to use the Licensed Marks with respect to such other Development Components as more fully set forth in this Agreement.

### 8.    **Indemnification; Insurance.**

(a)    Licensee agrees to indemnify, defend, and hold free and harmless Licensor, Donald J. Trump, its and his members, partners, affiliates, shareholders, employees, representatives, directors, officers, successors and assigns and, to the extent not already included in the foregoing list, each of the Press Protected Parties (collectively, the "**Trump Indemnified Parties**") from and against any and all liabilities, claims, losses, causes of action (including without limitation product liability actions and tort actions) and out-of-pocket expenses, including, without limitation, interest, penalties, reasonable attorneys' fees and expenses and third party fees, and all amounts paid in the investigation, defense, and/or settlement of any claims, suits, proceedings, judgments, losses, damages, costs, liabilities and

36





the like (individually and collectively, "**Claims**"), which may be suffered, incurred or paid by the Trump Indemnified Parties or any of them arising, in whole or in part, directly or indirectly, from or out of or relating to (i) Licensee's or Licensee's agents', servants', contractors' or employees' acts or omissions, in connection with the use of the Licensed Marks, (ii) the design, construction, maintenance, repair, operation, use or occupancy of the Development Components, (iii) promotion, sale, lease, or other offering of the Property or any portion thereof, (iv) any trademark, copyright, domain name, right of publicity, right of privacy action, proceeding or claim, or threat of such action, proceeding or claim, arising from Licensee's use of the Licensed Marks in violation of this Agreement or its use of any Approved Logos or any trademarks not approved by Licensor, (v) the failure of any lender which is providing financing for all or any portion of the Property (including, without limitation, any construction and/or mezzanine lender) to fulfill any requirement, satisfy any covenant or pay any portion of the License Fee in the time and manner set forth in this Agreement, (vi) the offer, marketing, sale, of any Condominium Unit, any Estate Lot or all or any portion or interest in any other Development Component and any Collateral Agreement however characterized, and/or use of Condominium Units , any Estate Lot or all or any portion or interest in any other Development Component, or (vii) non-compliance with, or violation of, any applicable federal or state securities laws, or any entitlements, land use or zoning requirements in any way relating to the Property, and the Collateral Agreements, however characterized, or (viii) the existence of any Hazardous Materials (as defined below) in the Property, or (ix) any breach or default by Licensee of any of the terms, covenants or provisions of this Agreement on Licensee's part to be observed or performed. Notwithstanding anything contained herein, the provisions of this indemnification shall not be construed to indemnify any Licensor Indemnified Party for any loss or damage attributable to the acts or omissions of such Licensor Indemnified Party. In the event that Licensee assigns this Agreement as permitted herein, Licensee shall be released from any liability to Licensor Indemnified Parties for any Claims arising pursuant to this Section 8(a), and the assignee shall assume any liability for such Claims.

(b)     Licensor hereby agrees to indemnify, defend, and hold free and harmless Licensee, its members, partners, affiliates, shareholders, employees, representatives, directors, officers, successors and assigns (collectively, the "**Licensee Indemnified Parties**") from and against any and all Claims which may be suffered, incurred or paid by the Licensee Indemnified Parties arising, in whole or in part, directly or indirectly, from, out of or relating to Licensor's or Licensor's agents, servants, contractors or employees (i) negligent acts or omissions while actually performing services pursuant to this Agreement; (ii) breach of Licensor's obligations pursuant to Section 6.2(a)(ii) of this Agreement; (iii) breach of Licensor's representations and warranties under Sections 11(a) and (b) of this Agreement, (iv) statements or representations made by Licensor which are materially untrue (provided, however, that the indemnity set forth in this clause (iv) shall not extend to, and Licensor shall have no liability to the Licensee Indemnified Parties for, any information, statement, representation or warranty, whether written or oral, furnished or made by Licensee or any employee, representative or agent of Licensee or furnished, it being understood that this subsection (iv) shall not reduce whatsoever Licensor's obligations under subsection (iii) above or (v) breach or default by Licensor of any of the terms, covenants or provisions of this Agreement on Licensor's part to be observed or performed, but only to the extent that, subject to the terms of this Agreement, Licensor, its agents, servants, contractors or employees shall have been grossly negligent or shall have willfully failed to comply with or observed the time periods and procedures set forth herein. Notwithstanding



37



anything contained herein, the provisions of this indemnification shall not be construed to indemnify any Licensee Indemnified Party for any loss or damage attributable to the acts or omissions of such Licensee Indemnified Party. In the event that Licensor assigns this Agreement as permitted herein, Licensor shall be released from any liability to the Licensee Indemnified Parties for any Claims arising pursuant to this Section 8(b), and the assignee shall assume any liability for such Claims.

(c)     Licensee shall obtain, at Licensee's sole cost and expense, and shall maintain throughout the term of this Agreement, the insurance coverage set forth on Schedule 2 annexed hereto and made a part hereof, and Licensee shall otherwise comply with the provisions of Schedule 2.

(d)     Licensee shall name, and shall cause the Board to name, the Trump Indemnified Parties as additional insureds in all policies of liability insurance maintained by Licensee and the condominium association and/or the Board, for and in connection with the construction, operation, ownership and maintenance of the Property.     Licensee and the condominium association and/or the Board shall deliver to Licensor a certificate and policy endorsement evidencing such coverage within ten (10) days of the issuance of each such policy of insurance and each renewal thereof.

(e)     (i) Whenever any claim shall arise for indemnification under Section 8(a), Licensor shall notify Licensee of such claim and, when known, the facts constituting the basis for such claim; provided, however, that in the event of any claim for indemnification hereunder resulting from or in connection with any claim or legal proceeding by a third party (a **"Third Party Claim"**), Licensor shall endeavor to give such notice thereof to Licensee prior to the time any response to the asserted claim is required (provided that failure to timely notify Licensee shall not relieve Licensee of any liability it may have to the Trump Indemnified Parties. Licensor shall, at its option, have the right to assume the defense of any such Third Party Claim, and shall have the right to retain counsel, at its exclusive cost, of its choice to defend any such Third Party Claim.  In the event Licensor shall not elect to assume the defense of any Third Party Claim, Licensee shall undertake (in accordance with the terms hereof), through counsel of Licensee's choosing (*provided* that such counsel must be reasonably acceptable to Licensor) and at Licensee's own expense, the settlement or defense thereof, and Licensor shall cooperate with Licensee and such counsel, at Licensee's expense, in connection therewith; *provided* that Licensor may participate in such settlement or defense through counsel chosen by Licensor and paid at Licensor's own expense; and *provided further* that, if in the reasonable opinion of counsel for Licensor, there is a reasonable likelihood of a conflict of interest between Licensee and Licensor, Licensee shall be responsible for the fees and expenses of the counsel to Licensor in connection with such defense.  Licensee shall not, without the prior written consent of Licensor, settle or compromise any Third Party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder, unless such settlement, compromise or consent includes an unconditional release, satisfactory to Licensor, of all applicable Trump Indemnified Parties from all liabilities arising out of such Third Party Claim and does not contain any equitable order, judgment or terms which includes any admission of guilt or wrongdoing by Licensor or any Indemnified Party.



38



(ii) Whenever any claim shall arise for indemnification under Section 8(b), Licensee shall notify Licensor of such claim and, when known, the facts constituting the basis for such claim; provided, however, that in the event of any claim for indemnification hereunder resulting from or in connection with any Third Party Claim, Licensee shall endeavor to give such notice thereof to Licensor prior to the time any response to the asserted claim is required (provided that failure to timely notify Licensor shall not relieve Licensor of any liability it may have to Licensee. Licensee shall, at its option, have the right to assume the defense of any such Third Party Claim, and shall have the right to retain counsel, at its exclusive cost, of its choice to defend any such Third Party Claim. In the event Licensee shall not elect to assume the defense of any Third Party Claim, Licensor shall undertake (in accordance with the terms hereof), through counsel of Licensor's choosing *(provided* that such counsel must be reasonably acceptable to Licensee) and at Licensor's own expense, the settlement or defense thereof, and Licensee shall cooperate with Licensor and such counsel, at Licensor's expense, in connection therewith; *provided* that Licensee may participate in such settlement or defense through counsel chosen by Licensee and paid at Licensee's own expense; and *provided further* that, if in the reasonable opinion of counsel for Licensee, there is a reasonable likelihood of a conflict of interest between Licensee and Licensor, Licensor shall be responsible for the fees and expenses of the counsel to Licensee in connection with such defense. Licensor shall not, without the prior written consent of Licensee, settle or compromise any Third Party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder, unless such settlement, compromise or consent includes an unconditional release, satisfactory to Licensee, from all liabilities arising out of such Third Party Claim and does not contain any equitable order, judgment or terms which includes any admission of guilt or wrongdoing by Licensee.

(f) The provisions of this Section 8 shall survive the expiration of the term or sooner termination of this Agreement.

9. **Assignment**.

(a) Licensor may assign this Agreement, without the prior consent of Licensee, to a Licensor Permitted Transferee (as herein defined), provided that the ownership or control of the Licensed Marks is obtained by such Licensor Permitted Transferee. This Agreement and Licensee's use of the Licensed Marks shall inure solely to the benefit of Licensor and to any and all heirs, successors or assignees of Licensor who own or control the Licensed Marks. For purposes of this Agreement, the term **"Licensor Permitted Transferee"** shall mean (i) Donald J. Trump, (ii) the spouse and/or descendants of Donald J. Trump (including any related trusts controlled by, and established and maintained for the benefit of Donald J. Trump or such spouse or descendants), (iii) the estate of any of the foregoing, and (iv) any entity in which Donald J. Trump and/or any of the parties referred to in clauses (i), (ii) or (iii) of this Section 9(a) has a controlling ownership interest.

(b) Upon filing of the Declaration or Condominium Documents in the appropriate land records office where the Property is located, the rights and obligations of Licensee hereunder (other than Licensee's payment obligations pursuant to Section 4 hereof that are no longer effective, it being agreed that certain recurring License Fees may remain payable and shall be assumed by the applicable Board) shall be severed and assigned to and assumed by,



39



the respective Boards as follows: Licensor and the applicable Board on behalf of the respective Condominium or association or other entity created pursuant to the Declaration shall each enter into a form of license agreement provided by Licensor to such Board (the **"Subsequent Board Agreement"**), which form shall contain substantially the same terms and conditions as set forth in this Agreement (as modified to provide for a limited subset of the Development Components that are applicable to such Board) other than the aforementioned payment obligations. No Subsequent Board Agreement shall be effective (and the respective Board shall not have any rights to the Licensed Marks), until such time as Licensor and the respective Board shall execute the respective Subsequent Board Agreement.

(c)     Licensee may assign this Agreement without the written consent of Licensor to an institutional lender as collateral security in connection with any construction financing of the Property, so long as such institutional lender includes a clause substantially similar to the clause set forth in Exhibit B annexed hereto and made a part hereof, in the loan documents and such lender acknowledges it is bound by the terms of this Agreement and that the loan documents are subject to the terms, conditions and restrictions of this Agreement. Licensor shall execute a collateral assignment of this Agreement in favor of Licensee's institutional lender or such other documents as may be reasonably requested by the institutional lender, so long as such assignment does not alter any of the terms of this Agreement. Any assignment permitted under this Section 9(c) shall relate only to the portion of the Property held as first priority collateral by such institutional lender, it being agreed that none of Licensee's lenders shall have duplicative or overlapping rights resulting from any such collateral assignment.

(d)     Licensee may assign this Agreement, without the prior consent of Licensor, to a Licensee Permitted Transferee (as herein defined). For purposes of this Agreement, the term **"Licensee Permitted Transferee"** shall mean any entity in which Licensee, or the current shareholders of Licensee, have a controlling (direct or indirect) interest, provided, that the association of such Licensee Permitted Transferee with Licensor would, in Licensor's sole judgment, not cause Licensor or Trump or any affiliate of either Licensor or Trump to lose, fail to qualify for or fail to obtain a renewal of any gaming license, real estate brokerage license, real estate mortgage brokerage license, real estate mortgage banking license or liquor license.

(e)     Notwithstanding the provisions of Sections 9(a), 9(b) and 9(c), (y) no assignment by Licensee shall relieve (i) the original named Licensee from its obligations under this Agreement, including, without limitation, Licensee's payment obligations pursuant to Section 4 hereof or (ii) the Principals from any of their obligations under this Agreement and (z) no assignment by Licensor shall relieve the original named Licensor of its obligations under Section 11(iv), (v) and (vi) of this Agreement.

(f)     Except as otherwise provided above, any other assignment of this Agreement or any rights hereunder, including by transfer of shares or interests in Licensor or Licensee, or by operation of law, shall require the prior written consent of the other party which may be withheld, and/or conditioned in the non-assigning party's sole discretion.



40



10. **Infringement**

(a)    If during the term of this Agreement any trademark action, proceeding or claim is instituted against Licensee in the Dominican Republic, based solely on the use of the Licensed Marks (exclusive of any Design Logos or Approved Logos) in the United States, Dominican Republic or any other jurisdiction in which Licensor and Licensee have agreed to register and have, in fact, registered the Licensed Marks (the **"Licensor Trademark Claim"**) pursuant to the terms of this Agreement, Licensor hereby agrees, subject to the other provisions of this Section 10 to indemnify, defend, and hold free and harmless Licensee, its employees, representatives, directors, officers, permitted successors and assigns from and against the Licensor Trademark Claim and reasonable out-of-pocket expenses, including, without limitation, interest, penalties, attorney and third party fees which may be suffered, incurred or paid by Licensee. Licensee agrees to fully cooperate with Licensor in the defense of the Licensor Trademark Claim or any threat thereof and to take no actions of any kind regarding the Licensor Trademark Claim or threat thereof without the express prior written consent of Licensor. Licensor shall have the sole and absolute right to: (i) defend itself against any Licensor Trademark Claim or threat thereof; and (ii) negotiate and enter into any settlement of any such Licensor Trademark Claim or threat thereof, provided, that Licensor shall (x) reasonably consult with Licensee prior to entering into any settlement of such Licensor Trademark Claim or threat thereof and prior to terminating the Agreement; and (y) reasonably work with Licensee in order to identify and implement a substitute Licensed Mark to the extent the Licensed Mark which is the subject of the Licensor Trademark Claim can, in Licensor's sole discretion or by order of a court of competent jurisdiction, no longer be used by Licensee. Licensee shall take all steps reasonably recommended by Licensor, and at Licensor's sole (but reasonable) expense, to mitigate its damages incurred, including the removal of the Licensed Marks from the Development Components and the Property and the discontinuance of any use or replacement of the Licensed Marks, if required by Licensor or by order of a court of competent jurisdiction. The remedy provided in this Section 10 shall be the sole and entire remedy of Licensee and, without limiting the provisions of Section 22, Licensor shall not be responsible for any damages of any kind, including special or consequential damages or projected lost sales or profit of Licensee or other expenditures of Licensee. Licensee shall promptly notify Licensor of any marks used by third parties that may be confusingly similar or otherwise damaging to the Licensed Marks, but shall take no other action of any kind with respect thereto, except by express prior written authorization of Licensor.

(b)    Intentionally Deleted.

(c)    Intentionally Deleted.

(d)    If during the term of this Agreement, any trademark action, proceeding or claim, based solely on the use of the mark CAP CANA as used in connection with the Licensed Marks (the **"Licensee Trademark Claim"**) pursuant to the terms of this Agreement, is instituted against Licensee, Licensor hereby agrees to reasonably cooperate with Licensee in the defense of the Licensee Trademark Claim at Licensee's sole cost and expense. Licensor agrees to take no actions of any kind regarding the Licensee Trademark Claim without the express prior written consent of Licensee. Licensor further agrees, within a reasonable period of time, 

41



to discontinue any use of the Cap Cana Mark as used in connection with the Licensed Marks, if required by Licensee.

(e) If during the term of this Agreement any trademark action, proceeding or claim, based on the use by Licensor of the Cap Cana Mark (the "**Cap Cana Trademark Claim**") pursuant to the terms of this Agreement, is instituted against Licensor, Licensee hereby agrees, to indemnify, defend, and hold free and harmless Licensor, its employees, representatives, directors, officers, permitted successors and assigns from and against the Cap Cana Trademark Claim and reasonable out-of-pocket expenses, including, without limitation, interest, penalties, attorney and third party fees which may be suffered, incurred or paid by Licensor. Licensee agrees to fully cooperate with Licensor in the defense of the Cap Cana Trademark Claim and to take no actions of any kind regarding the Cap Cana Trademark Claim without the express prior written consent of Licensor. Licensee shall have the sole and absolute right to settle any such Cap Cana Trademark Claim and to negotiate and determine the settlement terms thereof, provided, that Licensee shall (x) reasonably consult with Licensor prior to entering into any settlement of such Cap Cana Trademark Claim; and (y) reasonably work with Licensor in order to identify and implement a substitute Cap Cana Mark to the extent the Cap Cana Mark can, in Licensee's sole discretion or by order of a court of competent jurisdiction, no longer be used by Licensor. Licensee shall take all steps reasonably recommended by Licensor to mitigate Licensor's damages incurred, including the removal of the Cap Cana Mark from the Property and discontinuance of any use of the Cap Cana Mark, if required by Licensor.

11. **Representations, Warranties and Certain Covenants.**

(a) Licensor represents and warrants, and as applicable covenants, to Licensee that:

(i) Licensor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Licensor has the power and authority and all licenses, authorizations, consents and approvals to perform its obligations under this Agreement.

(ii) To Licensor's knowledge, and without having performed any inquiry or investigation in jurisdictions other than the United States, no other person holds rights over the Trump Mark in a way which would materially affect Licensor's rights to the Licensed Marks pursuant to the terms of this Agreement.

(iii) Licensor shall use commercially reasonable efforts to maintain in full force and effect the Licensed Marks in all jurisdictions for which Licensee is bearing the cost of registration pursuant to clauses 1(c) and 1(f) of this Agreement.

(iv) The Trump Mark is owned or controlled by Licensor in the United States.



42



(v) To Licensor's knowledge, and without having performed any inquiry or investigation in jurisdictions other than the United States, there is no material claim, suit, action or proceeding pending or threatened, or that could be made, against Licensor with respect to the execution of this Agreement by Licensor or the performance of its obligations hereunder or the validity of any of the Trump Marks, Licensor's ownership of any of the Trump Marks, the infringement of any of the Trump Marks by any third party or the infringement of rights of any third party arising out of the use of any of the Trump Marks, which, in each case, would deprive Licensee of any of its material rights granted to Licensee under this Agreement.

(vi) The execution, delivery and performance by Licensor of this Agreement has been duly authorized by all necessary limited liability company action, and does not and will not contravene the terms of Licensor's charter documents, conflict with, or result in any breach or contravention of, any contractual obligation to which Trump or Licensor is a party, or, to Licensor's knowledge, any order, injunction, writ or decree of any governmental authority to which Licensor or its property is subject or violate any requirement of law.

(vii) This Agreement constitutes a legal, valid and binding obligation of Licensor, enforceable against Licensor in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

(viii) Licensor shall use its commercially reasonable efforts to procure a registration from the National Office of Industrial Property in the Dominican Republic (the "**NOIP**") with respect to the Licensed Marks, and to protect and maintain in full force and effect, the Licensed Marks (exclusive of Approved Logos) in the Dominican Republic, to the extent a registration has been issued by the NOIP with respect to the Licensed Marks; provided that Licensee acknowledges that Licensor makes no representation that the NOIP will issue a registration for the Licensed Marks or that the Licensed Marks will be available for Licensee's use in the Dominican Republic; further, provided that the costs and expenses incurred by Licensor in performance of this covenant shall be borne as set forth in Section 1(c) of this Agreement.

(ix) Licensor agrees to indemnify, defend, save and hold harmless Licensee from and against any claims or suits for fees arising from



43



Licensor's breach of the warranties and representations made by Licensor in this <u>Section 11</u>.

(b)     Moreover Trump and Licensor (as applicable) hereby expressly undertake not to reduce, alter or terminate the rights of Licensor over the Licensed Marks in any way that may affect Licensor's authority and capability to perform its duties under this Agreement.

(c)     Licensee represents and warrants to Licensor and, as applicable, covenants and agrees that:

    (i)     Licensee is a corporation (Sociedad Anonima) duly organized, validly existing and in good standing under the laws of the Dominican Republic and of each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, including, without limitation, the jurisdiction in which the Property is located.

    (ii)     Licensee has the power and authority and all licenses, authorizations, consents and approvals to perform its obligations under this Agreement.

    (iii)     The execution, delivery and performance by Licensee of this Agreement has been duly authorized by all necessary corporate action, and does not and will not contravene the terms of Licensee's charter documents, conflict with, or result in any breach or contravention of, any contractual obligation to which Licensee is a party or, to Licensee's knowledge, any order, injunction, writ or decree of any governmental authority to which Licensee or its property is subject or violate any requirement of law.

    (iv)     This Agreement constitutes a legal, valid and binding obligations of Licensee, enforceable against Licensee in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

    (v)     There was no broker or finder instrumental in consummating the transaction contemplated in this Agreement and that no conversations or negotiations were had with any broker or finder, concerning the terms of this Agreement.

    (vi)     Licensee agrees to indemnify, defend, save and hold harmless Licensor from and against any claims or suits for fees arising from Licensee's breach of the warranties and representations made by Licensee in this <u>Section 11</u>.



44



(vii)    To Licensee's knowledge, after conducting the necessary due diligence, there is no law, ordinance, regulation, covenants, conditions or restriction which conflicts with or would otherwise prevent Licensee from (x) operating and maintaining the Property in accordance with the Operating Standards and (y) designing, developing, constructing, equipping and furnishing the Property in accordance with the Development Standards.

(viii)   To Licensee's knowledge, the Property is free of all Hazardous Materials (as herein defined); and neither Licensee nor any other Person, to the best knowledge of Licensee, has ever caused or permitted any Hazardous Materials to be placed, held, located or disposed of on, under, at or in a manner to affect any part of the Property and no part of the Property has ever been used, whether by Licensee or by any other Person, to the best knowledge of Licensee, for any activities involving, directly or indirectly, the use, generation, treatment, storage, transportation, or disposal of any Hazardous Material. None of the Property is subject to any existing, pending, or, to the best of Licensee's knowledge, threatened investigation or inquiry by any Governmental Authority (as herein defined) relating to Hazardous Materials located on or about any part of the Property, and no part of the Property is subject to any remedial obligations under any applicable Laws (as herein defined) pertaining to health or the environment. To the best of Licensee's knowledge, there are not now, nor have there ever been, any underground tanks, vessels, or similar facilities for the storage, containment or accumulation of Hazardous Materials of any sort on or affecting any part of the Property. For purposes of this Agreement, the term **"Hazardous Materials"** shall mean any and all materials considered to be or classified as hazardous pursuant to Environmental Law No.64-00, its rules of application and implementing regulations issued, from time to time, by the Ministry of Environment of the Dominican Republic.

(ix)     To Licensee's knowledge, (i) no other person holds rights over the Cap Cana Mark in a way which would materially affect Licensee's rights to the Cap Cana Mark pursuant to the terms of this Agreement and (ii) the Cap Cana Mark is owned or controlled by Licensee in the Dominican Republic.

(x)      Licensee is and shall, throughout the term of this Agreement, remain the lawful owner of the Property, and hold valid legal title thereto. Notwithstanding the foregoing, nothing contained herein shall be deemed to preclude Licensee from (y) selling any unit, lot or component located on the Property in the manner contemplated under this Agreement (subject to Licensor's right to receive those fees provided for in this Agreement) or selling any two of the 

45

beachfront locations which will not be used (in Licensee's sole discretion, but in any event in accordance with the terms of this Agreement) for constructing and developing the Condo Hotel; or (z) assigning this Agreement to a Licensee Permitted Transferee, provided, that, except as otherwise set forth in this Agreement, Licensee and said Licensee Permitted Transferee shall continue to be bound by the terms and provisions of this Agreement, including, without limitation, this subsection (x).

(d)    The provisions of this Section 11 shall survive the expiration or termination of this Agreement.

### 12.    **Licensor Office.**

So long as this Agreement (and/or any Subsequent Board Agreement) shall remain in effect and Licensor and any of Licensor's affiliates shall be involved with the supervision or management of any portion of the Property, Licensee (and/or the applicable Condominium) shall make available to Licensor, the use of appropriate office space (the "Office"), the size and location of which shall be mutually agreed upon by Licensor and Licensee. Licensor (and/or its affiliates) may utilize the Office for such purposes as Licensor (or its affiliates) may deem appropriate in connection with the Property, including, without limitation, management related functions relating to the Property. Licensee (and/or the applicable Condominium) shall provide such signage as Licensor may reasonably require (of sizes and in locations to be mutually agreed upon by Licensor and Licensee upon Licensor's proposal) which shall identify the Office and Licensor's (or Licensor's affiliates) activities therein. The usage of the Office will be at Licensee's (and/or the applicable Condominium's) sole cost and expense, but charges for use of services (i.e. water, telephone, electricity) will be at Licensor's cost.

### 13.    **Gaming Restriction.**

In no event may the Property, or any portion thereof, be used for Casino and Gaming Activities (as hereinafter defined) without the prior written consent of Licensor, which consent may be withheld in Licensor's sole discretion. In the event of a breach of this Section 13, Licensor shall have the immediate right to terminate this Agreement (provided that any such termination shall not relieve Licensee from any of its obligations hereunder, including, without limitation, the payment by Licensee of any License Fees which have accrued hereunder). For purposes of this Agreement, the term "Casino and Gaming Activities" shall mean the business of owning, operating, managing or developing a casino or similar facility in which a principal business activity is the taking or receiving of bets or wagers upon the result of games of chance or skill, including hotel, dockside, riverboat, cruise ship, transportation, entertainment, sports, resort, bar, restaurant and retail services in connection with any of the foregoing activities. Notwithstanding the foregoing, nothing contained in this Agreement shall prohibit Licensee (or Licensee's affiliates) from using land located outside the Property for Casino and Gaming Activities to the extent permitted by law, provided, that such use shall not include the Trump Mark, including, without limitation, the Licensed Marks. Without limiting any of the other



46



provisions of this Agreement, or the terms of <u>Exhibit C</u>, the restriction set forth in this <u>Section 13</u> shall be included in the Declaration and the Condominium Documents.

14. **Notices**.

(a) Any notice, election, request or demand which by any provision of this Agreement is required or permitted to be given or served hereunder shall be in writing and shall be given or served by (i) hand delivery against receipt; or (ii) by any nationally recognized overnight courier service providing evidence of the date of delivery; or (iii) by facsimile transmission, provided it is also concurrently sent by mail as provided in (ii) above, in each case addressed to:

<u>Licensee</u>:

Ricardo Hazoury
Alberto Larancuent No. 8, Ensanche Naco
Santo Domingo, Dominican Republic
Fax No.: 809 688-4767

<u>With copies to</u>:

Elaine Senra
Alberto Larancuent No. 8, Ensanche Naco
Santo Domingo, Dominican Republic
Fax No.: 809 375-5509

Jaime Mercado, Esq.
Simpson Thatcher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017-3954
Fax: (212) 455-2502

<u>Licensor</u>:

Trump Marks Real Estate LLC
c/o The Trump Organization LLC
725 Fifth Avenue
New York, New York 10022
Attention: Donald J. Trump
Fax: (212) 755-3230

<u>With a copy to</u>:

Trump Marks Real Estate LLC
725 Fifth Avenue
New York, New York 10022



47



Attention: Jason D. Greenblatt, Esq.
Fax: (212) 980-3821

and one additional copy to:

Trump Marks Real Estate LLC
725 Fifth Avenue
New York, New York 10022
Attention: Donald J. Trump, Jr., Ivanka Trump and Eric Trump
Fax: (212) 688-8135

or to such other address or addresses, or such other persons, as a party shall from time to time designate by notice given and delivered as aforesaid.

(b)     Any notice shall be deemed to have been rendered or given: (i) on the date hand delivered (or when delivery is refused), unless such hand delivery was not on a business day or was after 5:30 p.m. on a business day, in which event delivery shall be deemed to have been rendered on the next business day; or (ii) on the date delivered by a courier service (or when delivery is refused), unless such delivery was not on a business day or was after 5:30 p.m. on a business day, in which event delivery shall be deemed to have been rendered on the next business day.

15.     **Financing; Referral Fee.**

(a)     If at Licensee's request, Licensor, or any of its affiliates, is responsible for securing any financing for the construction of any portion of the Property or the Development Component, Licensee shall pay Licensor (or such Licensor's affiliate) one percent (1%) of the amount of the financing, payable on the closing of the financing, out of the proceeds thereof.

(b)     In the event that at any time an affiliate of Licensor or broker of Licensor shall refer to Licensee or Licensee's sales or leasing agent for any portion of the Property, a prospective purchaser or lessee (a **"Prospectus"**) of any of the Residential Component, Estate Lots, Golf Lots, Hotel Component and/or Commercial Component (as applicable), as defined under this Agreement, who shall close title to or enter into a lease agreement with respect to the use of the above mentioned components, as applicable (it being agreed that any leases other than leases of an element of the Commercial Component shall require Licensor and Licensee's prior consent), Licensee shall pay to Licensor a referral fee (the **"Referral Fee"**) equal to (a) in the case of a sale, three (3%) percent of the total purchase price of the corresponding Unit, including without limitation, the price for all furniture, fixtures equipment and unit upgrades related to such sale, as set forth in the contract of sale for such component; and (b) in the case of a lease agreement, one (1%) percent of the total amount payable under such agreement to Licensee for the first term of the lease, or other fee for all furniture, fixtures and equipment, that are part of such rental agreement, if not included in the rental price. For purpose of this agreement, the Referral Fee shall be deemed earned by Licensor's affiliate or Licensor's external broker (x) in the case of a sale, upon completion by the purchaser of all of the following: (i) execution of the applicable purchase and sale agreement related to the Unit within



48



the Development Component; (ii) payment of the down payment and/or the first advance of the down payment (whichever occurs first); and (iii) delivery of the corresponding financial information relating to the purchaser of the subject Unit; and (y) in the case of a lease or other agreement (other than a sale), upon the execution of the applicable lease or other agreement and the corresponding deposit and rental advance-payments have been paid by the lessee.

The Referral Fee will be paid to Licensor or its affiliate in the case of a sale, at the closing (as defined in Schedule 1) of the sale of the corresponding unit, and in accordance with the form of payment established by Licensee (which depends of the form of payment chosen by the buyer). Licensor shall use its reasonable commercial efforts to notify Licensee that the referral has been made by Licensor or an affiliate or broker of Licensor at the time, in the understanding that for the purpose of this agreement Licensee will pay the Referral Fee to the broker that the purchaser expressly indicates referred him to the project. The Referral Fees will be subject to applicable withholding taxes as referred in Section 20.

For purpose of this agreement, a "Referral" will be considered to be made by an affiliate of Licensor or external broker of Licensor when the following conditions are met:

(i) an affiliate or external broker of Licensor has sent (in full compliance with applicable data protection regulations) the contact information of the prospectus directly to the Sales Department of Licensee, including the following identifying information relating to potential buyer: name, address, telephone number, cell phone number, email address, etc; and if applicable, any other relevant information regarding real estate investments that said Prospectus have already made in Licensor's developments; and

(ii) an affiliate or external broker of Licensor has previously interacted with such Prospectus, and has provided to the Prospectus some relevant information and details related to the Property or a Development Component.

In case that from time to time, Licensee applies as a general policy the payment of higher referral commission rates to its referral brokers, then Licensee will pay to the affiliate of Licensor or broker of Licensor the Referral Fee at the same rate as paid to such other referral brokers. This provision will not apply for isolated cases where, for instance, Licensee gives different treatment to its referral brokers, in order to encourage sales efforts in some specific markets. For purposes of this paragraph, a "referral broker" is the Licensee's agent who is usually involved in sales activities, whose principal service provided to Licensee consists in referring a Prospectus to the sales department of Licensee (upon completion of applicable requirements), without incurring any expense, charge or costs in order to incentive the sales of a product to such prospectus.



49



16. **Confidentiality.**

Licensor and Licensee covenant and agree that, without the prior written consent of the other, and unless required by law or to enforce the terms of this Agreement, each will not, under any circumstances, disclose or permit to be disclosed the existence of this Agreement or any of its contents, to any person or entities for any purpose whatsoever, other than solely to their respective shareholders, directors, members, officers and other employees, attorneys, accountants, consultants, financial advisors and to any and all prospective partners, investors and lenders interested on the Development Components (collectively, "**Affiliated Parties**"), in each such case, on a "need to know basis". All Affiliated Parties shall be deemed bound by the provisions of this Section 16 in connection with any such permitted disclosure to any Affiliated Parties, and the parties shall indemnify and hold each other harmless from and against all damages, loss and liability, including without limitation, attorneys' fees, arising from or incurred as a result of the breach of such provisions by an Affiliated Party. Without limiting the foregoing, the parties shall not disclose the economic terms of this Agreement to any party including, without limitation, the Board or the Condominium, and shall not include a copy of this Agreement in the Condominium Documents, except in case that such party shall be required to provide some of this information to a Licensee Permitted Transferee as part of an assignment under Section 9(d) hereof.

17. **Additional Representations, Warranties and Covenants.**

(a) Licensee shall notify Licensor immediately in writing if Licensee or any direct or indirect owner of any interest therein is or becomes (i) engaged in any money laundering scheme or activity in violation of the Patriot Act (as hereinafter defined) or (ii) a Prohibited Person (as hereinafter defined). Licensee (i) understands and acknowledges that Licensor is, or may in the future become subject to, AML Laws (as hereinafter defined) and agrees to execute instruments, provide information or perform any other acts as may be requested by Licensor for the purpose of: (A) carrying out due diligence as may be required by AML Laws to establish the identity of such Licensee, as well as the identity of any of Licensee's direct or indirect shareholders, partners, members, directors, officers, beneficiaries, (B) maintaining records of such identities or verifications or certifications as to the same and (C) taking any other actions as may be required to comply with and remain in compliance with AML Laws applicable to Licensor, (ii) authorizes and consents to Licensor contacting the bank or other financial institution with which Licensee maintains an account and verifying with such bank or other financial institution such Licensee's identity, (iii) authorizes and consents to Licensor releasing confidential information about Licensee and its direct or indirect shareholders, partners, members, directors, officers, beneficiaries to the appropriate Governmental Authority (as hereinafter defined) (or to other financial institutions) if Licensor determines that it is in its best interest in light of applicable AML Laws and (iv) understands and acknowledges that if Licensor reasonably believes that Licensee (or any direct or indirect owner of any interest therein) is a Prohibited Person (as hereinafter defined) or Licensee (or any direct or indirect owner of any interest therein) has otherwise breached its representations and warranties hereunder as to its identity, Licensor may, without limiting any of the other provisions of this Agreement, including, without limitation, Section 6 hereof, immediately terminate this Agreement. Licensee shall comply with all AML Laws.





50

(b)    Licensee is not, nor is any direct or indirect owner of any interest in Licensee, (i) engaged in any money laundering scheme or activity in violation of the Patriot Act or (ii) a Prohibited Person.

(c)    For the purpose of this agreement, the term **"AML Laws"** shall mean money laundering and anti-terrorist Laws and Regulations and policies, including the Patriot Act and those issued by the U.S. Office of Foreign Asset Control and the U.S. Department of Treasury, all as amended, modified, succeeded or replaced from time to time. For the purpose of this agreement, the term **"Governmental Authority"** shall mean any foreign, national, federal, state, county, regional, local or municipal government (including any agency or political subdivision of any of the foregoing) and any Person with jurisdiction exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government or quasi-governmental issues (including any court). For the purpose of this agreement, the term **"Patriot Act"** shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, and the regulations promulgated thereunder, all as amended, modified, succeeded or replaced from time to time. For the purpose of this agreement, the term **"Prohibited Person"** shall mean (i) any Person listed in the Annex to, or who is otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism, (ii) any Person that is named as a "Specifically Designated National (SDN)" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website (http://www.treas.gov/offices/eotffc/ofac/sdn/t11sdn.pdf) or at any replacement website or other replacement official publication of such list or is named on any other Governmental Authority or regulatory list issued after September 11, 2001, (iii) any Person acting, directly or indirectly, in contravention of any AML Law, (iv) any terrorist organizations or narcotics traffickers, including those Persons that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Financial Action Task Force on Money Laundering, U.S. Office of Foreign Assets Control, U.S. Securities and Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, U.S. Internal Revenue Service, all as may be amended, modified, succeeded or replaced from time to time or (v) any Person that is owned or Controlled by, or acting for or on behalf of, any Person described in any of clauses (i), (ii), (iii) or (iv) above. For purposes of this Agreement, the term **"Person"** shall mean any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any Governmental Authority, endowment fund or any other form of entity.

18.    **Arbitration.**

(a)    In the event a dispute shall arise under this Agreement which the Parties have expressly agreed may be resolved by arbitration, either Licensor or Licensee may thereafter submit such dispute (the **"Arbitrable Dispute"**) to arbitration in accordance with the then prevailing Expedited Procedures of the Arbitration Rules for the Real Estate Industry of the American Arbitration Association or its successor for arbitration of commercial disputes as herein modified (collectively, the **"Arbitration Procedures"**).



51



(b)    In its demand for arbitration, the demanding party shall specify the name and address of the person to act as the arbitrator on its behalf. Within twenty (20) days after the service of the demand for arbitration, the receiving party shall give notice to the demanding party specifying the name and address of the person designated by the receiving party to act as arbitrator on its behalf, which arbitrator shall be similarly qualified. If the receiving party fails to notify the demanding party of the appointment of its arbitrator within such twenty (20) day period, the demanding party may send an additional notice to the receiving party, which notice and the front of the envelope containing the same shall be marked "**URGENT**" and shall include the following warning thereon: **FAILURE TO RESPOND WITHIN TEN (10) BUSINESS DAYS OF RECEIPT OF THIS SECOND NOTICE WILL RESULT IN THE DEMANDING PARTY'S ARBITRATOR BEING APPOINTED.** If the receiving party fails to reply within such ten (10) business day period then the arbitrator appointed by the demanding party shall be the arbitrator to determine the dispute submitted for arbitration; provided that such appointment of the demanding party's arbitrator shall not be deemed to have occurred unless such second notice has been provided by the demanding party in accordance and compliance in all respects with the foregoing requirements in respect thereof.

(c)    The arbitrators so chosen shall meet within fifteen (15) days after the second arbitrator is appointed and shall seek to reach agreement on the Arbitrable Dispute (or if the first arbitrator is deemed to be the sole arbitrator pursuant to Paragraph 18(b) above, such sole arbitrator shall decide the Arbitrable Dispute within the aforementioned 15-day period). If within twenty (20) days after the second arbitrator is appointed the two arbitrators are unable to reach agreement on the Arbitrable Dispute, the two arbitrators shall appoint a third arbitrator, who shall be a competent and impartial person (who does not and has not had relationship of any nature whatsoever to any of the parties and who has not worked during the ten (10) years prior to the appointment, as an employee, consultant, advisor or any other way, for any of the parties) with qualifications similar to those required of the first two arbitrators. If they are unable to agree upon such appointment within five (5) days after expiration of such twenty (20) day period, the third arbitrator shall be selected by the Parties themselves. If the parties do not agree on the third arbitrator within five (5) days after expiration of the foregoing five (5) day period, then either party, on behalf of both, may request appointment of such a qualified person by the then president of the Real Estate Board of New York, and either party may request that the appointment of the third arbitrator take place within the maximum period of five (5) days after the request for appointment. The third arbitrator shall decide the Arbitrable Dispute, if it has not been previously resolved, by following the procedures set forth in Section 18(d). Each party shall pay the fees and expenses of its respective arbitrator and both shall share the fees and expenses of the third arbitrator. Attorneys' fees and expenses of counsel and of witnesses for the respective parties shall be paid by the respective party engaging such counsel or calling such witnesses.

(d)    The Arbitrable Dispute shall be determined by the third arbitrator in accordance with the following procedures. Concurrently with the appointment of the third arbitrator, each of the arbitrators selected by the Parties shall state, in writing, his or her determination of the Arbitrable Dispute supported by the reasons therefor. The third arbitrator shall have the right to consult experts and competent authorities for factual information or



52



evidence pertaining to a determination of the Arbitrable Dispute, but any such determination shall be made in the presence of both Parties with full right on their part to cross-examine. The third arbitrator shall conduct such hearings and investigations as he or she deem appropriate and shall, within thirty (30) days after being appointed, select which of the two proposed determinations most closely approximates his or her determination of the Arbitrable Dispute. The third arbitrator shall have no right to propose a middle ground or any modification of either of the two proposed determinations. The determination he or she chooses as that most closely approximating his or her determination of the Arbitrable Dispute shall constitute the decision of the third arbitrator and shall be final and binding upon the parties. The third arbitrator shall render the decision in writing with counterpart copies to each party. The third arbitrator shall have no power to add to or modify the provisions of this Agreement. Promptly following receipt of the third arbitrator's decision, the parties shall execute such documents as are reasonably required to properly and fully memorialize the arbitrator's decision on the Arbitrable Dispute, including, without limitation, any amendment to this Agreement, but the failure of the Parties to do so shall not affect the effectiveness of the arbitrator's determination. In the event the Parties shall disagree as to what, if any, documents are reasonably required to memorialize the arbitrator's decision, such dispute shall further be decided by such arbitrator.

(e) In the event of a failure, refusal or inability of any arbitrator to act, his or her successor shall be appointed by him or her, but in the case of the third arbitrator, his or her successor shall be appointed in the same manner as that set forth herein with respect to the appointment of the original third arbitrator.

### 19. **Memorandum of License.**

Within ten (10) days following Licensor's request therefor, Licensee shall execute a memorandum of this Agreement in the form attached as Exhibit H hereto (or in other recordable form reasonably satisfactory to Licensor), which may specifically state the rights Licensor has pursuant to this Agreement, including, without limitation, that Licensor is entitled to share in certain fees, revenues and other consideration relating to the sale and lease of units and lots at the Property. Licensee shall cooperate with Licensor in connection therewith and reimburse Licensor for any recording and other charges (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection with the recording of such memorandum within ten (10) days following Licensor's request therefor. Likewise, Licensor shall reasonably cooperate with Licensee to the extent Licensee requires Licensor's assistance in preparing and/or executing a document to memorialize that Licensee has rights to the Licensed Marks in the Dominican Republic subject to and in accordance with the terms of this Agreement (but without actually including any of the terms of this Agreement, including, without limitation, the economic terms).

### 20. **Payments and Taxes.**

(a) Licensor shall provide Licensee, on a quarterly basis, with written receipts for all License Fees received by Licensor during such quarter.

(b) In the event Licensee shall be required to withhold any taxes or other mandatory payments imposed by the Dominican Republic ("**Licensor Local Tax Obligation**"), Licensee shall pay such Licensor Local Tax Obligation on Licensor's behalf and furnish to Licensor the receipt, remittance voucher or other original evidence of such payment of any Licensor Local Tax Obligation so paid so that Licensor can apply for a corresponding tax credit in the United States. Licensee shall fully cooperate with Licensor and provide such information




53

and records as Licensor may reasonably require in connection with any application to the tax authorities of Dominican Republic and/or the United States, including but not limited to, the obtaining of a credit for any Licensor's Local Tax Obligation paid in the Dominican Republic which amounts and other payments are being made by Licensee to Licensor hereunder.

(c)    Notwithstanding the foregoing, Licensee will not withhold any taxes on payments which are reimbursements of expenses, provided that the corresponding supporting documentation is delivered to Licensee along with the invoice to be sent for such purposes.

## Exclusivity

Provided Licensee is not in default of this Agreement, and until the Exclusive Expiration Date (as hereinafter defined), Licensor shall not license the Trump Mark (including but not limited to the Licensed Marks) to any individual or entity in connection with the sale and marketing of any other residential building, hotel condominium, estate lot projects, golf lots projects, golf villas projects or golf courses within the Dominican Republic (the "**Restricted Area**"). For purposes of this Agreement, the term "**Exclusive Expiration Date**" shall mean the first to occur of any of the following: (w) Licensee does not meet any of the deadlines set forth in Schedule 3 attached hereto and made a part hereof (each, a "**Minimum Requirement Deadline**" and collectively, the "**Minimum Requirement Deadlines**"), it being understood that upon Licensee failing to meet a Minimum Requirement Deadline, Licensor shall not be bound by this Section 21(a) with respect to the Component for which the Minimum Requirement Deadline has been missed (each, an "**Exclusivity Carve-Out Component**"), but Licensor shall nevertheless be bound to the provisions of Section 21(b) below with respect to such Exclusivity Carve-Out Component; (y) Licensee shall fail, at any time, or from time to time, to meet the Minimum Inventory Requirements███████████ years after the date hereof. Thus, by way of example only, in the event Licensee shall not meet a Minimum Requirement Deadline for the Condo Hotel, the Condo Hotel shall thereafter constitute an Exclusivity Carve-Out Component and Licensor shall not be bound by this Section 21(a) with respect to any Exclusivity Carve-Out Component (i.e., a hotel product), but shall be required to follow the procedures set forth in Section 21(b) below with respect to such Exclusivity Carve-Out Component, without affecting the exclusivity applicable to the other Development Components. Nothing contained in this Agreement, including, without limitation, this Section 21 (a) and Section 21(b), shall prohibit or restrict Licensor from licensing the Trump Mark, including, without limitation, the Licensed Marks, to a person or entity engaged in Casino and Gaming Activities for use by such person or entity exclusively in connection with such Casino and Gaming Activities (including, without limitation, within the Restricted Area) provided that, any such license to a third party shall not include, explicitly or implicitly, the right to promote and/or sell any real estate product such as condo hotels, condominiums, estate lots or any other real estate product whatsoever other than a Casino or a Casino-Hotel (for example such casino company shall be permitted to operate a hotel in connection with a casino, but not to sell condo hotel units or sell any other type of real estate product), nor shall Licensor be required to comply with Section 21(b) with respect thereto in any way whatsoever.

(b)    So long as Licensee is not in default under this Agreement, Licensor expressly acknowledges that with respect to any Exclusivity Carve-Out Component, prior to Licensor entering into a transaction for the use of the Trump Mark (including, without limitation, any Licensed Mark) with respect to any Exclusivity Carve-Out Component with a party other than

54





Licensee, Licensor shall give Licensee notice of Licensor's desire to enter into an alternate transaction with respect to such Exclusivity Carve-Out Component, and Licensee shall have a second opportunity to meet the Minimum Requirement Deadlines with respect to such Exclusivity Carve-Out Component, provided that the deadlines for Licensee to meet such Minimum Requirement Deadlines shall be extended to be thirty (30) days following Licensee's receipt of such notice from Licensor (the **"Revised Minimum Requirement Deadlines"**). If Licensee shall fail to meet the Revised Minimum Requirement Deadlines with respect to such Exclusivity Carve-Out Component, Licensor shall be free to enter into any transaction for the use of the Trump Mark (including, without limitation, the Licensed Mark) for an Exclusivity Carve-Out Component with a third party, and the provisions of Sections 21(a) and (b) shall no longer apply with respect to such Exclusivity Carve-Out Component.

22.     **Miscellaneous.**

(a)     This Agreement shall be governed, both as to interpretation and enforcement, by the laws of the State of New York and, as necessary, in the courts in that State, without regard to any principles of conflicts of law. Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the federal court or state court located in the County of New York in the State of New York, and each of the parties hereby consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or thereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient form. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. The parties acknowledge that the courts of the State of New York are a convenient forum for a resolution of any disputes hereunder. Notwithstanding the foregoing, but in addition to the rights provided above, Licensor shall have the right, in its sole discretion, to apply for injunctive relief against Licensee in the courts of the country where the Property is located and the courts of such country shall have jurisdiction with respect thereto.  Licensee and Licensor hereby:

(i)      irrevocably and unconditionally waive the right to a trail by jury in any action or proceeding or counterclaim of any type as to any matter arising directly or indirectly out of or with respect to this Agreement or any other document executed in connection herewith or therewith; and

(ii)     agree that any of them may file a copy of this Agreement with any court as written evidence of the knowing, voluntary and bargained for agreement between the parties irrevocably to waive trial by jury, and that any dispute or controversy of any kind whatsoever between them shall be tried in a court of competent jurisdiction by a judge sitting without a jury.

55





(b) This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

(c) If any provision hereof, or the application thereof to any person or circumstance, shall to any extent be invalid or unenforceable, the remaining provisions herein, or the application of such provisions to any persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby.

(d) This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and may not be amended except by an instrument in writing signed by a Licensor and Licensee. Failure of a party hereto to complain of any act, omission, course of action, or continued acts or omissions, no matter how long such may continue, shall not be deemed a waiver by said party of its rights hereunder, and all waivers of the provisions hereof shall be effective only if in writing, signed by the party so waiving. No waiver of any breach of this Agreement shall be deemed a waiver of any other breach of this Agreement or consent to any subsequent breach of this Agreement.

(e) The recitals set forth in this Agreement are incorporated herein.

(f) Licensee acknowledges that Licensor would be irreparably harmed and there would be no adequate remedy at law for Licensee's violation of any of the covenants or agreements contained in this Agreement. Accordingly, in the event of any default by Licensee hereunder, Licensor may, at its option, in addition to or in lieu of the termination rights granted pursuant to this Agreement, exercise any rights and remedies against Licensee under applicable law. The rights and remedies reserved to Licensor herein, including those not specifically described, shall be cumulative, and except as provided by any applicable law, Licensor may pursue any or all of such rights and remedies, at the same time or otherwise. The rights and remedies given to Licensor in this Agreement shall be in addition and supplemental to all other rights or remedies which Licensor may have under laws then in force. Without limiting the generality of the foregoing, Licensor shall have the right to seek monetary damages, specific performance, and/or injunctive relief for any default by Licensee of its obligations under this Agreement.

(g) Subject to the other provisions of this Agreement, including, without limitation, Sections 16 and 19 hereof, each party agrees, upon the request of the other party, to execute such additional documents or instruments deemed necessary or appropriate, in the reasonable judgment of the requesting party, to confirm the terms contemplated by this Agreement.

(h) Licensee acknowledges and agrees that Trump and the Press Protected Parties are intended as third party beneficiaries of this Agreement and therefore entitled to enforce the provisions benefiting them hereunder directly against Licensee or any other applicable party.

(i) Any agreement or document that Licensee is required to submit to Licensor for consent or approval under this Agreement shall also include any amendment, restatement, modification or extension of such agreement or document.



56



(j) Unless another standard is expressly identified in this Agreement, whenever Licensor's consent or approval is required hereunder, such consent or approval may be given or withheld by Licensor in Licensor's sole discretion. For purposes of this Agreement, "discretion" means with respect to any such consent or approval the discretion to consent or approve or fail to consent or approve with or without any reason, taking into account such factors, if any, as Licensor determines (including Licensor's self interest), and any such decision may be subject to any such conditions (or no conditions) as Licensor determines and shall be final and conclusive.

(k) All prior agreements (whether verbal or written) concerning the subject matter of this Agreement (**"Prior Agreements"**) are merged herein and this Agreement supersedes and replaces all such Prior Agreements.

(l) Except with respect to a violation by Licensor of <u>Section 21</u> of this Agreement, (i) Licensor shall not be liable to Licensee in contract, tort or otherwise for any lost profits or any indirect, consequential, special, exemplary or incidental damages arising from or relating to this Agreement; and (ii) damages payable by Licensor for default under this Agreement shall not exceed an amount equal to License Fees paid by Licensee to Licensor during the term of the Agreement, prior to the event giving rise to such damages.

(m) Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions. This Agreement has been drafted by Licensor as a convenience to the parties only and shall not, by reason of such action, be construed against Licensor or any other party. Licensee acknowledges and agrees that it has had full opportunity to review this Agreement and has had access to counsel of its choice to the extent Licensee deemed necessary in order to interpret its legal effect.

(n) Licensee acknowledges and agrees each and all of the Trump Indemnified Parties are intended as third party beneficiaries of this Agreement and therefore entitled to enforce the provisions benefiting or otherwise related to them hereunder directly against the Licensee or any other applicable party.

(o) All references in this Agreement (including all Schedules to this Agreement) to dollar amounts, and uses of the symbol "$" shall refer to the lawful currency of the United States of America. All amounts to be paid hereunder shall be paid in US Dollars including, without limitation, the License Fee.

(p) Each party shall bear their own costs and fees (including but not limited to attorneys fees and the costs of other advisors and third party providers) in connection with the negotiation and execution of this Agreement. The parties hereby expressly agree that Licensor's costs and expenses covered by this section shall not be considered Recoverable Expenses.

### [SIGNATURES FOLLOW ON THE NEXT PAGE]





57

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates and at the places set forth below effective as of the date first set forth above.

LICENSOR:

TRUMP MARKS REAL ESTATE LLC

By: _____
Donald J. Trump, President

LICENSEE:

CAP CANA, S.A.

By: _____
Ricardo Hazoury, President

_____
Donald J. Trump, solely as to Sections 4(f) and 11(b) of this Agreement

THE UNDERSIGNED HEREBY AGREE SOLELY TO THE PROVISIONS OF SECTION 4(f):

_____
Ivanka Trump

_____
Donald Trump, Jr.

_____
Eric Trump



   · **IN WITNESS WHEREOF,** the parties have executed this Agreement on the dates and at the places set forth below effective as of the date first set forth above.

**LICENSOR:**

**TRUMP MARKS REAL ESTATE LLC**

By:_____
       Donald J. Trump, President

**LICENSEE:**

**CAP CANA, S.A.**

By:_____
       Ricardo Hazoury, President

_____
Donald J. Trump, solely as to Sections 4(f)
and 11(b) of this Agreement

THE UNDERSIGNED HEREBY AGREE SOLELY
TO THE PROVISIONS OF SECTION 4(f):

_____
Ivanka Trump

Donald Trump, Jr.

_____
Eric Trump

STATE OF NEW YORK ) 
                               ss.: 
COUNTY OF NEW YORK )

On the sixteenth day of February in the year 2007 before me, the undersigned, a Notary Public in and for said State, personally appeared Donald J. Trump, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as indicated in such instrument, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

ALAN GARTEN 
Notary Public, State of New York 
No. 02GA6021578 
Qualified in Nassau County 
Commission Expires on March 15, 20 07

59



STATE OF NEW YORK     )
                             ss.:
COUNTY OF NEW YORK   )


      On the sixteenth day of February in the year 2007 before me, the undersigned, a Notary Public in and for said State, personally appeared Donald Trump Jr., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as indicated in such instrument, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


                                    _____

                                         Notary Public





STATE OF NEW YORK    )
                             ss.:
COUNTY OF NEW YORK   )

        On the sixteenth day of February in the year 2007 before me, the undersigned, a Notary Public in and for said State, personally appeared Eric Trump, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as indicated in such instrument, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
.⁀Notary Public

ALAN GARTEN
Notary Public, State of New York
No. 02GA6021578
Qualified in Nassau County
Commission Expires on March 15, 20 07

61



STATE OF NEW YORK    )
                               ss.:
COUNTY OF NEW YORK  )

On the sixteenth day of February in the year 2007 before me, the undersigned, a Notary Public in and for said State, personally appeared Ivanka Trump, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity as indicated in such instrument, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

ALAN GARTEN
Notary Public, State of New York
No. 02GA6021578
Qualified in Nassau County
Commission Expires on March 15, 20 __

_____
Notary Public

62





STATE OF NEW YORK )
                      ss.:
COUNTY OF NEW YORK )

      On the sixteenth day of February in the year 2007 before me, the undersigned, a Notary Public in and for said State, personally appeared Ricardo Hazoury, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as indicated in such instrument, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

JAIME MERCADO
NOTARY PUBLIC State of New York
No. 02ME5071419
Qualified in New York County
Commission Expires January 13 2007

