UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRUMP MARKS REAL ESTATE LLC,<br><br>     Plaintiff,<br><br>   - against -<br><br>CAP CANA, S.A., RICARDO HAZOURY,<br>FERNANDO HAZOURY, ABRAHAM HAZOURY,<br>CATHERINE KURY HAZOURY, GEORGE<br>SPENCE, MICHEL RODRIQUEZ and MICHELL<br>VARGAS,<br><br>    Defendants. | Index No. 12-CV-6440-NRB |

## DECLARATION OF ERIC F. TRUMP IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Pursuant to 28 U.S.C. § 1746, I, Eric F. Trump, declare under penalty of perjury that the following is true and correct:

1. I am the Vice President of Trump Marks Real Estate LLC, the plaintiff in the above-captioned action ("Trump Marks") and have personal knowledge of the facts and circumstances set forth herein.

2. I submit this declaration in opposition to Defendants', Cap Cana, S.A. ("Cap Cana"), Ricardo Hazoury, Fernando Hazoury, Abraham Hazoury, Catherine Kury Hazoury, George Spence, Michel Rodriguez, and Michell Vargas (collectively, "Individual Defendants") (together with Cap Cana, "Defendants"), pre-answer motion to dismiss dated November 16, 2012 ("Defendants' Motion").

3. This action arises out of a license agreement wherein Cap Cana, the owner and operator of a world class resort in the Dominican Republic, licensed from

1

Trump Marks the "Trump" name and trademark so that the project, which was to consist of a hotel, condominium units and various estate lots, could be known as "Trump at Cap Cana."  In exchange for such license, Cap Cana agreed to pay Trump Marks various license fees, including approximately <u>6% of the contract sale price</u> for each estate lot that was sold, plus a higher marginal percentage when the lots sold above a set premium.  Once a purchaser paid 30% of the contract price, Trump Marks was entitled to receive a proportionate share of its license fee.

4.     There is no dispute among the parties as to the principal amount of license fees due to Trump Marks.  There is also no dispute among the parties as to the results of any audit which may have been performed on the books and records of Cap Cana, and Defendants' counsel's attempt to characterize this dispute as an "Audit Dispute" within the scope of the limited arbitration provision is simply wrong and unsupportable.  In short, uncharacteristic as it may be, the parties actually agree on the amount which is owed to Trump Marks.

**<u>The Estate Lots</u>**

5.     The *Trump at Cap Cana* project is a luxury mixed use, multi-component resort in the process of being developed and constructed by Defendants on more than 8,000 acres of oceanfront property in and around Punta Cana, Dominican Republic (the "Project").  The component of the Project at issue in this lawsuit are the estate lots consisting of 68 separate <u>vacant</u> estate lots ranging in size from 1.6 to 12 acres, each situated atop one of the highest bluffs in the Dominican Republic with spectacular views of the Caribbean Sea (the "Estate Lots").  The purchase price for any

one of these vacant Estate Lots ranges from three million ($3,000,000.00) dollars to twelve million ($12,000,000.00) dollars.

**The License Agreement**

6.     Trump Marks, as licensor, and Cap Cana, as licensee, entered into a License Agreement dated February 16, 2007 (the "License Agreement").  The License Agreement permits Cap Cana to use the "Trump" name and mark for the purpose of identifying, promoting and marketing the Project.  In exchange for use of the "Trump" name, Cap Cana agreed to pay Trump Marks certain upfront license fees together with a percentage of the gross selling price of each vacant estate lot sold at the Project, and certain incentive fees (collectively the "License Fees").  (A copy of the License Agreement, without exhibits and schedules except Schedule 1, is annexed hereto as Exhibit A.)

**Fees due under the License Agreement**

7.     Pursuant to the terms of the License Agreement, as part of its License Fees, Trump Marks was entitled to receive a percentage (approximately 6%) of the gross sales price of each Estate Lot.  Each License Fee payment was to be made to Trump Marks on the date that the buyer either took possession of his or her Estate Lot or paid 90% of the purchase price of such lot, whichever came first.  In the event, however, that the buyer paid more than 30% of the purchase price prior to taking possession of his or her Estate Lot, Trump Marks was entitled to the immediate payment of a pro rata portion of the License Fee with the remainder to be paid to Trump Marks at the time the buyer took possession.  (*See* Schedule 1 of License Agreement, which is annexed hereto as Exhibit A.)

8.      In order for Trump Marks to monitor the amount of the License Fee due, Cap Cana was obligated to deliver to Trump Marks a monthly sales report. Specifically, Section 4(b) of the License Agreement provides that:

> [Cap Cana] shall deliver to [Trump Marks] . . . progress reports with respect to each phase, on such forms, and containing such information, as [Trump Marks] shall require . . . the Reports shall be delivered to [Trump Marks] with the following frequency. . . . monthly Reports covering the marketing and sales phases commencing upon the date that [Cap Cana] shall commence the preparation of a sales campaign for [*inter alia,* the Estate Lots].

9.      The monthly sales reports required pursuant to Section 4(b) of the License Agreement (the "Sales Reports") detailed, among other things, the name of each purchaser who contracted to purchase an Estate Lot, the gross sales price to be paid for each Estate Lot and the amount of any payments made to date by the purchaser.  Cap Cana began providing monthly Sales Reports on or about June 2007. On or about November 2, 2007, Trump Marks received an updated Sales Report showing that paid deposits for two of the Estate Lots (lots #6 and #14) had exceeded 30% of the gross purchase prices.  Based upon the amounts received as reported by Cap Cana, Trump Marks was entitled to a payment of approximately $555,348.00 in License Fees, and Cap Cana shortly thereafter paid the $555,348.00 that was due.  (A copy of the November 2, 2007 Sales Report is annexed hereto as Exhibit B.)

10.      From Trump Marks' perspective, everything seemed to operating as envisioned in the License Agreement.

**The Fraud**

11.      Shortly after Cap Cana's payment of $555,348.00, however, Cap Cana's delivery of Sales Reports became sporadic and irregular.  Despite repeatedly

4

demanding that an updated Sales Reports be sent, Cap Cana did not circulate its next updated Sales Report until April 15, 2008.

12.     Despite the passage of approximately 4 months, the April 15, 2008 Sales Report indicated that no new money was collected by Cap Cana from purchasers and that no additional License Fees were due to Trump Marks.  (A copy of the April 15, 2008 Sales Report and the transmittal email dated April 15, 2008 to which it was attached are collectively annexed hereto as Exhibit C.)  The April 15, 2008 Sales Report turned out to be, as more fully described below, an out-right lie.   As alleged in the Complaint, we later learned that Cap Cana underreported the money collected on all but 2 of the 67 Estate Lots it had reportedly sold. (*See* Compl., ¶35.)  Moreover, Cap Cana had underreported by almost 90% on 19 of the Estate Lots it had reportedly sold.  (*See Id.,* ¶36.)  The following is a table showing just the amounts that should have been paid, but were concealed:

| LOT # | % Collected as reported by Cap Cana on April 15, 2008 | % Actually collected by Cap Cana by April 15, 2008 | | Date money was collected by | Fee actually due on 4/15/08 that was concealed |
|---|---|---|---|---|---|
| 3 | 14% | 100% | *AS OF* | 3/10/2008 | $178,200.00 |
| 5 | 11% | 100% | *AS OF* | 1/24/2008 | $145,800.00 |
| 6 | 36% | 100% | *AS OF* | 3/14/2008 | $137,871.36 |
| 7 | 11% | 100% | *AS OF* | 12/26/2007 | $172,800.00 |
| 8 | 12% | 100% | *AS OF* | 3/5/2008 | $176,256.00 |
| 10 | 11% | 64% | *AS OF* | 3/23/2008 | $180,948.00 |
| 11 | 11% | 100% | *AS OF* | 1/31/2008 | $226,800.00 |
| 16 | 12% | 32% | *AS OF* | 3/14/2008 | $31,973.40 |
| 20 | 12% | 100% | *AS OF* | 12/26/2007 | $167,400.00 |
| 21 | 12% | 34% | *AS OF* | 3/19/2008 | $142,590.95 |

| LOT # | % Collected as reported by Cap Cana on April 15, 2008 | % Actually collected by Cap Cana by April 15, 2008 | | Date money was collected by | Fee actually due on 4/15/08 that was concealed |
|---|---|---|---|---|---|
| 23 | 12% | 38% | *AS OF* | 3/6/2008 | $149,315.82 |
| 24 | 11% | 100% | *AS OF* | 1/11/2008 | $189,000.00 |
| 25 | 14% | 36% | *AS OF* | 3/7/2008 | $30,326.40 |
| 26 | 11% | 100% | *AS OF* | 1/10/2008 | $313,200.00 |
| 27 | 12% | 32% | *AS OF* | 4/2/2008 | $55,987.20 |
| 31 | 12% | 100% | *AS OF* | 2/29/2008 | $285,120.00 |
| 32 | 11% | 100% | *AS OF* | 3/26/2008 | $311,729.52 |
| 38 | 12% | 32% | *AS OF* | 4/7/2008 | $102,384.00 |
| 39 | 11% | 33% | *AS OF* | 1/14/2008 | $437,419.50 |
| 41 | 12% | 100% | *AS OF* | 2/18/2008 | $378,163.68 |
| 42 | 12% | 100% | *AS OF* | 3/28/2008 | $383,616.00 |
| 43 | 11% | 100% | *AS OF* | 2/29/2008 | $313,425.10 |
| 45 | 12% | 100% | *AS OF* | 2/8/2008 | $305,856.00 |
| 47 | 12% | 33% | *AS OF* | 3/6/2008 | $58,060.80 |
| 50 | 12% | 100% | *AS OF* | 1/10/2008 | $385,394.33 |
| 51 | 11% | 31% | *AS OF* | 3/19/2008 | $368,913.10 |
| 52 | 12% | 100% | *AS OF* | 12/26/2007 | $401,206.77 |
| 56 | 12% | 100% | *AS OF* | 3/31/2008 | $463,189.47 |
| 57 | 11% | 30% | *AS OF* | 4/2/2008 | $604,704.91 |
| 67 | 12% | 32% | *AS OF* | 2/1/2008 | $548,180.63 |
| 68 | 11% | 73% | *AS OF* | 3/26/2008 | $586,567.12 |
| 69 | 12% | 100% | *AS OF* | 4/1/2008 | $537,094.23 |
| 71 | 11% | 100% | *AS OF* | 1/11/2008 | $736,085.58 |
| | | | | Total ⟶ | $9,505,579.87 |

13.     After the April 15, 2008 Sales Report, specifically, from May 2008 through May 2009, not a single Sales Report was sent by Cap Cana to Trump Marks despite Trump Marks' repeated, persistent demands.  (*See* Compl.,, ¶32.)  Trump Marks' repeated demands for updated Sales Reports were both verbal and written.  (*See* Compl., ¶32; *see also* copies of emails requesting updated Sales Reports are annexed hereto as Exhibit D.)  In addition to simply ignoring Trump Marks' requests, Defendants manufactured a cascade of excuses to delay the circulation of the updated Sales Reports: for example, the Sales Reports would come shortly, the person in charge of preparing the Sales Report was out sick, on vacation, on temporary leave or the accounting department was restructuring.

14.     Finally, on or about May 7, 2009, Defendant Michell Vargas from Cap Cana furnished Trump Marks with an updated Sales Report covering the time period ending March 31, 2009.  (Copies of Cap Cana's May 7, 2009 Sales Report and the transmittal email to which it was attached are annexed hereto collectively as Exhibit E.)

15.     To Trump Marks' shock, according to the May 7, 2009 Sales Report, Trump Marks was entitled to at least $8,705,887.00 in License Fees through March 31, 2009.  Thus, using the numbers circulated by Cap Cana on May 7, 2009, during the year in which Cap Cana failed to produce a single Sales Report to Trump Marks, as required under the License Agreement, Cap Cana **collected** approximately $139,663,045.00 from purchasers of the Estate Lots.  As egregious as it was for Cap Cana to withhold an entire year's worth of Sales Reports, that egregiousness is

multiplied by the fact that Cap Cana was simultaneously collecting $139,663,045.00 in Estate Lot sale proceeds.

16.     This was no minor mathematical or accounting error.  In fact, this was text book fraud on such a wide scale, involving millions of dollars, that the Individual Defendants, with whom Trump Marks and I had been communicating, had to know of and had to be involved in.

17.     Given Cap Cana's 13-month delay in circulating an updated Sales Report, the receipt of the May 7, 2009 Sales Report showing over $8,705,887.00 due sent a shockwave, to say the least, though our organization.  We reviewed the May 7, 2009 Sales Report internally and quickly realized that Trump Marks was apparently due $10,026,014.00 in License Fees as of March 2009, not the $8,705,887.00 initially reported.  Trump Marks immediately invoiced Cap Cana for $10,026,014.00 on May 8, 2009.  (A copy of Trump Marks' invoice and email to Michell Vargas is annexed hereto as Exhibit F.)

18.     The biggest shock, however, was soon to come.  Shortly after Cap Cana received our May 8, 2009 invoice, and despite the fact that Cap Cana had **collected** at least $139,663,045.00 in funds, Cap Cana informed Trump Marks for the first time that Cap Cana did not have the money to pay.

19.     Bear in mind that Cap Cana was selling vacant lots, which means that Cap Cana did not have a large over head or spiraling construction costs, or anything of the sort, with respect to the Estate Lots.  Defendants' obligation was simply to sell the Estate Lots, collect the proceeds, and remit Trump Marks its agreed to percentage from the collected proceeds. Defendants never offered any explanation as

to where the $139,663,045.00 went.  Moreover, despite the fact that each of the Individual Defendants submitted declarations in support of Defendants' Motion—not one of them denied these allegations.

20.    Thus, with no other reasonable inference to be made, Defendants have, upon information and belief, squandered these funds and have left Cap Cana admittedly undercapitalized and unable to pay its debts.

**The Individual Defendants' abused the corporate form to work a fraud upon Trump Marks**

21.    Defendants Ricardo Hazoury, Fernando Hazoury, Abraham Hazoury, and Catherine Kury Hazoury are all directors of Cap Cana. (*See* R. Hazoury Dec., ¶3; F. Hazoury Dec., ¶3.; A. Hazoury Dec., ¶3, and C. Hazoury Dec. ¶4.)  There can be little dispute that Cap Cana is the Hazoury family and the Hazoury family is Cap Cana.  When the Hazourys act, that act is an act of the corporation—just like when the Hazoury family appeared in New York to sign the License Agreement, appeared in New York to convince us to enter into numerous repayment plans and appealed for more and more and more time to replace the misappropriated funds. (*See* R. Hazoury Dec., ¶9; F. Hazoury Dec., ¶10.; and C. Hazoury Dec. ¶14; *see also* Exhibit G, letter dated December 28, 2009 from F. Hazoury to E. Trump [stating "[w]e cannot overstate how mortified we are as a family to have to ask for your family's forbearance under these circumstances".)

22.    Moreover, the Individual Defendants are, and have been at all relevant times, the individuals in control of Cap Cana.  They were directly responsible for sending and updating the Sales Reports to Trump Marks – or ultimately in charge

and control of the people sending and updating the Sales Reports.  The Individual Defendants not only had knowledge of the sale tactics being used to sell the Estate Lots, but they had personal knowledge of the details of each sale.  Moreover, they are, and have been at all relevant times, the individuals in a position to misappropriate the funds being collected.

23.    Furthermore, given the magnitude and nature of what has been admitted by the Defendants, there can be little doubt that this scheme was conceived, dominated, controlled and executed by these senior executives. In addition to the facts alleged in the Complaint:

(a)    Cap Cana admittedly received yet admittedly failed to disclose to Trump Marks over $139,663,045.00 (compare the April 15, 2008 Sales Report and the May 7, 2009 Sales Report, which was the next Sales Report received, both created by Defendants, Exhibits C and E);

(b)    Cap Cana admittedly failed to disclose and concealed this $139,663,045.00 for at least 13 months from May 2008 through May 2009 (*id.*);

(c)    Cap Cana was admittedly undercapitalized when Cap Cana finally revealed that, despite collecting $139,663,045.00, it did not have the funds to pay Trump Mark its proportionate share (*see, e.g.,* Exhibits G and H);

(d)    The Individual Defendants have failed to explain (or even attempt to explain) where the $139,663,045.00 went (*see* each of the Declarations by the Individual Defendants submitted in support of Defendants' Motion); and

(e)    The Individual Defendants, despite each having submitted a declaration in support of Defendants' Motion, do not deny that they misappropriated the funds due Trump Marks for their personal benefit (*see*

each of the Declarations by the Individual Defendants
submitted in support of Defendants' Motion).

(*See also* Compl., ¶¶53, 56-58, 60.)

24.     It was also later learned that out of all the payments of License Fees due to Trump Marks from Cap Cana, Cap Cana withheld 25% with the obligation to remit that 25% to the Dominican Republic taxing authority.  Cap Cana, however, failed to pay those taxes, which was part and parcel to this larger fraud or wrong committed by the Individual Defendants against Trump Marks.  (*See* Exhibit R for acknowledgement by Fernando Hazoury of Cap Cana's failure to pay these taxes from May 2010 through August 2010.)

25.     Whether the Individual Defendants used this scheme to float their personal lifestyles or whether they funneled Trump Marks' money to other projects that were more profitable to them personally, the Individual Defendants were only able to do so by grossly misstating the Sales Reports that they knew we were relying on and by concealing the money received by ceasing to send updated Sales Reports altogether (*see* Compl., ¶¶57, 58).

**The Initial Repayment Plan**

26.     Shortly after learning for the first time that Cap Can was unable to pay the $10,026,014.00 in May 2009, the parties began working out terms to a repayment plan.  In the interim, the parties agreed that several interim payments in the fixed amount of $1,333,333.33 would be paid.  At all relevant times, Cap Cana's position was only that more time was needed to pay—not that the amount of the principal due through March 31, 2009 was in dispute.  In furtherance of this agreement, Cap Cana made the first two installments of $1,333,333.33 on or about May 21, 2009

and August 28, 2009.  (*See* Exhibit I, showing two net payments of $1,000,000.00 after Cap Cana withheld 25% from each payment for the purpose of paying Dominican Republic taxes on behalf of Trump Marks, which, as later learned, Cap Cana fraudulently kept for itself.)

**The 2009 Audit**

27.     On or about July 10, 2009, Trump Marks notified Cap Cana that it was exercising its right under the License Agreement to conduct an audit of Cap Cana's books and records (the "Audit").  (A copy of the July 10, 2009 audit letter to Cap Cana is annexed hereto as Exhibit J.)  The Audit took place in or about July 2009 and covered the time period commencing on the date of the License Agreement and continuing through June 30, 2009.  As feared, the Audit Report showed that, as of June 30, 2009, Cap Cana actually owed Trump Marks at least $14,147,137 (not counting accrued interest or the $1,333,333.33 payments made on May 21, 2009 or August 28, 2009).  In September 2009, an audit report was issued that summarized these findings (the "2009 Audit Report," a copy of which is annexed hereto as Exhibit K).

28.     Cap Cana provided all the documentation inspected by the auditors and the results of the audit were discussed in detail with Cap Cana by the auditors and by Trump Marks.

**There has never been, nor is there now, an Audit Dispute**

29.     After the 2009 Audit Report issued in September 2009, the parties discussed in detail the results of the Audit and the additional amounts claimed due as of June 30, 2009.  The parties' efforts to finalize a long term repayment plan continued and proposals were exchanged.

12

30.     For example, in or around late September 2009, Trump Marks' circulated a repayment proposal, which proposed that $15,821,747 was due on May 21, 2009 and which outlined a repayment plan that would bring Cap Cana's balance to zero by September 20, 2012.   (A copy of Trump Marks' September 2009 proposal is annexed hereto as Exhibit L.)  On October 13, 2009, Defendant Michel Rodriguez from Cap Cana responded to that proposal with a repayment proposal that proposed that $14,984,132 was due on May 21, 2009.  (A copy of page 1 of Cap Cana's repayment proposal and transmittal email from Michel Vargas is annexed hereto as Exhibit M.)

31.     Shortly thereafter, the parties agreed upon a repayment schedule and Cap Cana began paying pursuant thereto.   (A copy of a ledger showing all payments made to date by Cap Cana is annexed hereto as Exhibit N.)

**Cap Cana repeatedly failed to make the payments under the repayment agreement – yet the amount due is repeatedly confirmed and never in dispute**

32.     On December 28, 2009, Defendant Fernando Hazoury sent Trump Marks a letter acknowledging the then existing repayment schedule and informing us that Cap Cana did not have the money to honor the scheduled payments.  Mr. Hazoury did, however, propose a new repayment schedule requiring monthly payments of $168,849.69 and seven larger lump sum payments.  (*See* Exhibit G.)

33.     Around that same time or shortly thereafter, the parties stepped up efforts to agree on terms to a larger default and forbearance agreement.  While that agreement did not ever materialize due to developing realization that Defendants were not acting in good faith, the parties did have plenty of opportunities to discuss the outstanding amounts.  Again, there was absolutely no dispute as to the amount that was

due.  (Copies of Trump Marks' email dated March 4, 2010, with schedule showing $15,132,911 due as of May 21, 2009, and Cap Cana's email dated March 9, 2010 in response thereto confirming that "we have the same numbers" are collectively annexed hereto as Exhibit O.)  Thus, again, as of March 9, 2010, there was and is no Audit Dispute or any other dispute that Cap Cana owed $15,132,911 as of May 21, 2009.

34.    On March 9, 2010, Trump Marks received Cap Cana's monthly scheduled payment of approximately $169K for February 2010.

35.    On April 20, 2010, Fernando Hazoury emailed Trump Marks requesting a new schedule of reduced lump sum, "extraordinary" payments.  (*See* Exhibit P.)  On June 15, 2010, however, Fernando Hazoury emailed Trump Marks to state that "I regret to inform you . . . we were not able to carry out today's payment in the amount of $433,593.02."  (*See* Exhibit H.)

36.    In light of the foregoing events, by letter dated June 17, 2010 (the "Default Notice"), Trump Marks notified Cap Cana that it was in default of its obligations under the License Agreement in that Cap Cana had failed to timely pay to Trump Marks certain License Fees and accrued interest due as of the date thereof, in the sum of $9,266,647.72.  In response to Default Notice, Cap Cana made several large payments.

37.    On July 7, 2010, Trump Marks sent Fernando Hazoury, Ricardo Hazoury and Michel Rodriguez, among others, yet another proposed repayment schedule.  (A copy of the July 7, 2010 email is annexed hereto as Exhibit Q.)  Notably, in the proposed schedule annexed to the July 7, 2010 email, the balance stated as due as of July 31, 2010 was $7,495,529.00 and said balance was to be repaid in 12

installments of approximately $650,000.00—the first of which being due on August 1, 2010.

38.    It bears repeating, there was and is no Audit Dispute or any other substantive dispute as to what is even owed.

39.    In response to this proposal repayment schedule, on or about August 1, 2010, Cap Cana made the first installment of $650,000.00—leaving a balance as of $6,849,569.00.  (*See* Exhibit N.)  Shortly thereafter, on August 11, 2010, Fernando Hazoury followed up Cap Cana's $650,000.00 payment with an email to Trump Marks stating, in part, as follows:

> This past July you submitted . . . a new payment schedule which included the commissions owed and corresponding interests payments.  **In addition, it was presented to us a new set of agreement documents** (Settlement Agreement and Confession of Judgment) **in which we are obligated to clearly acknowledge our debt, which for our company is not a problem as we recognize this debt and have been making the correspondent payments with interest and late fees** included in certain instances, and furthermore renounce any legal/judicial process in the procurement of payment, which in reality is an automatic judgment against our company in case of any minimal delay in the payment of a monthly amount.
>
> *    *    *
>
> Attached you find a revised payment schedule (Attachment I) to which our company can commit at the signing of the new agreement documents Trump has proposed. [emphasis supplied]

The payment scheduled attached as Attachment I to the August 11, 2010 email proposed a payment plan wherein the balance of $6,847,582.41 would be repaid in 17 installments of $425,000.00.  (A copy of Fernando Hazoury's August 11, 2010 email is annexed hereto as Exhibit R.)

40.    As the Court can easily see by comparing the repayment proposal attached to Exhibit Q and the repayment counterproposal attached to Exhibit R that the parties agree as to the amount owed as of August 2, 2010—approximately $6,849,569.00, give or take a couple of days' interest. The $6,849,569.00 amount due as of August 2, 2010 represents the balance due as of that date after applying all payments made by Cap Cana and applying all interest accrued from May 21, 2009, the date of Cap Cana's first installment payment under the initial repayment plan. Clearly, there was no and there is no dispute about this figure.

41.    Shortly thereafter, Cap Cana again failed to make schedule payments.   On September 16, 2010, Fernando Hazoury emailed Trump Marks regarding Cap Cana's failure to make the full September 2010 payment as agreed.   In the email, Mr. Hazoury states – in no uncertain terms – "[t]he one fact to never doubt is that you will receive 100% of the money owed."   (A copy of the Fernando Hazoury's email dated September 16, 2010 is annexed hereto as Exhibit S.)

42.    On October 4, 2010, Trump Marks was informed by Cap Cana that September's payment of $425,000.00 was not paid due to cash flow problems but it would be paid by October 15, 2010.   Yet again, on February 4, 2011, Cap Cana informed us that a scheduled payment could not be made.   (*See* Exhibit T.)

43.    Thereafter and to date, Cap Cana has made some additional payments although all such payments ceased after April 20, 2011. (*See* Exhibit N.)

44.    During all this time, not one email or letter was ever sent by Cap Cana or the Individual Defendants disputing the Audit results or the amount claimed therein as due.   Even the declarations submitted in support of Defendants' Motion do

not challenge or dispute the amount due, because the Individual Defendants know they have no basis to challenge or dispute the amount due.

45. Again, despite years of acknowledging the amounts owed, Defendants' counsel, not Defendants, now for the first time claims that there is an Audit Dispute under the License Agreement.  Notably, as previously stated, not a single one of the declarations submitted by the Individual Defendants alleges that there is an Audit Dispute.  Simply put, there has not been, nor is there now, any Audit Dispute, as defined in the License Agreement.  Cap Cana did not commission an internal audit to demonstrate a discrepancy with the Audit Report.  That did not happen because Cap Cana repeatedly acknowledged the amounts we claimed due.  This has always been a matter of how soon Cap Cana would pay the amounts owed.

**Trump Marks' claim for a receiver to be appointment should not be dismissed**

46. The factual allegations in the Complaint describe in detail the fraud and wrongdoing worked by Defendants against Trump Marks.  These allegations have been repeated thoroughly above and are incorporated again by reference here.

47. Also alleged in the Complaint, Defendants have squandered the money previously collected from the Estate Lot purchasers and now do not have the money to pay the License Fees due.  Moreover, Defendants have openly admitted to such inability to pay: *e.g.,* email dated October 4, 2010 sent on behalf of Defendants to Trump Marks, "Sorry for the delay in answering you.  We have had a lot of problems with our collections and we couldn't pay our obligations at (sic) time."  (*See* Exhibit T.) Additionally, in an email dated February 4, 2011 sent by Fernando Hazoury to Trump Marks, "[B]ut we have had very minimal number of creditors that are being paid in cash.

A large number of debts are being renegotiated or the payment is being accepted in alternate forms (exchanges), in order to liberate funds for the most essential cash payments."  (*See* Exhibit T.)

48.     Notwithstanding Cap Cana's inability to pay the money owed, Cap Cana does have, based upon the most recent Sales Report, 11 vacant Estate Lots on the market.  A receiver is needed to prevent Defendants from (1) improperly disposing of or wasting any of Cap Cana's remaining assets; (2) liquidating any assets for less than fair market value; (3) concealing or misappropriating any funds received from the sale of any of Cap Cana's assets; and (4) rendering Cap Cana completely judgment proof.

49.     Frankly, it would be a travesty to permit Defendants to waste or misappropriate Cap Cana's remaining assets and do further irreparable harm to Trump Marks.  Trump Marks is in imminent danger of Defendants wasting the 11 remaining Estate Lots and any additional money collected under existing contracts:  moreover, such a result would likewise work an irreparable harm to Trump Marks.

50.     Based upon the extensive allegations of fraud, the millions of dollars admittedly owed to Trump Marks, the existence of 11 remaining Estate Lots to be sold, the money being collected on existing contracts, and Cap Cana's admitted inability to pay what is owed to Trump Marks, Defendants' Motion seeking to dismiss Trump Marks' cause of action for a receiver must be denied.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Defendants' Motion in its

entirety.

Dated:  New York, New York
          January 17, 2012



Eric F. Trump

19